# 22-484-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

ARKANSAS TEACHERS RETIREMENT SYSTEM, WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD, PLUMBERS AND PIPEFITTERS PENSION GROUP,

*Plaintiffs-Appellees,*

*(Caption continued on inside cover)*

————

PURSUANT TO MARCH 9, 2022 ORDER GRANTING PERMISSION TO APPEAL
FROM AN ORDER GRANTING CERTIFICATION OF CLASS BY
THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
MASTER FILE NO. 1:10 CIV. 03461 (PAC)
THE HONORABLE PAUL A. CROTTY

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS

Kannon K. Shanmugam
Aimee W. Brown
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 223-7300

Audra J. Soloway
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(202) 373-3000

Robert J. Giuffra, Jr.
Richard H. Klapper
David M.J. Rein
Benjamin R. Walker
Julia A. Malkina
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Defendants-Appellants The Goldman Sachs Group, Inc.,*
*Lloyd C. Blankfein, David A. Viniar, and Gary D. Cohn*

May 11, 2022

Pension Funds, Ilene Richman, Individually and on behalf
of all others similarly situated, Pablo Elizondo, Thomas Draft,
Individually and on behalf of all others similarly situated,

*Plaintiffs,*

Howard Sorkin, Individually and on behalf of all others similarly situated,
Tikva Bochner, On behalf of herself and all others similarly situated, Dr. Ehsan
Afshani, Louis Gold, Individually and on behalf of all others similarly situated,

*Consolidated-Plaintiffs,*

—against—

Goldman Sachs Group, Inc., Lloyd C. Blankfein,
David A. Viniar, Gary D. Cohn,

*Defendants-Appellants,*

Sarah E. Smith,

*Consolidated-Defendant.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant The Goldman Sachs Group, Inc. does not have a parent corporation, and no publicly held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

*Page*

**JURISDICTIONAL STATEMENT** ........................................................1

**INTRODUCTION** .............................................................................2

**QUESTIONS PRESENTED** ...............................................................6

**STATEMENT OF THE CASE** ............................................................6

    A.    Legal Background ..............................................................6

    B.    Factual Background ...........................................................8

         1.    The generic challenged statements .............................8

         2.    The alleged "corrective disclosures" .......................11

    C.    Procedural History ..........................................................14

         1.    Defendants' evidence rebutting price impact ...........14

         2.    Plaintiffs' price-impact evidence ............................17

         3.    Prior certification decisions ....................................18

         4.    The Supreme Court's vacatur ..................................20

         5.    The district court's recertification decision ............21

**SUMMARY OF ARGUMENT** ...........................................................23

**STANDARD OF REVIEW** ...............................................................27

**ARGUMENT** ..................................................................................27

**I.**    **THE DISTRICT COURT ERRONEOUSLY FOUND PRICE IMPACT BY MISCONSTRUING THE SUPREME COURT'S DECISION IN THIS CASE** ..................................................28

A.     Under The Supreme Court's Framework, The Nature Of The Challenged Statements And Their Stark Mismatch With The "Corrective Disclosures" Decisively Refute Price Impact ................29

     1.     The challenged statements were exceedingly generic .............29

     2.     The district court misconstrued the Supreme Court's mismatch framework ...............................................34

     3.     Under the correct framework, there is a glaring informational mismatch between Defendants' generic challenged statements and Plaintiffs' three claimed "corrective disclosures" ............................................38

B.     A Common-Sense Analysis Of The Challenged Statements And Their Mismatch With The "Corrective Disclosures" Overwhelms Any Negligible Evidence Of Price Impact ...................43

     1.     Expert evidence about market perception reinforced a common-sense reading of the challenged statements ..............43

     2.     Defendants offered economic evidence rebutting price impact, while Plaintiffs offered no competing economic evidence ...................................................47

C.     At A Minimum, Any Price-Impact Finding Should Be Restricted To The Challenged Statements And "Corrective Disclosures" On Which The District Court Relied ...........................51

II.     THE DISTRICT COURT ERRONEOUSLY EXTENDED THIS COURT'S INFLATION-MAINTENANCE THEORY ...........................53

A.     Price Impact Cannot Turn On "Corrective Disclosures" That Did Not Match The Challenged Misstatements ...............................54

     1.     This Court has applied the inflation-maintenance theory only in circumstances involving a near-perfect match .............55

     2.     The district court's expansion would unmoor the inflation-maintenance theory from any reasonable measure of price impact ............................................57

B. The Resulting Affirmative-Disclosure Regime Would Conflict With This Court's Consistent Precedents ..........................................61

**III.** **THE DISTRICT COURT'S DECISION SHOULD BE REVERSED**...............................................................................63

**CONCLUSION**............................................................................................65

# TABLE OF AUTHORITIES

*Page(s)*

## Cases:

*Altayyar* v. *Etsy, Inc.*,
 731 Fed. Appx. 35 (2d Cir. 2018)..................................................30, 33

*Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)........................................................................7

*Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*,
 11 F.4th 138 (2d Cir. 2021) (*Goldman III*)...................................21, 29

*Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*,
 955 F.3d 254 (2d Cir. 2020) (*Goldman II*) ...................................*passim*

*Arkansas Teachers Ret. Sys.* v. *Goldman Sachs Grp.*,
 879 F.3d 474 (2d Cir. 2018) (*Goldman I*) ...........................18, 19, 27

*Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund*
 *Samruk-Kazyna JSC*,
 2022 WL 151302 (2d Cir. Jan. 18, 2022) .........................................49

*Basic Inc.* v. *Levinson*,
 485 U.S. 224 (1988)......................................................................*passim*

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
 506 Fed. Appx. 32 (2d Cir. 2012)......................................................30

*Bowers* v. *Transportacion Maritima Mexicana, S.A.*,
 901 F.2d 258 (2d Cir. 1990) ..............................................................63

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *MBIA, Inc.*,
 637 F.3d 169 (2d Cir. 2011) ..............................................................60

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
 752 F.3d 173 (2d Cir. 2014) ..........................................................*passim*

*Dirks* v. *SEC*,
 463 U.S. 646 (1983)..........................................................................45

*Dodona I, LLC* v. *Goldman Sachs & Co.*,
132 F. Supp. 3d 505 (S.D.N.Y. 2015) ..................................................................13

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)...................................................................................6, 49

*ECA, Local 134* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ..................................................................30, 33, 47

*Employees' Ret. Sys.* v. *Whole Foods Market, Inc.*,
905 F.3d 892 (5th Cir. 2018) ...............................................................................50

*Fogel* v. *Vega*,
759 Fed. Appx. 18 (2d Cir. 2018).......................................................................30

*In re Goldman Sachs Grp. Sec. Litig.*,
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) ...................................................18

*In re Goldman Sachs Grp. Sec. Litig.*,
2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018)....................................................19

*Goldman Sachs Grp.* v. *Arkansas Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021)................................................................................*passim*

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)........................................................................7, 26, 54, 60

*Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ................................................................................30

*Lopez-Esparza* v. *Holder*,
770 F.3d 606 (7th Cir. 2014) .............................................................................48

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)..............................................................................................61

*Plumbers & Steamfitters Local 773* v. *Danske Bank*,
11 F.4th 90 (2d Cir. 2021) ....................................................................30, 31, 61

*In re Proshares Tr. Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013) ................................................................................61

*Reese* v. *Bahash*,
   574 Fed. Appx. 21 (2d Cir. 2014)...............................................................30, 33

*Reynolds* v. *Giuliani*,
   506 F.3d 183 (2d Cir. 2007) ..................................................................63

*Scott* v. *GM*,
   605 Fed. Appx. 52 (2d Cir. 2015)...........................................................33

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ...............................................30, 33, 34, 61

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021) ..................................................................30

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ..................................................................27

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ..........................................................*passim*

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) .......................................................56, 57, 59

## Statutes, Rules, and Regulations:

15 U.S.C.
   § 78aa ....................................................................................................1
   § 78j(b) .........................................................................................*passim*
   § 78t(a) ..................................................................................................1
   § 78u-4(b)(1) .......................................................................................32

28 U.S.C. § 1331 ....................................................................................1

17 C.F.R.
   § 229.101..............................................................................................62
   § 240.10b-5 ...........................................................................................1

Federal Rule of Civil Procedure 23(b)(3) ...............................................7

Federal Rule of Civil Procedure 23(f) .............................................*passim*

## Other Authorities:

A. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 Wash. U. L. Rev. 1821 (2021) ........................................................62

Goldman Sachs, *1999 Annual Report* (2000), https://www.goldmansachs.com/investor-relations/financials/ archived/annual-reports/attachments/1999-annual-report.pdf ...........................9

Goldman Sachs, *Goldman Sachs Introduces 14 Business Principles That Define the Firm*, https://www.goldmansachs.com/our-firm/history/moments/1979-business-principles.html .........................................9

Goldman Sachs, *Form 10-K* (2003), https://www.goldmansachs.com/investor-relations/financials/ archived/10k/docs/2002-10-k.pdf ........................................................9

V. Monga & E. Chasan, *The 109,894-Word Annual Report*, Wall Street J. (June 2, 2015) ........................................................62

## JURISDICTIONAL STATEMENT

The district court has federal-question jurisdiction over this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. On December 8, 2021, following remand from this Court, the district court granted Plaintiffs' renewed motion for class certification. Special Appendix (SA) 1-28. On December 22, 2021, Defendants timely petitioned under Federal Rule of Civil Procedure 23(f) for leave to appeal, and this Court granted the petition on March 9, 2022. Joint Appendix (JA) 4730.

## INTRODUCTION

Plaintiffs seek to represent a shareholder class alleging that Goldman Sachs committed securities fraud when it repeated longstanding generic statements about its business principles and conflicts risks. To show classwide reliance on those statements, Plaintiffs invoke the "fraud-on-the-market" presumption established in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). But the *Basic* presumption applies only if the allegedly fraudulent statements affected a company's stock price, and Goldman's generic statements never did.

The Supreme Court has provided new legal guidance on the appropriate assessment of price impact in this case. Under that guidance, it is clear that no class can be certified here. In reviewing the district court's second certification of the proposed class, the Supreme Court instructed that the "generic nature" of asserted misstatements "often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory" of securities fraud—the theory on which Plaintiffs rely. *Goldman Sachs Grp.* v. *Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021). The Court further cautioned that the inflation-maintenance theory "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," especially when the misrepresentation is "generic" and the corrective disclosure is "specific." *Id.*

If this case does not present such an impermissible "mismatch" between generic purported misstatements and specific claimed "corrective disclosures," then it is difficult to imagine any case in which the Supreme Court's guidance would have a meaningful effect. Since 1979, before it became a public company, Goldman— like most of corporate America—has propounded firmwide principles, aspiring to put its "clients' interests . . . first"; to act with "integrity"; and to comply with "the laws, rules and ethical principles that govern us." JA3203. Goldman—again, like most of corporate America—has also long warned investors of risks inherent in its business, including "conflicts of interest." JA3278. It is undisputed that none of those broad and ubiquitous statements affected Goldman's stock price when made.

But in April and June 2010, something else *did* affect Goldman's stock price: news of actual or rumored government enforcement activity involving alleged conflicts of interests in two collateralized debt obligations (CDOs) that Goldman had sold to sophisticated institutions several years earlier. Under Plaintiffs' theory, Goldman's stock price subsequently fell not for the obvious reason—uncertainty over the reported enforcement activity—but because investors supposedly learned that Goldman's longstanding descriptions of its firmwide values and conflicts risks had been "false" when Goldman repeated them during the 2007 to 2010 class period.

Plaintiffs' theory cannot survive the Supreme Court's decision in this case. Goldman's challenged statements could hardly be more generic, and their generic

-3-

nature is "important evidence" of their lack of price impact. *Goldman*, 141 S. Ct. at 1961. There was also a stark mismatch between Goldman's front-end statements about corporate values and risks, and Plaintiffs' claimed back-end "corrective disclosures" revealing actual or rumored government enforcement activity involving conflicts in two CDOs. And Plaintiffs offered no economic evidence to counter the "common sense" conclusion based on the statements themselves that Goldman's generic statements lacked price impact. *Id.* at 1960.

In nevertheless certifying a class for the third time, the district court committed at least two legal errors requiring reversal. *First*, it understated the generic nature of the challenged statements and misconstrued the Supreme Court's direction that courts should consider any "mismatch" in specificity and content between a challenged statement and a "corrective disclosure." Instead, the district court interpreted the Supreme Court's mismatch framework to require only that the purported "corrective disclosure" "implicate" the same general subject matter as the asserted misrepresentation. SA27. If allowed to stand, the district court's subject-matter test would vitiate the Supreme Court's decision: Virtually any misconduct "implicates" some prior broad corporate statement about objectives or policies, but that does not mean that any disclosure of specific misconduct "actually corrected the generic misrepresentation." *Goldman*, 141 S. Ct. at 1961.

*Second*, by tolerating a broad mismatch here, the district court extended the inflation-maintenance theory well beyond the circumstances that this Court contemplated in *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016). In *Vivendi*, this Court held that a specific misstatement that maintains a company's stock price can have price impact if a truthful version of that statement would have decreased the stock price. By contrast, the district court here held that generic statements can have inflation-maintaining impact if, in place of such generic statements, disclosures of specific misconduct would have decreased the stock price. As a result, the court rendered a finding of price impact—and, thus, class certification—nearly automatic whenever a defendant makes generic statements about its integrity, reputation, or internal controls, as nearly every company does, and later commits some undisclosed misconduct. Under the district court's rule, companies could avoid class certification in those circumstances only if they also affirmatively disclosed the uncharged misconduct—a duty that this Court has repeatedly disavowed.

The district court's two mutually reinforcing errors stripped the Supreme Court's ruling of its practical import. Those errors would either render price impact irrebuttable in inflation-maintenance cases or usher in a regime of mandatory disclosure of uncharged misconduct. This Court should apply the Supreme Court's decision and reverse.

-5-

## QUESTIONS PRESENTED

1.      Whether the district court misconstrued the Supreme Court's decision in this case, which required that, to certify a class based on the inflation-maintenance theory of securities fraud, a court must consider the "generic nature of a misrepresentation" and whether the alleged misrepresentation and "corrective disclosure" match in their level of specificity and content.

2.      Whether the district court erroneously expanded this Court's inflation-maintenance theory to presume price impact from a public company's non-disclosure of uncharged misconduct.

3.      Whether reversal rather than vacatur is warranted.

## STATEMENT OF THE CASE

Defendants appeal from a decision by the U.S. District Court for the Southern District of New York (Crotty, J.) granting Plaintiffs' motion for class certification, for the third time, on remand from this Court's vacatur of the district court's second class-certification decision.  The district court's opinion is available at 2021 WL 5826285.  *See* SA1-28.

### A.    Legal Background

Under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), private plaintiffs must demonstrate reliance on a material misrepresentation.  *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-342

(2005). The reliance element would ordinarily preclude classwide Section 10(b) claims under Federal Rule of Civil Procedure 23(b)(3), because individualized inquiries into whether each class member purchased stock in reliance on the alleged misrepresentation would predominate over common questions. In *Basic*, however, the Supreme Court adopted a "rebuttable presumption" of classwide reliance. 485 U.S. at 242. That presumption reflects a "fraud-on-the-market" theory, under which a company's stock price in an efficient market is presumed to reflect all public information about the company (including any material misrepresentations). *Id.* at 247. As a result, courts may presume that investors relied on a public company's material misrepresentations in buying or selling securities. *See Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 461-462 (2013).

In *Basic* itself, the Supreme Court recognized that a defendant could rebut the presumption of reliance by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." 485 U.S. at 248. The Court later confirmed that a defendant has the right to introduce any evidence showing that "the asserted misrepresentation (or its correction) did not affect the market price." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 279-280 (2014). "[I]n the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 278.

Plaintiffs typically seek to prove price impact by showing that a misrepresentation caused the defendant's stock price to rise. But when an alleged misstatement does not increase a company's stock price, the "inflation-maintenance" theory may apply. Under that theory, which Plaintiffs rely on here, a misstatement need not fraudulently inflate a stock's price when made, but instead may fraudulently prevent a previously inflated stock price from declining. *See Vivendi*, 838 F.3d at 257. In such circumstances, plaintiffs typically attempt "to prove the amount of inflation indirectly," by claiming that a back-end price drop "is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman*, 141 S. Ct. at 1961. Defendants, in turn, may rebut price impact by challenging that inference, or offering any other evidence relevant to price impact. *Id.* at 1960-1961.

### B.     Factual Background

#### 1.     The generic challenged statements

Plaintiffs seek to represent a class of Goldman shareholders between February 5, 2007, and June 10, 2010. They allege that Goldman made two categories of false statements that fraudulently maintained its stock price.

*First*, Plaintiffs challenge certain of Goldman's aspirational "business principles," along with public statements reiterating those principles. JA97. Goldman has provided its business principles to employees since 1979, and has

published them in its annual reports since 2000.[1]  Plaintiffs allege that certain of

those principles were fraudulent from 2007 to 2010, JA97, including:

- "Our clients' interests always come first.  Our experience shows that if we serve our clients well, our own success will follow."

- "We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us.  Our continued success depends upon unswerving adherence to this standard."

- "Integrity and honesty are at the heart of our business."  JA3203.

*Second*, Plaintiffs challenge Goldman's generic warning about the risks of

conflicts of interest inherent in its complex global business.  Since 2003, that

warning has appeared in similar form in the mandatory "Risk Factors" section of

Goldman's annual Form 10-K filings.[2]  Plaintiffs again allege that the warning was

fraudulent from 2007 to 2010.  JA98.  Over that period, the warning stated, in

relevant part:

---

[1]     *See* Goldman Sachs, *Goldman Sachs Introduces 14 Business Principles That Define the Firm*, https://www.goldmansachs.com/our-firm/history/moments/1979-business-principles.html; Goldman Sachs, *1999 Annual Report* 82 (2000), https://www.goldmansachs.com/investor-relations/financials/archived/annual-reports/attachments/1999-annual-report.pdf.

[2]     *See* Goldman Sachs, *Form 10-K* 20 (2003), https://www.goldmansachs.com/investor-relations/financials/archived/10k/docs/2002-10-k.pdf.

***Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses.***

Our reputation is one of our most important assets.  As we have expanded the scope of our businesses and our client base, we increasingly have to address potential conflicts of interest. . . .

We have extensive procedures and controls that are designed to identify and address conflicts of interest . . . .  However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and our reputation could be damaged and the willingness of clients to enter into transactions in which such a conflict might arise may be affected if we fail, or appear to fail, to identify and deal appropriately with conflicts of interest.  In addition, potential or perceived conflicts could give rise to litigation or enforcement actions.

JA3278 (emphasis in original).

None of the challenged statements referred to any particular transaction, business, or procedure.  Nor did those generic statements promise that the company would always avoid or successfully manage conflicts, or claim that Goldman had better conflicts management than its peers.  To the contrary, the conflicts warning described conflicts as one "of the more important" "risks that [were] substantial and inherent in [Goldman's] businesses."  JA3271.  Reinforcing that warning, Goldman's Form 10-K filings also summarized pending litigation arguably

involving alleged conflicts, such as breaches of fiduciary duties or violations of disclosure requirements.  *See* JA3145-3157, 3282-3291, 3409-3418, 3553-3562.

There was no statistically significant increase in Goldman's stock price on any of the 18 dates on which the challenged statements were made during the class period.  SA7; *see* JA2193.

## 2.    The alleged "corrective disclosures"

Plaintiffs allege that Defendants' generic statements about Goldman's business principles and conflicts risks were false because of alleged misconduct involving four CDOs in 2006 and 2007.  *See* JA90-91, 95-96, 101.  The four CDOs—Abacus, Hudson, Anderson, and Timberwolf—referenced residential mortgage-backed securities composed of subprime mortgages.  JA62, 103-104, 111, 118. Plaintiffs allege that Goldman put its interests, or those of one client, ahead of the interests of other CDO purchasers, all sophisticated institutions with which Goldman traded in arm's-length transactions.  JA62-72, 95, 101-130.

Starting in 2007, there were multiple public reports of Goldman's alleged conflicts of interest in CDO transactions, with several notable reports in late 2009. JA2496-2502.  For example, in November 2009, Gregory Zuckerman published his bestselling book *The Greatest Trade Ever*, detailing the core alleged conflict in the Abacus CDO:  a hedge-fund manager who planned to take a short position "would pick a hundred or so mortgage bonds for" Abacus, and Goldman "didn't see anything

wrong with [the] request and agreed to work with his team." JA2935-2936. In December 2009, *The New York Times* reported that the same hedge-fund manager had "persuaded Goldman Sachs . . . to put together [CDOs] which were filled with nasty mortgages that he could then short," but "nobody told" the other CDO purchasers. JA2943. Later that month, *The New York Times* reported in a front-page story that "Goldman kept a significant amount of the financial bets against securities in Hudson, so it would profit if they failed," supposedly "put[ting] the firm[] at odds with [its] own clients' interests." JA2944-2945. None of these public reports had any impact on Goldman's stock price. JA1551; *see* SA10, 13.

Plaintiffs nevertheless claim that three supposed "corrective disclosures"—published months or years after various public reports—revealed, for the first time, the falsity of Defendants' generic business principles and conflicts warning:

- ***April 16, 2010***:  The SEC filed a highly publicized enforcement action alleging that Goldman had committed fraud by not disclosing to potential purchasers of the Abacus CDO that a hedge fund with a substantial short position had "played an active and determinative role in the asset selection process."  JA66, 146-147, 3581.

- ***April 30, 2010***: *The Wall Street Journal* reported a rumor that the Department of Justice was investigating Goldman over unspecified "mortgage trading." JA149, 3613.  The same report noted that "[i]t couldn't be determined which Goldman deals are being scrutinized."  JA3615.

- ***June 10, 2010***: The press "reported that the SEC was investigating whether[,] in connection with the Hudson CDO, Goldman profited by" selling the CDO to clients knowing the CDO would decline in value. JA150, 3617.

In the end, the Department of Justice never brought any criminal charges against Goldman over its mortgage trading. The SEC did not bring an enforcement action regarding the Hudson CDO, and Goldman won summary judgment on claims by Hudson purchasers because the Hudson offering documents "indicated to [purchasers] that a Goldman subsidiary stood to gain if there were an adverse credit event" on the underlying subprime mortgages. *Dodona I, LLC* v. *Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 516 (S.D.N.Y. 2015). Goldman and the SEC settled the sole government enforcement action, which concerned Goldman's alleged failure in the Abacus CDO to disclose one client's involvement in asset selection. *See* JA665. Notably, even though Plaintiffs also allege "undisclosed fraudulent conduct" with respect to the Timberwolf and Anderson CDOs, JA101, none of the claimed "corrective disclosures" mentioned or revealed any misconduct in either Timberwolf or Anderson. *See* JA146-151.

The longstanding statements about Goldman's values and risks were never themselves the subject of any government enforcement action or, to Defendants' knowledge, any government investigation. Plaintiffs nevertheless brought this suit, asserting that those challenged statements had "defrauded" Goldman's shareholders.

-13-

Plaintiffs seek more than $13 billion, JA48, far more than the CDO purchasers—*i.e.*, those directly affected by any misconduct in the CDOs—sought or received.

## C.    Procedural History

In 2015, invoking the *Basic* presumption, Plaintiffs first moved to certify a class.  Because the challenged statements did not increase Goldman's stock price when made, Plaintiffs relied on the "inflation-maintenance" theory to assert that the statements maintained an already-inflated stock price—without ever identifying the conduct or statements that actually introduced that inflation in the first place.  *See* SA7, 23.   Meanwhile, to rebut the *Basic* presumption, Defendants submitted extensive expert evidence that their generic statements had no impact on Goldman's stock price, either when made or when the "truth" supposedly was revealed.

### 1.    Defendants' evidence rebutting price impact

a.    The generic nature of Goldman's business principles and conflicts warning made them inherently unlikely to influence investors.  To buttress that common-sense assessment, Defendants presented expert testimony from Dr. Laura Starks, whose academic research focuses on "the decision-making process of investors." JA2594.  Dr. Starks opined that generic statements like those challenged here are irrelevant to investors' decision-making.  Specifically, she explained that Goldman's aspirational business principles were not the "types of statements that investors find to be pertinent to making investment decisions" because they

-14-

contained no information about "revenue, earnings, cash flows, dividends, [or] profitability."  JA2598-2601.  Goldman's conflicts warning similarly did not "provide any specific information that an investor . . . could reasonably use" to distinguish the company from its competitors, and investors would not rely on it to assess the company's "future financial performance or value."  JA2608-2613.

Dr. Starks further explained that the challenged statements are pervasive among public companies and thus did not differentiate Goldman from its peers.  She identified more than 30 companies—including JP Morgan, Citigroup, and Morgan Stanley—that made indistinguishable statements.  Indeed, "every company" that she examined "made public statements analogous to" the challenged statements.  JA2610-2613.  Dr. Starks concluded that "the prevalence of these kinds of general statements in company communications is indicative of their lack of information content for investors in determining the future financial performance or value of a company."  JA2613.

Dr. Starks also showed that stock analysts did not view the challenged statements here as containing information that affected Goldman's value.  JA2627.  Because analysts are "a useful measure of the information that investors would deem most significant," Dr. Starks examined all 880 analyst reports on Goldman during the class period.  JA2614, 2616-2633.  She found that *not one* analyst report mentioned the business principles or conflicts warning, confirming that analysts "did

not view the statements as containing information pertinent to [] investment decision-making." JA2627, 2632. Instead, consistent with her academic research, "analysts focused on the themes of growth, management and strategy, profitability, financial position, and market conditions." JA2619.

b. In addition to Dr. Starks, Defendants presented two experts who studied the economic effects of Goldman's challenged statements and Plaintiffs' purported "corrective disclosures." Dr. Paul Gompers showed that Goldman's stock price did not experience a statistically significant drop after widely publicized reports of alleged conflicts on 36 separate dates before the "corrective disclosures"—including reports on the front pages of *The Wall Street Journal* and *The New York Times*. JA615-620, 2389-2396, 2404-2406. Those press reports detailed allegations that Goldman had conflicts with purchasers of the very CDOs at issue here. *See* JA615-620. Plaintiffs did not dispute that those prior reports lacked any price impact. *See* SA13.

Dr. Stephen Choi showed that news of government enforcement, not any "correction" of the challenged statements, explained the stock-price declines on the three "corrective disclosure" dates. JA2558-2560. Based on a review of "all [SEC] enforcement actions against publicly traded companies" over a five-year period, Dr. Choi found that Goldman's stock-price decline after the SEC filed its Abacus complaint was "not statistically different from" declines experienced by other

-16-

companies in response to news of similar enforcement actions.   JA2525; *see* JA2524-2535.  He thus concluded that the SEC action "likely accounted for the full" amount of the decline on Plaintiffs' first "corrective disclosure" date.  JA2518, 2526. He reached a similar conclusion for the other two dates.  JA2550-2558.

### 2.    Plaintiffs' price-impact evidence

In response, Plaintiffs presented one expert, Dr. John Finnerty, who was offered as an expert on market efficiency and damages, not investor decision-making.  JA1254-1257, 2187-2190.  Dr. Finnerty disputed the methods and opinions of Defendants' experts.  SA13-15.  He also reviewed more than 1,500 news articles and analyst reports discussing Goldman, *see* JA2102-2182, but identified only three articles even tangentially related to the challenged statements, JA1201; *see* JA2040-2041.

As for economic evidence, Dr. Finnerty showed that the stock-price declines on Plaintiffs' three "corrective disclosure" dates were statistically significant, which Goldman never disputed.  JA2787-2788, 2792, 2793.  Dr. Finnerty acknowledged that "[w]hen enforcement actions are announced, they are almost always met with a strong negative reaction," regardless of the underlying allegations.  JA641, 643.  But he admittedly made no attempt to isolate the price impact of the challenged statements from news of the SEC's Abacus complaint or other rumored government enforcement actions.  JA660.  Instead, he speculated that Goldman's stock-price

-17-

declines on the three "corrective disclosure" dates were "substantially caused by a series of revelations concerning Goldman's alleged fraudulent conduct related to the management of its conflicts of interest and its business principles." JA2190-2191.

Dr. Finnerty made no other attempt to explain how the generic challenged statements affected Goldman's stock price. He conceded that he did not "do any work to assess whether any inflation entered Goldman Sachs' stock price prior to the start of the class period." JA4616. Rather, he "was asked to assume the allegations in the complaint" as to the challenged statements' supposedly inflationary impact. *Id.* He also conceded that he "d[id]n't know" whether "the stock price [would] have fallen" if "Goldman had not made the statements." JA4630.

### 3. Prior certification decisions

a. In initially certifying the class, the district court expressly declined to consider the nature of the challenged statements themselves, ruling that such evidence related only to "the statements' materiality and not price impact." *In re Goldman Sachs Grp. Sec. Litig.*, 2015 WL 5613150, at *6 (S.D.N.Y. Sept. 24, 2015). This Court granted Rule 23(f) review and vacated. *Arkansas Teachers Ret. Sys.* v. *Goldman Sachs Grp.*, 879 F.3d 474 (2d Cir. 2018) (*Goldman I*). It instructed the district court on remand to (i) apply the preponderance-of-the-evidence standard in deciding whether Defendants had shown that the challenged statements lacked price

-18-

impact; and (ii) consider the price-impact evidence that the court had previously disregarded, including the highly publicized reports of Goldman conflicts that pre-dated Plaintiffs' "corrective disclosures." *Id.* at 485-486.

b. On remand, the district court recertified the class, again giving no weight to the generic nature of the challenged statements. *In re Goldman Sachs Grp. Sec. Litig.*, 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018). This Court again granted Rule 23(f) review, and affirmed in a divided opinion. *Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*, 955 F.3d 254 (2d Cir. 2020) (*Goldman II*), *vacated*, 141 S. Ct. 1951 (2021). The majority rejected Defendants' arguments that the district court had erred in refusing to consider evidence about the generic nature of the challenged statements, expressing concern that such an analysis would "smuggl[e] materiality into Rule 23." *Id.* at 267. It also concluded that the district court had not clearly erred in weighing the remaining evidence. *Id.* at 271.

Judge Sullivan dissented. He concluded that "no reasonable investor would have attached any significance to the generic statements on which Plaintiffs' claims are based." *Id.* at 278. He also warned that if Plaintiffs could "neutralize[]" all of Defendants' evidence "by the mere assertion that the SEC's repackaging of [prior] disclosures must have" had *some* effect on Goldman's stock price, "then the *Basic* presumption is truly irrebuttable." *Id.* at 275, 278.

### 4.     The Supreme Court's vacatur

The Supreme Court granted review and vacated this Court's decision. It clarified in several critical respects the standard for considering a price-impact defense.

*First*, the Supreme Court explained that "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory." *Goldman*, 141 S. Ct. at 1961. That is because "a more-general statement will affect a security's price less than a more-specific statement on the same question." *Id.* at 1960 (citation omitted). The Court observed that both "expert testimony" and "common sense" can shed light on "whether a generic misrepresentation had a price impact." *Id.*

*Second*, the Supreme Court held that plaintiffs invoking the inflation-maintenance theory cannot simply speculate that a stock drop after a negative disclosure equals "the amount of inflation maintained by [an] earlier misrepresentation." *Id.* at 1961. To the contrary, the inference "that the back-end price drop equals front-end inflation[] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Such a mismatch occurs when, for example, "the earlier misrepresentation is generic . . . and the later corrective disclosure is specific." *Id.* The Court gave as an example of a fatal mismatch a generic statement that "we have faith in our business model,"

-20-

followed by a specific "corrective disclosure" that "our fourth quarter earnings did not meet expectations." *Id.*

*Third*, the Supreme Court observed that a defendant's burden of persuasion should "have bite" only in the "rare[]" case in which the evidence is "in equipoise." *Id.* at 1963. Otherwise, "[t]he district court's task is simply to assess *all* the evidence of price impact—direct and indirect—and determine whether it is *more likely than not* that the alleged misrepresentations had a price impact." *Id.* (emphases added).

### 5. The district court's recertification decision

This Court recognized that the Supreme Court's decision contained three "new ideas" and instructed the district court on remand to "apply the legal standard as supplemented by the Supreme Court." *Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*, 11 F.4th 138, 143-144 (2d Cir. 2021) (*Goldman III*).

On remand, and without reopening the record or hearing argument, the district court recertified the class. SA28; *see* SA5 n.3. The court explained that "the heart of the parties' post-appeal dispute" was "the extent of the alleged misstatements' generic nature, and any accompanying effect on the inference of price impact." SA19. The court recognized that some of the challenged statements "present as platitudes," but stated that, "when read in conjunction with" other statements, they were not "so generic as to diminish their power to maintain pre-existing price inflation." SA20. Although acknowledging that the challenged statements and

"corrective disclosures" "do not present *equivalent* levels of genericness," the court then concluded that no significant mismatch existed between Goldman's generic statements and Plaintiffs' claimed "corrective disclosures." SA27; *see* SA26-28. Critically, the court did not compare the contents of any of the challenged statements with the alleged "corrective disclosures." Rather, it thought that it was sufficient that the challenged statements and "corrective disclosures" "implicate[d] the[] same" general subject matter: "conflicts and Goldman's infrastructure for managing them." SA27; *see* SA24 (disclosures "implicated the substance of the alleged misstatements").

As to the remaining evidence, the district court agreed with some of Dr. Finnerty's criticisms of Defendants' experts, including that Dr. Starks's analysis of analyst reports was too "narrow[]"; that the purported "corrective disclosures" differed from the prior reports of conflicts that Dr. Gompers had studied; and that Dr. Choi's analysis had methodological weaknesses. SA17-18. The court nevertheless "credit[ed] Dr. Starks' testimony that some of the alleged misstatements here were unlikely, in a vacuum, to consciously influence investor behavior," SA21, and accepted that news of enforcement actions may have contributed to the stock-price declines, SA17-18. On the other side of the balance, the court uncritically accepted Dr. Finnerty's conclusory assertion that the declines on the three "corrective disclosure" dates were "linked" to the subject of the

-22-

challenged statements. SA16-17. It also accepted his speculation that "truthful, contrary substitutes for the alleged misstatements"—apparently meaning disclosures of "the details and severity of" alleged conflicts in the Abacus and Hudson CDOs—"*would* have impacted investors' subsequent decision-making." SA21 (citation omitted).

## SUMMARY OF ARGUMENT

"Tak[ing] into account *all* record evidence relevant to price impact," the generic challenged statements here "'did not actually affect the market price of the stock.'" *Goldman*, 141 S. Ct. at 1959, 1961 (quoting *Halliburton*, 573 U.S. at 284). In nevertheless recertifying the class for the third time, the district court committed multiple legal errors, each of which independently supports reversal.

I. The Supreme Court has now made clear that "the generic nature of a misrepresentation" and any "mismatch between the contents of the misrepresentation and the corrective disclosure" are "important evidence of a lack of price impact." *Goldman*, 141 S. Ct. at 1961. The district court got both of those "important" analyses wrong.

*First*, the challenged statements here were exceedingly generic. In case after case, this Court has concluded that no investor would reasonably rely on nearly identical statements. Yet rather than conducting a similar common-sense assessment about whether the challenged statements here in fact affected Goldman's stock price,

-23-

the district court erroneously minimized their genericness. It declared, without explanation, that all of the challenged statements, including those that "present as platitudes," were not "so generic as to diminish their power to maintain pre-existing price inflation." SA20.

*Second*, the district court misconstrued the Supreme Court's mismatch framework. The district court applied its own subject-matter test, under which the challenged statements and "corrective disclosures" need only "implicate" the same general subject. SA24, 27. That lax test allowed the district court to declare a match here without identifying what new information the "corrective disclosures" added or comparing that information to Goldman's alleged misstatements. But as the Supreme Court explained, a "corrective disclosure" must be capable of "actually correct[ing] the generic misrepresentation." *Goldman*, 141 S. Ct. at 1961. And as the Supreme Court's own example illustrates, that requires a match not just in subject matter, but also in content and specificity. *See id.* Here, there was a stark mismatch between the challenged statements—aspirational, firmwide statements of corporate values and a general, firmwide warning of conflicts—and Plaintiffs' three claimed "corrective disclosures," which at most reported details of, or investigations into, previously reported conflicts in the Abacus and Hudson CDOs.

Applying the Supreme Court's directions, this Court should decertify the class. In response to Defendants' common-sense and expert evidence about the

nature of the challenged statements and their mismatch with the "corrective disclosures," Plaintiffs introduced negligible contrary evidence of price impact. Their sole expert, Dr. Finnerty, identified at most three news articles tangentially related to the challenged statements, out of more than 1,500 news and analyst reports about Goldman—underscoring rather than rebutting evidence from Dr. Starks that investors did not value such generic and ubiquitous statements. And, in contrast with Defendants' experts, Dr. Finnerty offered no economic evidence attempting to isolate any price impact of the "corrective disclosures." Taking into account the full evidentiary record, the only permissible conclusion is that the challenged statements lacked price impact.

At a minimum, any class in this case can extend no broader than the district court's price-impact rationale. Because the district court gave no explanation for concluding either that the business principles had price impact or that the second or third "corrective disclosures" matched up with the conflicts warning, the class should at least be limited to claims involving the conflicts warning and the first "corrective disclosure."

II. By using specific "corrective disclosures" to infer the price impact of generic challenged statements, the district court also improperly extended the inflation-maintenance theory. The court justified its price-impact finding by observing that investors would have responded if, instead of speaking about its

business principles and conflicts risks, Goldman had revealed the details of specific CDO conflicts related to the "corrective disclosures." *See* SA21-23. Under that reasoning, the price impact of even the most generic challenged statement can be presumed based on the price impact of later revelations of specific misconduct. By contrast, this Court has applied the inflation-maintenance theory only where a near-perfect match exists between the challenged statements and the "corrective disclosures," such that "the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *Vivendi*, 838 F.3d at 255 (citation omitted).

The district's court's expansion of the inflation-maintenance theory would have two illogical effects. *First*, it would untether the price-impact analysis from "the particular misrepresentation at issue"—undermining the foundational premise of the *Basic* presumption. *Halliburton*, 573 U.S. at 279. *Second*, because virtually all public companies make broad statements about their principles and risks, it would require those companies to disclose affirmatively any specific misconduct, to avoid the certification of a securities class if such misconduct later causes a stock drop. That result would contradict this Court's repeated instruction that "[d]isclosure is not a rite of confession," and that companies have no affirmative duty to "disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

-26-

III.   Once this Court corrects the district court's legal errors, it should reverse rather than remand.   Because the evidence here supports only one conclusion—a finding of no price impact—a fourth remand would serve no purpose.

## STANDARD OF REVIEW

This Court reviews the discretionary aspects of a class-certification decision for "abuse of discretion," but "review[s] *de novo* any issues of law underlying the Rule 23 ruling." *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008); *see Goldman I*, 879 F.3d at 482.   As discussed below, the district court's class-certification decision rested on multiple erroneous legal conclusions, including a misconstruction of the Supreme Court's mismatch framework and an unwarranted expansion of the inflation-maintenance theory.

## ARGUMENT

On remand, the district court's task was "simply to assess all the evidence of price impact—direct and indirect—and determine whether it [was] more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963.   But the court misconstrued the Supreme Court's direction on the critical price-impact evidence in the case:  the generic challenged statements and their mismatch with the purported "corrective disclosures."   SA26-28.   That error also led the court to apply an unduly expansive version of the inflation-maintenance theory, in

circumstances that this Court has never endorsed, and that the theory's animating principles cannot justify.  Those legal errors warrant reversal.

## I.  THE DISTRICT COURT ERRONEOUSLY FOUND PRICE IMPACT BY MISCONSTRUING THE SUPREME COURT'S DECISION IN THIS CASE.

Three categories of evidence bear on price impact here.  *First*, and most significantly, the nature of the generic challenged statements and their mismatch with the asserted "corrective disclosures" are "important," "common sense" evidence that weighs decisively against price impact.  *Goldman*, 141 S. Ct. at 1960-1961.  *Second*, press and analyst reports underscored that investors did not value the aspirational, ubiquitous statements at issue.  *Third*, Defendants introduced expert economic evidence confirming the absence of price impact, while Plaintiffs introduced only their expert's speculation and say-so.

Despite that lopsided evidence, the district court erroneously found price impact by misconstruing the Supreme Court's directions regarding the first and most important category of evidence:  the challenged statements themselves.  The district court minimized the generic nature of the statements and applied its own subject-matter test that glossed over the significant mismatch between the challenged statements and the purported "corrective disclosures."  Once this Court corrects those legal errors, the record supports only one conclusion:  that the challenged statements lacked price impact.

**A.  Under The Supreme Court's Framework, The Nature Of The Challenged Statements And Their Stark Mismatch With The "Corrective Disclosures" Decisively Refute Price Impact.**

**1.  The challenged statements were exceedingly generic.**

As the Supreme Court has now confirmed, the generic nature of a challenged statement is critical evidence weighing against price impact.  *See Goldman*, 141 S. Ct. at 1960-1961.  After all, "a more-general statement will affect a security's price less than a more-specific statement on the same question."  *Id.* at 1960 (citation omitted).  Under that common-sense approach, Defendants' challenged statements are "more-general."  The Supreme Court repeatedly characterized those statements as "generic," *see id.* at 1957-1961, 1963, and this Court did the same, *Goldman III*, 11 F.4th at 142-143.  But the district court resisted both the Supreme Court's and this Court's characterizations and understated the genericness of the asserted misstatements, determining that they "were not *so* generic as to diminish their power to maintain pre-existing price inflation."  SA20 (emphasis added).  That conclusion was wrong.

a.  The challenged business principles—such as "[o]ur clients' interests always come first" and "[i]ntegrity and honesty are at the heart of our business"— are quintessentially aspirational.  JA3203.  They are broad pronouncements of corporate values like those made by almost every public company.  *See* JA2603.  This Court has repeatedly held that such "[g]eneral statements about reputation,

-29-

integrity, and compliance with ethical norms . . . are too general to cause a reasonable investor to rely upon them." *UBS*, 752 F.3d at 183 (internal quotation marks omitted). That is true for two reasons, which Dr. Starks's analysis confirmed. *First*, general statements about a company's principles lack "specific, factual" information about "the state of [the company's] business" that investors use to make investment decisions. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168, 170 (2d Cir. 2021); *see* JA2608-2610. *Second*, such aspirational statements are ubiquitous, and because "almost every [company] makes" them, "[n]o investor would take such statements seriously." *ECA, Local 134* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see* JA2611-2612, 2718-2737.

Although not directly controlling here, this Court has concluded on numerous occasions that vague, aspirational statements of corporate values indistinguishable from Goldman's business principles—such as "we put clients at the center of all we do" and "honesty and integrity are non-negotiable core values"—are statements that no reasonable investor would rely on when making investment decisions.[3] If, as a

---

[3]     *See, e.g.*, *Plumbers & Steamfitters Local 773* v. *Danske Bank*, 11 F.4th 90, 103-104 (2d Cir. 2021); *Synchrony*, 988 F.3d at 173; *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60, 63 (2d Cir. 2019); *Fogel* v. *Vega*, 759 Fed. Appx. 18, 21, 23-24 (2d Cir. 2018); *Altayyar* v. *Etsy, Inc.*, 731 Fed. Appx. 35, 37-38 (2d Cir. 2018); *Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); *UBS*, 752 F.3d at 183; *Reese* v. *Bahash*, 574 Fed. Appx. 21, 23 (2d Cir. 2014); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 Fed. Appx. 32, 37 (2d Cir. 2012); *JP Morgan Chase*, 553 F.3d at 205-206.

matter of common sense, no reasonable investor "would take such statements seriously in assessing a potential investment" or "would weigh these generic statements in its investment calculus," *Danske Bank*, 11 F.4th at 103-104, then, also as a matter of common sense, such statements are highly unlikely to have actually affected a company's stock price. As the Supreme Court has now made clear, those common-sense evaluations can and properly do overlap. *Goldman*, 141 S. Ct. at 1960-1961 & n.2. The district court thus erred in relegating to a brief footnote this Court's repeated, common-sense conclusions about investor indifference to comparable generic statements, out of misguided concern that relying too heavily on those conclusions would permit materiality to "slither" into its price-impact analysis. SA8; *see* SA22 n.17.

The district court correctly acknowledged that Goldman's challenged business principles "present as platitudes when read in isolation." SA20. But rather than follow the Supreme Court's direction about how such "platitudes" affect the price-impact analysis, the district court erroneously minimized the genericness of the business principles by reading them "in conjunction" with the conflicts warning. SA20, 27. The court offered no justification for treating the entirely separate conflicts warning, which appears in the middle of the company's 300-page Form 10-K filing with the SEC, as providing relevant context for the challenged business principles, which originated in the 1970s and have appeared each year to the present

day in Goldman's annual report to shareholders. Plaintiffs never argued that the conflicts warning transformed Goldman's business principles from "platitudes" into specific promises or concrete statements of fact relating to conflicts management. Nor did Plaintiffs present any evidence that investors or analysts would have understood the business principles as deriving meaning from the conflicts warning. The district court's suggestion that a variety of unrelated statements contributed to some vague overarching impression conflicts with Section 10(b)'s focus not on vague impressions, but on "each statement" that a company makes. 15 U.S.C. 78u-4(b)(1) (requiring complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why").

b.     The challenged firmwide conflicts warning, which has appeared in some form for nearly two decades, was similarly generic and qualified. Far from guaranteeing that Goldman was conflict-free in any particular transaction or business, the conflicts warning appeared in the "Risk Factors" section of Goldman's Form 10-K and broadly cautioned that conflicts of interest were "increasing" and that avoiding such conflicts "is complex and difficult." JA3278. In context, the further statement that Goldman's "extensive procedures and controls" were "designed to" manage conflicts was thus aspirational, and Goldman cautioned that such efforts might "fail[] or appear to fail." *Id.* Indeed, the later "Legal Proceedings" section of Goldman's Form 10-K highlighted possible failures: each

year, the company described one to two dozen pending legal matters, some of which involved alleged breaches of fiduciary duties or failures to disclose required information to investors. *See* JA3145-3157, 3282-3291, 3409-3418, 3553-3562.

This Court has repeatedly held that "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources'" to regulatory compliance efforts—particularly alongside "acknowledgements of the complexity" of such efforts—should not be construed as specific guarantees of compliance. *Singh*, 918 F.3d at 64.[4] Because such statements do not "guarantee" any "concrete fact or outcome," they do not affect investors' decision-making or the stock's price. *UBS*, 752 F.3d at 185.

The district court, however, determined that Goldman's firmwide conflicts warning was "more specific" and "significantly more substantive" than the business principles, SA20, because the court overlooked what the warning actually said. The court mischaracterized the conflicts warning as stating "that Goldman had sufficient

---

[4]    *See, e.g.*, *Etsy*, 731 Fed. Appx. at 37-38 ("We cancel transactions if fraud is detected, and we strive to prohibit bad actors from using our platform."); *Scott* v. *GM*, 605 Fed. Appx. 52, 54 (2d Cir. 2015) (company "aimed to increase vehicle profitability through monitoring of its dealer inventory levels") (brackets and internal quotation marks omitted); *Reese*, 574 Fed. Appx. at 23 (company's rating model demonstrated "integrity" and "independence"); *JP Morgan Chase*, 553 F.3d at 205 (company used "risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process") (brackets omitted).

-33-

conflicts procedures in place" (presumably, in the court's unstated view, "sufficient" to manage at least the CDO conflicts asserted here), and revealing "Goldman's specific approach to conflicts management."   SA23, 26-27.   By its terms, the conflicts warning did neither.   It expressly advised shareholders that Goldman's procedures were imperfect and might "fail[] or appear to fail," potentially "giv[ing] rise to litigation or enforcement actions."   JA3278.   As in *Singh*, the asserted misstatement thus "suggest[ed] caution (rather than confidence) regarding the extent of [the company's] compliance."   918 F.3d at 64.   And although it mentioned the existence of "procedures and controls," the conflicts warning did not describe or guarantee any particular procedures or controls, much less any relevant to Goldman's CDO business.   JA3278.   In fact, the only conflicts controls briefly identified were those "designed to prevent the improper sharing of information among [Goldman's] businesses"—a type of conflict irrelevant here.   *Id.*

## 2.   The district court misconstrued the Supreme Court's mismatch framework.

The Supreme Court emphasized that the inference of price impact in an inflation-maintenance case "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."   *Goldman*, 141 S. Ct. at 1961.   After erroneously portraying the challenged statements as less generic than they were, the district court misconstrued the standard for finding a

mismatch between those statements and the purported "corrective disclosures." SA25-28.

a. The district court misunderstood the Supreme Court as imposing a *subject-matter test* for comparing asserted misrepresentations and claimed "corrective disclosures." That is, the district court required only that the misrepresentations and "corrective disclosures" "implicate" the same general subject matter, rather than involve the same content and level of specificity. SA24, 27. The court acknowledged that the generic statements and "corrective disclosures" here "do not present *equivalent* levels of genericness." SA27. But the court reasoned that, short of an "exceedingly" large or "boundless[] gap in genericness," SA26-28, it was sufficient that (some of) the challenged statements and (some of) the "corrective disclosures" "implicate[d] the[] same conflicts and Goldman's infrastructure for managing them." SA27.

The district court's analysis confirms the manipulability of its flawed subject-matter test. For starters, the court *never identified* in its mismatch analysis what new information the purported "corrective disclosures" revealed. The press had already widely reported on the alleged conflicts in the Abacus and Hudson CDOs before any of Plaintiffs' three claimed "corrective disclosure" dates. *See* JA2936, 2942, 2944. When Dr. Gompers opined that the "corrective disclosures" added no new, corrective information that could have price impact, the district court found that

-35-

conclusion unpersuasive because, unlike the previous reports, the "corrective disclosures" (apparently referring to the April 16, 2010 SEC complaint) were "colored with inflammatory and granular detail" about the Abacus conflict. SA16; *see* SA17-18. In its mismatch analysis, however, the court failed to acknowledge its earlier conclusion that the "corrective disclosures" added only specific evidentiary details—details that plainly did not match the generic challenged statements. *See* SA27.

Next, the district court *never compared* the contents of Goldman's alleged misstatements and Plaintiffs' three "corrective disclosures," as the Supreme Court's mismatch framework requires. Instead, the district court merely gestured to Goldman's conflicts warning, mischaracterizing it as revealing "Goldman's specific approach to conflicts management." SA26-27. The court did not further describe what that "specific approach" was for Goldman's CDO business (or any other) or how any of the three "corrective disclosures" contradicted that approach. Indeed, it did not say much about the contents of the "corrective disclosures" at all. The court acknowledged that they were "somewhat more detailed and narrow in scope"— which should have been a red flag in its mismatch analysis—but simply concluded that they "implicate[d] the[] same conflicts and Goldman's infrastructure for managing them." SA27. In a footnote, the court added that even the combined

"mismatch in generic *nature*" and "mismatch in *scope*" was unproblematic under its construction of the Supreme Court's decision. SA27 n.19.

b. The district court's subject-matter test misconstrued the Supreme Court's decision. The Supreme Court's mismatch framework requires a court to scrutinize the actual "contents of the misrepresentation and the corrective disclosure" to discern whether their contents match and thus whether the "corrective disclosure" might have "actually corrected the generic misrepresentation." *Goldman*, 141 S. Ct. at 1961. A subject-matter test, by contrast, cannot answer the question whether the "corrective disclosure" matched closely enough to "actually correct[]" the asserted misstatement.

Nor can the district court's focus on subject matter be squared with the Supreme Court's paradigmatic example of an impermissible mismatch: a "generic" statement like "we have faith in our business model" and a "specific" disclosure like "our fourth quarter earnings did not meet expectations." *Id.* Those statements do not match in specificity (overall business vs. fourth quarter of one fiscal year) or content (business model vs. recent earnings). *Id.* But they do "implicate[]" the same general subject, SA27: the company's financial performance. Under the district court's reasoning, weak fourth-quarter earnings might easily be said to "poke [a] targeted, meaningful hole[] in overarching impressions" about the strength of the company's business model. SA27 n.19. Thus, under the district court's subject-

matter test, even the Supreme Court's paradigmatic example of a mismatch would be close enough to infer price impact.

As a practical matter, too, adopting the district court's subject-matter test would nullify the Supreme Court's attempt to place guardrails on the inflation-maintenance theory. Companies often state an array of aspirational principles covering a wide variety of subjects: customer service, profitability, integrity, social responsibility, and the like. *See* JA2603, 2609-2610, 2718-2732. Likewise, companies often at least acknowledge the existence of policies relating to regulatory compliance, personnel, ethics, business strategy, and so on. *See* JA2612-2613, 2733-2737. When some employee commits misconduct, or some failure of corporate controls occurs, the misconduct or failure almost certainly would "implicate" at least one corporate principle or policy. Thus, endorsing the district court's reasoning would gut the Supreme Court's mismatch framework.

> **3. Under the correct framework, there is a glaring informational mismatch between Defendants' generic challenged statements and Plaintiffs' three claimed "corrective disclosures."**

Under a correct understanding of the Supreme Court's mismatch framework, there are stark differences in the content and specificity of the challenged statements and "corrective disclosures." As shown above, the challenged misstatements were exceedingly generic. They conveyed only that Goldman (i) has aspirational firmwide principles about integrity and client service, and (ii) employs extensive,

-38-

but fallible, firmwide conflicts procedures. *See* pp. 29-34, *supra*. In contrast to those generic challenged statements, the first and third "corrective disclosures" related to specific Goldman CDO transactions; the second was entirely vague. To the extent those "corrective disclosures" added any new information, that minimal new information provided details that did not match the broad alleged misstatements.

The first disclosure, from ***April 16, 2010***, involved allegations in the SEC's complaint against Goldman concerning the Abacus CDO. JA146-147, 3581. The asserted conflict in Abacus related to one client's participation in asset selection, which had previously been reported in *The New York Times*. SA10; *see* JA2942. But the district court stated that the SEC complaint added "granular detail" and "evidence from inside Goldman" to previous public reports about the alleged misconduct. SA16. The SEC complaint never once mentioned the challenged statements.

The second disclosure, from ***April 30, 2010***, involved a vague rumor of a Department of Justice investigation into either Goldman or its employees for unspecified "mortgage trading." JA153-154, 3613. The report itself acknowledged that "[i]t couldn't be determined which Goldman deals are being scrutinized." JA3615. At most, the report disclosed the possibility of some unidentified mortgage-trading enforcement activity. Again, it never mentioned the challenged statements.

The third disclosure, from **June 10, 2010**, involved a press report about rumors that the SEC was investigating conflicts of interest in the Hudson CDO. JA150, 3617. *The New York Times* had previously reported on its front page the alleged conflict in Hudson relating to Goldman's short position. SA10; *see* JA2944. At most, the June 10 press report revealed the rumored possibility of an SEC investigation into that alleged conflict. It too never mentioned the challenged statements.

Under the Supreme Court's mismatch framework, none of the three "corrective disclosures" matched Goldman's challenged statements in substance or scope. Allegations that certain Goldman employees did not properly manage conflicts in two CDOs—part of a residential-mortgage business that in 2007 represented just 1% of Goldman's overall revenues, JA3675—were far more specific than the firm's business principles, which set an aspirational standard for how all Goldman employees should strive to do business globally. Similarly, details about alleged conflicts in parts of Goldman's CDO business did not line up with the challenged firmwide conflicts warning. Plaintiffs have never claimed that Goldman did not have firmwide conflicts procedures, and the conflicts warning, far from representing that Goldman had no conflicts, cautioned that the firm's conflicts were "complex and difficult" to manage and that "enforcement actions" could result if controls "fail[ed]." JA3278.

The mismatch between the challenged statements and claimed "corrective disclosures" tracks closely to the Supreme Court's paradigmatic example of a fatal mismatch. *See Goldman*, 141 S. Ct. at 1961. As the table below illustrates, Goldman's business principles are nearly identical to the Supreme Court's example of "hav[ing] faith in our business model," and the conflicts warning is barely more specific. *Id.* Meanwhile, the "corrective disclosures" convey less information on much narrower subjects than the Supreme Court's example of a report that "fourth quarter earnings did not meet expectations." *Id.* Had the district court applied the proper mismatch framework, it could not have ignored the obvious parallels to the Supreme Court's example, nor could it have tolerated such a stark "gap in genericness." SA28.

| **Challenged Statements** | **"Corrective Disclosures"** |
|---|---|
| **Supreme Court's Example:**<br><br>"[W]e have faith in our business model." | "[O]ur fourth quarter earnings did not meet expectations." |
| **Business Principles:**<br><br>"Integrity and honesty are at the heart of our business."<br>"Our clients' interests always come first."<br>"We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us." JA3203. | **(i)** SEC enforcement action alleging that Goldman committed fraud by not disclosing to potential Abacus CDO purchasers that a hedge fund with a short position had "played an active and determinative role in the asset selection process." JA66; *see* JA3581. |
| **Conflicts Warning:**<br><br>"Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses."<br><br>"We have extensive procedures and controls that are designed to identify and address conflicts of interest . . . . However, appropriately identifying and dealing with conflicts of interest is complex and difficult, and . . . conflicts could give rise to litigation or enforcement actions." JA3278. | **(ii)** Report of rumor that "Goldman was the subject of a criminal investigation by the Department of Justice" into unspecified mortgage trading. JA149; *see* JA3613.<br><br>**(iii)** Report about rumored SEC investigation of the Hudson CDO, which provided no new information about alleged conflicts in that CDO—the details of which *The New York Times* had reported six months earlier on its front page, without any price impact. JA150; *see* JA2944, 3617. |

**B.     A Common-Sense Analysis Of The Challenged Statements And Their Mismatch With The "Corrective Disclosures" Overwhelms Any Negligible Evidence Of Price Impact.**

The district court's legal errors in assessing the challenged statements were outcome-determinative.  As the court itself recognized, the generic nature of the asserted misstatements and the resulting mismatch with Plaintiffs' purported "corrective disclosures" were "the heart of the parties' post-appeal dispute."  SA19.  That was not simply because those were the issues left open on remand, but because the evidentiary record at that point was otherwise thin:  the district court had given little weight to Defendants' extensive evidence, while Plaintiffs had offered minimal evidence of their own.  Plaintiffs relied solely on the testimony of Dr. Finnerty, whose analysis of "market commentary" confirmed rather than undercut the generic nature of the statements, and who admittedly offered no economic evidence to disaggregate the impact of news of government enforcement from the impact of the supposed revelation that the challenged statements were "false."  JA4603.  Once the important, common-sense evidence about the statements themselves and their mismatch with the "corrective disclosures" is properly construed, it strongly outweighs that negligible competing evidence.

**1.     Expert evidence about market perception reinforced a common-sense reading of the challenged statements.**

a.     Defendants introduced evidence from Dr. Starks that, consistent with a "common sense" assessment of the challenged statements, *Goldman*, 141 S. Ct. at

1960, the statements were too generic to be relied upon by investors and were pervasive in the industry. Dr. Starks explained that, based on academic research of investor decision-making, no investor "relies on general statements about a company's business principles, general statements about the importance of its reputation and client franchise, or general statements regarding a company's management of conflicts of interest in valuing a company." JA2601-2602. By contrast, investors "focus on information that affects a company's future financial performance and value," including "information that impacts a company's growth in revenue, earnings, cash flows, dividends, and profitability." JA2598, 2600-2601.

Dr. Starks buttressed those lessons from academic research with studies of the particular statements in this case. *First*, she found that statements analogous to the challenged business principles and conflicts warning were "commonly used in company communications across a wide range of industries," including by "every company [she] examined." JA2603, 2610-2613. Indeed, she identified more than 30 companies that made statements indistinguishable from those challenged here—underscoring that the challenged statements contained no "differentiable content" on which investors might rely. JA2610; *see* JA2718-2737. *Second*, Dr. Starks reviewed all 880 analyst reports on Goldman during the class period and found that none referred to the challenged statements, contrary to what one would expect if those statements could affect the value of Goldman stock. JA2608-2632.

-44-

Although "credit[ing]" Dr. Starks's evidence, the district court deemed that evidence of "limited usefulness." SA21. It reasoned that, even if investors did not find Goldman's generic statements relevant, they might have found relevant the "details and severity" of specific alleged misconduct. *Id.*; *see* SA13-15. But that backwards reasoning, which focuses on investor interest in the information in the "corrective disclosures," simply reflects the district court's flawed mismatch analysis and erroneous benchmark for price impact, as further shown at Part II, *infra*.

b.      Meanwhile, Plaintiffs did not offer an expert on investor decision-making, although their market-efficiency and damages expert, Dr. Finnerty, agreed with much of Dr. Starks's opinion. For example, Dr. Finnerty acknowledged that "[i]nformation regarding earnings relative to street consensus, changes in company forecast, and . . . other critical corporate events" generally "cause[s] statistically significant price movements." JA484-485. He also agreed that analyst reports were "a pretty good indication of what the market investors would regard as important." JA318; *see Dirks* v. *SEC*, 463 U.S. 646, 658 n.17 (1983) (quoting SEC's observation that "market efficiency in pricing is significantly enhanced by [analysts'] initiatives to ferret out and analyze information").

Dr. Finnerty surveyed over 1,500 articles and analyst reports relating to Goldman, *see* JA2102-2182, and identified just three instances of contemporaneous media commentary that purportedly demonstrated the "importan[ce]" of Goldman's

business principles and conflicts warning to the market, JA1201; *see* JA2040-2041. One Associated Press article mentioned Goldman's business principles; one *Wall Street Journal* op-ed alluded to the business principles; and one *Wall Street Journal* article mentioned conflicts management generally, but not the conflicts warning itself. *See id.* But none of the three articles, or any other commentary that Dr. Finnerty identified, attributed any stock-price decline to a revelation that the challenged statements were "false." In fact, the Associated Press article—the only example that specifically identified any of the challenged statements—characterized Goldman's "14 Business Principles" as "a sales pitch that few Wall Street firms always live up to." JA3770. Far from casting doubt on Defendants' evidence, Dr. Finnerty's inability, after combing through extensive market commentary, to find any significant evidence connecting Goldman's stock price to the challenged statements confirms that the challenged statements lacked price impact either when made or when their "falsity" was supposedly revealed.

Finally, Dr. Finnerty identified a few analyst reports that characterized Goldman as having generally effective conflicts management or a strong reputation. *See* SA14-15. Although those reports might suggest that pervasive conflicts or a strong reputation matters, they have no bearing on the price impact of *Goldman's statements about* its conflicts or reputation. As this Court has explained in an analogous context, "the importance of a bank's reputation for integrity" is a distinct

question from "the materiality of a bank's statements regarding its reputation." *JP Morgan Chase Co.*, 553 F.3d at 206. So too for price impact. Goldman's reputation is not based on its generic statements about its reputation, such as "Our reputation is one of our most important assets." JA3278. As a result, market commentary discussing Goldman's strong reputation in no way indicates that those generic statements themselves had price impact.

> **2. Defendants offered economic evidence rebutting price impact, while Plaintiffs offered no competing economic evidence.**

a. Defendants also introduced substantial economic evidence rebutting price impact. In particular, Dr. Gompers and Dr. Choi provided economic analyses showing that (i) the market had not reacted to earlier disclosures about Goldman's alleged conflicts, and (ii) the market's reaction to the "corrective disclosures" was attributable solely to the reported government enforcement activity. Dr. Gompers analyzed news reports of Goldman's alleged conflicts of interest on 36 dates before the first "corrective disclosure" and found that they had no impact on Goldman's stock price. JA2386-2396, 2496-2508. Meanwhile, Dr. Choi showed, based on an analysis of prior SEC enforcement actions, that the stock-price declines relied upon by Plaintiffs were attributable to investor concerns over reports and rumors of government enforcement actions, not the alleged falsity of the challenged statements. JA2524-2545. That conclusion reflects the common-sense reality that

when a company is subject to a government enforcement action, investors may "anticipate that the targeted firm" will eventually pay sanctions, fines, or legal settlements; will suffer a "major drain on the resources of the firm" during the investigation; or will be the subject of "future regulations." JA1708, 1712-1713.

The district court did not dispute Dr. Gompers's finding of no price impact on the 36 previous dates with reported conflicts, though it did not credit his conclusion that Plaintiffs' three "corrective disclosures" likewise lacked price impact because, in the court's view, the SEC's Abacus complaint was the first disclosure "to detail and document those conflicts with hard evidence." SA17. The court also declined to give Dr. Choi's evidence "significant weight." SA18. Although the court's criticisms of Dr. Gompers and Dr. Choi were unfounded, this Court need not address those specific evidentiary questions here. In this posture, the critical point is that, whatever weight it warranted, the *only* concrete economic evidence before the district court refuted the price impact of the challenged statements. *See Lopez-Esparza* v. *Holder*, 770 F.3d 606, 609 (7th Cir. 2014) ("Some evidence would seem to preponderate over no evidence.").

b. Plaintiffs again relied solely on Dr. Finnerty, who principally opined—and Defendants never disputed—that the stock-price declines on the three "corrective disclosure" dates were statistically significant. SA9. But Dr. Finnerty conceded that he took no action to disaggregate the price impact of the purported

-48-

revelation that Goldman's challenged statements were "false" from the obvious confounding variable: "the news concerning the regulatory enforcement actions." JA4602-4603; *see* SA18-19 (recognizing that "the enforcement actions themselves—divorced from the underlying conduct alleged therein—may have been a 'contributing factor' to Goldman's price drops"). In the analogous loss-causation context, this Court recently instructed that the failure to "disaggregate losses caused by disclosures of the truth behind the alleged misstatements from losses that result from other factors" is fatal to a showing that the claimed "corrective disclosure" hurt a company's stock price. *Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022); *see Dura Pharms.*, 544 U.S. at 343 ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires.").

Plaintiffs could have hired an expert to perform an event study to try to isolate any price impact of the challenged statements. Dr. Finnerty acknowledged that the accusation of "fraud by a regulatory body" is "bad news" that causes "the market [to] react[] negatively" and that "[o]ne *could do* a disaggregation analysis" to remove that confounding variable. JA359, 4603 (emphasis added). He simply chose not to do so because he mistakenly believed that the actual or rumored government enforcement activity was "inextricably tied" to the alleged securities fraud. JA4603. But the enforcement activity involved misrepresentations to Goldman's CDO

purchasers; it had nothing to do with the challenged statements. That is not the *same fraud* alleged here. *See Employees' Ret. Sys.* v. *Whole Foods Market, Inc.*, 905 F.3d 892, 904 (5th Cir. 2018) (explaining that plaintiffs had "conflate[d]" a fraud against customers involving misweighed food, which led to a decline in stock price, "with the allegedly actionable securities fraud"). The enforcement activity was thus a confounding variable that needed to be isolated, not ignored.

In the end, because Plaintiffs failed to introduce any event study or other economic evidence on price impact, the district court was left with Dr. Finnerty's conclusory speculation that some of the stock-price decline "was caused by the public disclosure of news concerning Goldman's conflicts." SA10; *see* SA17. But that bare speculation amounts to no evidence at all. At a minimum, given the extensive evidence rebutting price impact, that speculation does not make it "more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963.

\* \* \*

In short, even crediting all of the evidence on Plaintiffs' side of the ledger, Plaintiffs' price-impact showing boiled down to (i) a stock-price decline on each of their claimed "corrective disclosure" dates—which occurs in every securities-fraud case—and (ii) their expert's speculation that three news articles "linked" the subject of the challenged statements and the "corrective disclosures." SA16-17. Given that

minimal showing, the most relevant evidence that the district court should have considered was a common-sense evaluation of the generic challenged statements and their mismatch with the "corrective disclosures." Coupled with Dr. Starks's confirmatory testimony about investor behavior, that common-sense evidence made it far "more likely than not" that the challenged statements lacked price impact. *Goldman*, 141 S. Ct. at 1963. The district court's legal errors in evaluating that evidence thus made all the difference.

**C.    At A Minimum, Any Price-Impact Finding Should Be Restricted To The Challenged Statements And "Corrective Disclosures" On Which The District Court Relied.**

For the reasons explained above, the district court applied the incorrect legal framework, and its decision to certify the class should be reversed. *See* Part III, *infra*. In the alternative, however, this Court should at least vacate the district court's decision and remand with instructions to modify the class definition in two important respects.

*First*, the Court should preclude classwide reliance on the challenged business principles. The district court and Plaintiffs focused almost entirely on the challenged conflicts warning. *See, e.g.*, SA20 ("[i]n particular," the conflicts warning was "more specific in form and focus" than the business principles); SA21 (substitute truthful statement was "the alleged truth about [Goldman's] conflicts"); SA23 (preexisting inflation stemmed from the belief "that Goldman had sufficient conflicts

procedures in place"); SA24 (some market reports "placed significant emphasis on Goldman's conflicts infrastructure"); SA26-27 ("[i]n particular," the conflicts warning was not too generic). And the court's conclusion that the challenged statements and "corrective disclosures" "implicate" the same subject—"conflicts and Goldman's infrastructure for managing them"—likewise was based entirely on the conflicts warning. SA27. The court thus declined to extend its subject-matter test to the maximally broad subjects of the business principles, such as "clients' interests"; compliance with "laws, rules and ethical principles"; and "integrity." JA3203.

*Second*, this Court should limit the class period to exclude Plaintiffs' second and third "corrective disclosure" dates. Although the district court did not expressly distinguish among Plaintiffs' three "corrective disclosures"—itself a major error, for the reasons shown above—its repeated description of new "detail[s]" about "conflicts" at most relates to the first disclosure involving the SEC's Abacus complaint, from ***April 16, 2010***. *See, e.g.*, SA16-17, 27-28. The second disclosure, on ***April 30, 2010,*** reported only rumors of an investigation into unspecified "mortgage trading." It stated nothing about conflicts, and the court gave no explanation for its relationship to the challenged conflicts warning. *See* JA3613; *see also* p. 39, *supra*. Similarly, the third disclosure, on ***June 10, 2010,*** did not reveal any "inflammatory and granular detail" or "evidence from inside Goldman itself."

SA16.  Because the alleged Hudson conflict had already been splashed on the front page of *The New York Times*, the only new information was a rumor of an SEC investigation into that conflict (which never resulted in any enforcement action).  *See* JA2944, 3617; *see also* p. 40, *supra*.

At bottom, even the district court's flawed matching exercise compared only the conflicts warning and the first "corrective disclosure," from ***April 16, 2010***.  The court's decision cannot support the certification of a broader class based on the business principles or the other two "corrective disclosures."

## II.  THE DISTRICT COURT ERRONEOUSLY EXTENDED THIS COURT'S INFLATION-MAINTENANCE THEORY.

The district court's recertification decision also warrants reversal because it unjustifiably extended this Court's inflation-maintenance theory.  In applying that theory despite the significant mismatch described above, the district court used the price impact of specific misconduct to approximate the price impact of the generic asserted misrepresentations.  That is, the court considered whether Goldman's stock price would have declined not if Goldman's business principles and conflicts warning had themselves been more "truthful," but if Goldman had "truthfully" revealed the details of the specific CDO conflicts to which (some of) the "corrective disclosures" related.  *See* SA21-23.  The expansion of the inflation-maintenance theory to permit class certification on that basis would conflict with Supreme Court precedent requiring that an asserted misstatement "actually affect the market price

-53-

of the stock," *Halliburton*, 573 U.S. at 284, and this Court's longstanding precedent holding that "disclosure is not a rite of confession," *UBS*, 752 F.3d at 184.

### A. Price Impact Cannot Turn On "Corrective Disclosures" That Did Not Match The Challenged Misstatements.

This Court has adopted an already-broad conception of price impact under the inflation-maintenance theory. In *Vivendi*, the Court assessed price impact by comparing the price following an alleged inflation-maintaining statement with the hypothetical price that would have followed a comparable truthful statement. *See* 838 F.3d at 258. And the Court has rejected a requirement that plaintiffs show fraud-induced inflation or otherwise demonstrate how inflation is actually introduced into the stock price. *See Goldman II*, 955 F.3d at 265; SA23. By contrast, the Supreme Court specifically declined to endorse the inflation-maintenance theory and assumed that the standard for assessing price impact under that theory is what would have occurred if, rather than making a false statement, the defendant had said nothing. *See Goldman*, 141 S. Ct. at 1959 n.1, 1961. But whatever the merits of this Court's existing inflation-maintenance theory, the district court's *further* expansion of that theory was unwarranted.[5]

---

[5] This Court's existing inflation-maintenance theory is flawed in multiple respects that warrant further review by the *en banc* Court or the Supreme Court. *First*, the proper approach is to compare the price following an alleged inflation-maintaining statement with the hypothetical price that would have followed a company's *silence*, because Section 10(b) does not impose a duty to speak.

### 1.   This Court has applied the inflation-maintenance theory only in circumstances involving a near-perfect match.

Although this Court has indicated that a misstatement's inflation-maintaining effects can sometimes be measured by a corrective disclosure's inflation-dissipating effects, that principle works only when one statement is the inverse of the other.  If the two statements match, then a court can reasonably "assum[e] that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."  *Vivendi*, 838 F.3d at 255 (citation omitted).  But if the original statement and "corrective disclosure" do not match—including because the later disclosure is far more specific—nothing in this Court's inflation-maintenance precedents requires a defendant to show that the *more specific information* in the later disclosure lacked price impact.

Thus, this Court has applied its truthful-comparator standard only in circumstances where the hypothetical truth precisely matches—and is the inverse of—the challenged statements.  In *Vivendi*, for example, the defendant company made statements about its liquidity, including that it would meet aggressive cash-

---

Adopting a silence-as-comparator standard would be dispositive here, as Dr. Finnerty testified that he "d[idn't] know" whether Goldman's stock price would have fallen "[i]f Goldman had not made the [challenged] statements."  JA1118. *Second*, the inflation-maintenance theory should at least be limited to specific misstatements about a discrete financial, operational, or performance metric that can be directly contradicted by a later corrective disclosure.  That rule, too, would be dispositive here.

flow targets. 838 F.3d at 234-235. In reality, Vivendi's executives feared that the company was "running out of cash" and "nearing bankruptcy." *Id.* at 235. Yet the company continued to assure concerned investors that it had "strong free cash flow" and "cash available for investing," until its liquidity problems were revealed. *Id.* at 236-237, 245; *see id.* at 251-252. As a result, the alleged misstatements directly matched the corrective disclosures: Vivendi said that it had plenty of cash available, but it did not. Accordingly, when this Court considered the price impact of a hypothetical truthful statement—"not a rosy picture of [Vivendi's] liquidity state, but the misgivings its executives were sharing behind the scenes"—that substitute statement involved the same content and level of specificity as the original misstatements. *Id.* at 258; *see id.* at 259 (comparing a hypothetical misstatement that "Model V has passed all safety tests" to a truthful revelation that the vehicle is "unfit to be on the road").

Similarly, in *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), this Court applied the inflation-maintenance theory to a direct match between the alleged misstatements and corrective disclosures. Barclays assured investors that certain trading platforms were "safe from" aggressive trading practices, and that it "was taking steps to protect" institutional investors in those platforms by monitoring and removing aggressive traders who violated the platforms' special protections. *Id.* at 87. The New York Attorney General later filed a complaint alleging that Barclays's

representations about those trading platforms were false because no special protections and monitoring existed for a significant portion of trading, and Barclays favored rather than removed aggressive traders. *Id.* at 88. Thus, as in *Vivendi*, any hypothetical truthful statement that would have had price impact in *Barclays*—*e.g.*, that the trading platforms were *not* subject to special protections from aggressive trading practices—would have tracked the original misrepresentations in specificity and scope.

The same is true of this Court's explanation earlier in this case of how the inflation-maintenance theory should operate. *See Goldman II*, 955 F.3d at 264. The Court hypothesized a record label that falsely confirms a rumor about "plan[ning] to sell a secretly recorded Beatles album containing a dozen unreleased songs." *Id.* The Court explained that, "[h]ad the CEO told the truth"—that the label had no such album or plans—the record label's stock price would have dropped. *Id.* Again, the truth was the exact inverse of the misstatement. Under those circumstances, the (negative) effect of the truth was a reasonable substitute for the (positive) effect of the misstatement.

>    ### 2. The district court's expansion would unmoor the inflation-maintenance theory from any reasonable measure of price impact.

In misapplying the inflation-maintenance theory, the district court sharply departed from *Vivendi* and its progeny. Under *Vivendi*, Plaintiffs might have

attempted to argue that a substitute truthful statement would have decreased Goldman's stock price. But because the challenged statements were so general, any reasonable truthful substitute would have been similarly general. For example, Goldman might have stated, "We have imperfect controls for avoiding conflicts of interest"; or "We have extensive conflicts controls, but do not always follow them perfectly"; or "Although integrity and honesty are at the heart of our business, some employees have not adhered to that ideal." Such hypothetical truthful statements would have been extremely unlikely to have any price impact—not least because they are essentially what Goldman said in the first place. *See* JA3278.

But the district court did not use a reasonably comparable truthful substitute for the asserted misstatements as its benchmark for price impact. The court acknowledged that the generic misstatements "were unlikely, in a vacuum, to consciously influence investor behavior." SA21; *see* SA23 (Plaintiffs' claims "do not hinge on whether such statements were consciously relied upon, in the moment, by investors evaluating Goldman"). Instead, the court erroneously based its decision on how investors might have reacted to specific information about the misconduct in the "corrective disclosures." *See* SA21. Put differently, the court did not determine that correcting the alleged inaccuracy in Goldman's statements would have had price impact, but rather that disclosing the "details and severity of Goldman's misconduct" would have. *Id.*

The district court's decision looks nothing like this Court's prior inflation-maintenance decisions in *Vivendi* and *Barclays*. And the difference is not merely coincidental, as Plaintiffs have suggested. *See* Plaintiffs' Rule 23(f) Opp. 19-20. Rather, the parity between a defendant's asserted misstatement and the alternative statement that a truthful defendant would have made reflects a foundational premise of the inflation-maintenance theory: when a tight match exists, a court can reasonably "assum[e] that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *Vivendi*, 838 F.3d at 255 (citation omitted); *see Goldman II*, 955 F.3d at 265. Without that tight match, the inference collapses, as the Supreme Court recognized. *See Goldman*, 141 S. Ct. at 1961.

If this Court were to allow the specific misconduct discussed in a "corrective disclosure" to control the price-impact inquiry, the result would be an inflation-maintenance theory that has moved multiple steps away from traditional understandings of price impact:

- The inflation-maintenance theory generally precludes a defendant from arguing that the *challenged misrepresentation* did not affect the company's stock price when made.

- *Vivendi*'s inflation-maintenance theory further precludes a defendant from arguing that its *silence* would not have affected the stock price.

- The district court's inflation-maintenance theory still further precludes a defendant from arguing that *equivalent-but-truthful speech* would not have affected the stock price, so long as a disclosure of more specific misconduct would have.

The district court's final step wholly untethers the price-impact analysis from whether an alleged misrepresentation "actually affect[ed] the market price of the stock." *Halliburton*, 573 U.S. at 284. And it undermines the Supreme Court's guarantee that defendants must have a meaningful "opportunity to rebut the [*Basic*] presumption by showing . . . that the *particular misrepresentation at issue* did not affect the stock's market price." *Id.* at 279 (emphasis added). After all, under the district court's theory, a defendant must show that *other statements*—different in kind, even if relating to the same broad subject—lacked price impact.[6]

---

[6]     Plaintiffs contend that the law-of-the-case doctrine prevents this Court from rejecting the district court's use of specific misconduct discussed in the "corrective disclosures" as the benchmark for evaluating the price impact of Defendants' generic challenged statements. *See* Plaintiffs' Rule 23(f) Opp. 19. But in observing that it would be "reasonable to assume" that Goldman's stock price would have declined had Goldman specifically revealed the alleged CDO misconduct, *see Goldman II*, 955 F.3d at 271-272, this Court did not assess the appropriate level of generality of a truthful substitute statement under *Vivendi*. *See City of Pontiac Gen. Emps.' Ret. Sys.* v. *MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) (law-of-the-case doctrine applies only where a court previously "expressly or impliedly decided" a question). In any event, "the law of the case does not withstand 'an intervening change of controlling law.'" *Id.* (citation omitted). The Supreme Court vacated this Court's decision in *Goldman II* and gave relevant guidance about an impermissible mismatch between front-end misstatements and back-end "corrective disclosures."

**B.    The Resulting Affirmative-Disclosure Regime Would Conflict With This Court's Consistent Precedents.**

The district court's expansion of *Vivendi* to infer price impact from specific disclosures that do not match alleged misstatements is also irreconcilable with this Court's precedents repeatedly confirming that "disclosure is not a rite of confession" under Section 10(b). *UBS*, 752 F.3d at 184; *see In re Proshares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013).

Section 10(b) does not "create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011).    As a general matter, companies have no duty to "disclose uncharged, unadjudicated wrongdoing."  *UBS*, 752 F.3d at 184; *Danske Bank*, 11 F.4th at 98-99.  If eventually charged with misconduct, a company may of course be held liable for that misconduct.  But that does not turn any previous failure to disclose potential misconduct into a fraud perpetrated against shareholders.  *See Singh*, 918 F.3d at 59-60 (rejecting "attempt to recast corporate mismanagement as securities fraud").  Yet the district court's decision would lead to that result:  if Goldman did not voluntarily report to shareholders any suspected misconduct in its CDOs, it could face a multi-billion-dollar securities-fraud class action.

Unless the district court's decision is reversed, future plaintiffs can easily locate among a company's voluminous public statements a generic statement that implicates the same subject as any misconduct.  Virtually every company makes

generic statements about its integrity, reputation, or internal controls. *See* JA2609-2610, 2718-2732; *see also* SA23-24. Increasingly, companies also make statements about environmental, social, and governance issues. *See* A. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 Wash. U. L. Rev. 1821, 1845-1847, 1854 (2021) (describing misconduct-driven securities litigation as "the biggest elephant in the room" for the potential "adoption of a broad SEC-mandated ESG disclosure regime"). As part of that trend, the SEC recently proposed requiring certain climate-related disclosures. *See* SEC Proposed Rule, Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 21, 2022). The SEC already requires companies to make a host of other disclosures, including the general development of the business and its strategy, 17 C.F.R. § 229.101; pertinent "risk factors" for the company, *id.* § 229.105; the company's financial condition and known uncertainties, *id.* § 229.303; and its code of ethics for certain officers, *id.* § 229.406. Unsurprisingly, even as of several years ago, the average Form 10-K had already grown to three times the length of this brief. *See* V. Monga & E. Chasan, *The 109,894-Word Annual Report*, Wall Street J. (June 2, 2015).

Given the tangle of voluntary and mandatory disclosures, companies are apt to say something on most subjects, if the subject is defined at a high enough level of generality. Any misconduct that a single employee or business unit could commit would be virtually certain to implicate some such subject. If, under the district

court's theory, market movement following allegations of that specific misconduct is enough to establish the price impact of the original generic statement, a finding of price impact (and class certification) would become nearly automatic whenever misconduct is alleged and a company's stock price declines. A company thus could avoid the certification of a securities-fraud class for every corporate misstep only by affirmatively disclosing all uncharged misconduct. That would, in practical effect, impose the same automatic-disclosure regime that this Court has repeatedly determined is legally unwarranted.

## III. THE DISTRICT COURT'S DECISION SHOULD BE REVERSED.

As shown above, the district court's misconstruction of the Supreme Court's mismatch framework and extension of the inflation-maintenance theory were legal errors, and those errors were outcome-determinative. *See* pp. 28-63, *supra*. Although this Court often remands after correcting a district court's application of an erroneous legal standard, if the evidence "admits only a single resolution of the controlling issue, remanding the case serves no useful purpose." *Reynolds* v. *Giuliani*, 506 F.3d 183, 197 (2d Cir. 2007); *see Bowers* v. *Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990) (finding "no need to remand to the district court . . . because the record permits only one conclusion").

Although this Court could, in theory, remand to the district court with instructions to conduct a proper mismatch analysis and to reweigh the evidence,

there is little evidence to reweigh on Plaintiffs' side of the balance. Given the exceedingly generic nature of the challenged statements, the stark mismatch between those statements and the three purported "corrective disclosures," and Plaintiffs' failure to introduce meaningful economic evidence of price impact, it is far "more likely than not" that the alleged misrepresentations lacked price impact. *Goldman*, 141 S. Ct. at 1963. Indeed, any district-court decision to the contrary would be an abuse of discretion.

This case has been going on for 12 years; it has been before this Court three times on Rule 23(f) review; and the Supreme Court itself has clarified the governing legal principles. Discovery closed more than six years ago, and the district court declined to supplement the evidentiary record after this Court's last remand. *See* SA5 n.3. Remanding for the district court to weigh the lopsided evidence for the fourth time would serve no conceivable purpose.

# CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court reverse the district court's certification order and decertify the class.

Respectfully,

/s/ Robert J. Giuffra, Jr.

| | |
|---|---|
| Kannon K. Shanmugam | Robert J. Giuffra, Jr. |
| Aimee W. Brown | Richard H. Klapper |
| PAUL, WEISS, RIFKIND, | David M.J. Rein |
| WHARTON & GARRISON LLP | Benjamin R. Walker |
| 2001 K Street, N.W. | Julia A. Malkina |
| Washington, D.C. 20006 | Jacob E. Cohen |
| (202) 223-7300 | SULLIVAN & CROMWELL LLP |
| | 125 Broad Street |
| Audra J. Soloway | New York, New York 10004 |
| PAUL, WEISS, RIFKIND, | (212) 558-4000 |
| WHARTON & GARRISON LLP | |
| 1285 Avenue of the Americas | Morgan L. Ratner |
| New York, New York 10019 | SULLIVAN & CROMWELL LLP |
| (202) 373-3000 | 1700 New York Avenue, N.W. |
| | Washington, D.C. 20006 |
| | (202) 956-7500 |

*Attorneys for Defendants-Appellants The Goldman Sachs Group, Inc.;*
*Lloyd C. Blankfein; David A. Viniar; and Gary D. Cohn*

May 11, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(A) because the brief contains 13,997 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

Dated: May 11, 2022

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

*In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-3461 (PAC)
  (S.D.N.Y.), Opinion & Order, entered on Dec. 8, 2021
  (Dkt. No. 258)...............................................SA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                 :

IN re GOLDMAN SACHS GROUP, INC.    :
SECURITIES LITIGATION           :      Master File No. 10 Civ. 3461 (PAC)
                                 :

This Document Relates To:         :

                                 :      **OPINION & ORDER**
    ALL ACTIONS              :

                                 :
-------------------------------------------------------------X

After a prolonged interlocutory appeals saga that has prompted three decisions from the Second Circuit, one from the Supreme Court, and untold pages of cumulative briefing, this Court is again asked to resolve the parties' class certification dispute.

By now, the facts of this case are well-known, having been set forth in this Court's prior opinions. *See, e.g.*, *Richman v. Goldman Sachs*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012). In brief, Lead Plaintiffs ("Plaintiffs") allege Goldman Sachs Group, Inc. and some of its senior executives (collectively, "Defendants" or "Goldman") violated Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. Specifically, they accuse Defendants of making false and misleading statements pertaining to Goldman's conflict of interest policies and business practices, which were later exposed as false through reports of Goldman's conflicted role in certain collateralized debt obligation ("CDO") transactions.

Plaintiffs again seek to certify the following class: "All persons or entities who, between February 5, 2007, and June 10, 2010, purchased or otherwise acquired the common stock of The Goldman Sachs Group, Inc. ('Goldman' or the 'Company'), and were damaged thereby. . . ." *See* Pls.' Class Cert. Mem. 1 n.1, ECF No. 136. Upon due consideration of all evidence before the Court, and in light of the clarified guidance from the Supreme Court and Second Circuit, the Court

1

again concludes that Defendants have failed to rebut the *Basic* presumption by a preponderance of the evidence. Accordingly, the motion for class certification is **GRANTED**.

## BACKGROUND

Plaintiffs' claims fall within the inflation-*maintenance*, rather than the inflation-*introducing*, category of actionable misstatements: that is, Plaintiffs claim Defendants' false statements fraudulently maintained, rather than induced, an inflated share price.

Underlying Plaintiffs' claims is the charge that Goldman duped its investors into believing Goldman was aligned with their interests, and indeed had robust institutional systems to manage and mitigate conflicts of interest, while the company was in fact actively betting against the success of its investors' positions. Plaintiffs assert Goldman artificially maintained an inflated stock price through misrepresentations as to its conflicts of interest and internal conflict procedures, only for its stock price to plunge when the market learned the truth. The misstatements alleged in the Consolidated Class Action Complaint (the "Complaint") include, among others, the following:

> Our reputation is one of our most important assets. As we have expanded the scope of our business and our client base, we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client . . . .

> We have extensive procedures and controls that are designed to identify and address conflicts of interest . . . .

> Our clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow. . . .

> We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. Our continued success depends upon unswerving adherence to this standard. . . .

> Most importantly, and the basic reason for our success, is our extraordinary focus on our clients. . . .

> Integrity and honesty are at the heart of our business.

*See* Compl. ¶¶ 134, 154, ECF No. 68.

Defendants allegedly made these statements in a variety of settings, including Form 10-Ks, earnings calls, investor conferences, statements to the press, and Goldman's annual reports to shareholders (which contained "The Goldman Business Principles," from which some of the alleged misstatements originated). *See id.* ¶¶ 127, 154, 277. Taken together, Plaintiffs allege, these misstatements formed the foundation of Goldman's broader campaign to stoke its own value by "promot[ing] its reputation as the preeminent Wall Street bank focused first and foremost on responsible business practices that placed their clients' needs paramount to all else." *See id.* ¶¶ 13, 151–57, 271–306

The Court previously granted in part and denied in part Defendants' motion to dismiss. It dismissed claims arising from Defendants' alleged failure to disclose Goldman's receipt of Wells Notices from the Securities and Exchange Commission ("SEC"), but allowed claims arising from the alleged misstatements concerning Goldman's conflicts of interest to proceed. *See Richman*, 868 F. Supp. 2d at 280.[1]

Plaintiffs then moved for class certification. In 2015, the Court granted their motion, finding that Plaintiffs had satisfied the four requirements under Rule 23(a) and successfully invoked the *Basic* presumption, and that Defendants had failed to rebut this presumption. *See In re Goldman Sachs Grp., Inc. Sec. Litig.* ("*2015 Certification*"), 2015 WL 5613150, at *1 (S.D.N.Y. 2015). The Second Circuit vacated this order and, on remand, suggested the Court further develop the factual record to aid in reevaluating whether Defendants had rebutted the *Basic* presumption

---

[1] The Court then denied Defendants' subsequent motions for partial reconsideration and for certification of that denial for interlocutory appeal. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 5002090 (S.D.N.Y. Oct. 7, 2014).

by a preponderance of the evidence. *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*ATRS I*"), 879 F.3d 474, 482, 484 (2d Cir. 2018). The Court then solicited supplemental briefing from the parties, held an evidentiary hearing, heard oral argument, and thereafter concluded that Defendants had failed to rebut the *Basic* presumption by a preponderance, and again certified the class. *See In re Goldman Sachs Grp., Inc. Sec. Litig.* ("*2018 Certification*"), 2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018).[2]

Defendants again appealed. This time, the Second Circuit affirmed, holding that this Court had correctly applied the inflation-maintenance theory, properly allocated the burden of rebutting the *Basic* presumption, and permissibly concluded that Defendants had failed to present evidence sufficient to carry that burden. *See Ark. Tchr. Ret. Sys.* ("*ATRS II*"), 955 F.3d at 271. The Second Circuit also rejected Defendants' argument, raised on appeal, that so-called "general" statements cannot, as a matter of law, impact share price. *Id.* at 267–68.

Defendants then petitioned for, and the Supreme Court granted, certiorari. Before the Supreme Court, Defendants abandoned their argument that what they now labeled "generic" statements could not impact stock price as a matter of *law*. *See Ark. Tchr. Ret. Sys.* ("*ATRS III*"), 11 F.4th at 142. Instead, they emphasized that the generic nature of a statement is relevant evidence of price impact as a matter of *fact*. *See id.* Plaintiffs conceded this point, and the Supreme Court enshrined it in its opinion: "[T]he generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification." *Goldman*, 141 S. Ct. at 1958. It then remanded to the Second Circuit because it was "unclear" whether the Second Circuit had done so, *id.* at 1963, and the Second Circuit remanded to this Court for the same reason.

---

[2] *Aff'd sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020), *vacated and remanded*, 141 S. Ct. 1951 (2021), *and vacated and remanded sub nom. Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138 (2d Cir. 2021).

*See ATRS III*, 11 F.4th at 143.  Upon remand, the Court solicited from the parties two rounds of supplemental briefing to aid its application of the clarified standards set forth above.[3]  *See* ECF No. 249.

## DISCUSSION

### I.       Applicable Law

#### a.   The *Basic* Presumption

To prevail on a claim under Section 10(b) of the Exchange Act, "a private plaintiff must prove, among other things, a material misrepresentation or omission by the defendant and the plaintiff's reliance on that misrepresentation or omission." *Goldman*, 141 S. Ct. at 1958.  As to reliance, plaintiffs may invoke the "*Basic* presumption"—a rebuttable presumption "that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011); *see also Basic v. Levinson*, 485 U.S. 224, 247 (1988).  Plaintiffs invoking the *Basic* presumption must show that the alleged misstatements were (1) publicly known and (2) material,[4] (3) that the stock was traded in an efficient market, and (4) that the plaintiffs in fact traded the stock between the time of the alleged misrepresentations and subsequent corrective disclosures. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

The *Basic* presumption has "particular significance" at the class certification stage.  *See*

---

[3] Upon reviewing the record, the Court determined both parties had already submitted evidence that fully addressed the factual issues raised in the remand orders, including the extent to which the alleged misstatements were too generic to influence Goldman's stock price.  It therefore did not invite the parties to supplement the substantial evidentiary record already in place from the 2018 and 2015 class certification proceedings.  *See* ECF No. 249.

[4] Because the *Basic* presumption's materiality requirement "does not bear on Rule 23's predominance requirement" and therefore "should be left to the merits stage," plaintiffs need not show materiality at the class certification stage. *Goldman*, 141 S. Ct. at 1959 (citing *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466–68 (2013)).

5

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 462 (2013). This is because

plaintiffs seeking class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure

must show, *inter alia*, that "questions of law or fact common to class members predominate over

any questions affecting only individual members."[5] Fed. R. Civ. P. 23(b)(3); *Amchem Prod., Inc.*

*v. Windsor*, 521 U.S. 591, 594 (1997) ("Rule 23(b)(3)'s predominance requirement . . . tests

whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

Absent the *Basic* presumption, therefore, questions as to each individual plaintiff's reliance

"ordinarily would defeat predominance" and, by extension, class certification. *Goldman*, 141 S.

Ct. at 1959.

 Although it eases plaintiffs' class certification efforts, the *Basic* presumption is not a blank

check. It may be rebutted at the class certification stage through a showing that the alleged

misstatements in fact had no impact on stock price. *Basic Inc. v. Levinson*, 485 U.S. 224, 248

(1988). Defendants must show a complete lack of price impact by a preponderance of the

evidence. *Goldman*, 141 S. Ct. at 1963 (adding that "[t]he defendant's burden of persuasion will

have bite only when the court finds the evidence in equipoise—a situation that should rarely

arise"). In sum, at the class certification stage, "[t]he district court's task is simply to assess all

the evidence of price impact—direct and indirect—and determine whether it is more likely than

not that the alleged misrepresentations had a price impact." *Id.*

 **b. Inflation-Maintenance Theory**

 Price impact may arise from misstatements taking either of two forms: (1) those that

---

[5] As the Court has already held, and as Defendants do not contest, the four prerequisites under
Rule 23(a)—numerosity, commonality, typicality, and adequacy—are satisfied in this case. *See*
Fed. R. Civ. P. 23(b)(3); *2015 Certification*, 2015 WL 5613150, at *2–3, *vacated on other
grounds, ATRS I*, 879 F.3d 474 (2d Cir. 2018).

fraudulently introduce inflation into the stock price ("inflation introduction"), or (2) those that fraudulently maintain an already inflated stock price ("inflation maintenance"). *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257 (2d Cir. 2016). Where, as here, the misstatements are not alleged to have introduced additional inflation, price impact is measured by "the amount that the stock's price would have fallen without the false statement." *See Goldman*, 141 S. Ct. at 1961.[6] Importantly, for inflation-maintenance claims, "once a company chooses to speak, the proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*." *Vivendi*, 838 F.3d at 258 (emphasis in original).

### c. Supreme Court and Second Circuit Guidance

In its review of the Second Circuit's order affirming this Court's 2018 Certification, the Supreme Court offered several "clarifications of the legal standard" governing class certification. *See ATRS III*, 11 F.4th at 143 (characterizing *Goldman*, 141 S. Ct. at 1958–63). These included confirmation of the Second Circuit's prior holding that a *Basic*-rebutting defendant is subject to a preponderance of the evidence standard. *See Goldman*, 141 S. Ct. at 1963.

The Supreme Court also offered additional "new ideas," *see ATRS III*, 11 F.4th at 143, to apply upon remand.

*First*, it held that, as a matter of *fact*, the "generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification . . . regardless whether the evidence is also relevant to a merits question like materiality." *Goldman*, 141 S. Ct.

---

[6] The Supreme Court offered this characterization of the inflation-maintenance theory, but declined to express any view as to its "validity," or its "contours." *See Goldman*, 141 S. Ct. at 1959 n.1. Unlike the Supreme Court, this Court is of course bound by the Second Circuit's inflation-maintenance jurisprudence as set forth in *Vivendi* and progeny. *See* 838 F.3d 223.

at 1958. It also cautioned that, although courts must not misconstrue this overlap as grounds to "refuse to consider" evidence relevant to both materiality and price impact at the class certification stage, they must "resist[] the temptation" to allow merits issues, "including materiality," to slither into their price impact analysis. *Id.* at 1961 n.2 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 608–09 (7th Cir. 2020)).

*Second*, the Supreme Court offered guidance as to how such genericness interacts with the inflation-maintenance theory's central inference—that "front-end inflation" maintained through alleged misstatements corresponds to "back-end price drop" when subsequent corrective disclosures evaporate that inflation. *Goldman*, 141 S. Ct. at 1961. It held that this narrative "starts to break down" where more generic misstatements are set against more specific corrective disclosures. *Id.* Such a "mismatch," the Supreme Court explained, would tend to undermine the inference that "the specific disclosure actually corrected the generic misrepresentation," and therefore make it less likely that "back-end price drop" in *fact* equals "front-end inflation." *Id.*

*Third*, the Supreme Court reiterated that district courts should be "aided by a good dose of common sense" as they consider all evidence probative of price impact. *Goldman*, 141 S. Ct. at 1960 (internal quotation marks and citations omitted).

## II.    Evidence of Price Impact

The parties have presented the Court with extensive evidence concerning price impact, through multiple rounds of briefing and supplemental briefing, numerous expert reports, and a two-day proceeding involving both an evidentiary hearing and oral argument.

Because Plaintiffs' claims fall within the inflation-maintenance, rather than the inflation-introduction, strain of Rule 10(b) claims, any price impact must be measured via stock price decreases occurring after the alleged misstatements were revealed to be false. *See, e.g., Pearlstein*

8

*v. BlackBerry Ltd.*, No. 13-CV-7060 (CM), 2021 WL 253453, at *17–18 (S.D.N.Y. Jan. 26, 2021);

*see also ATRS II*, 955 F.3d at 264–65 (contrasting price impact analysis in inflation-maintenance

contexts from the "classic" inflation-introduction scenario).

### a. Plaintiffs' Evidence

Plaintiffs have submitted evidence of three such occurrences.[7] *First*, they cite a 12.79%

decrease (or -9.27% abnormal return)[8] in Goldman's stock price on April 16, 2010 following a

public disclosure accusing Goldman of sponsoring a synthetic CDO (the "ABACUS CDO")

without disclosing that the hedge fund Paulson & Co. Inc. had played a "significant role" in its

portfolio selection process, chosen risky mortgages it "believed would perform poorly or fail," and

then shorted (bet against) the ABACUS CDO's success. *See* 1/30/2015 Finnerty Decl. ¶¶ 52–63,

ECF No. 193-11; Compl. ¶¶ 53, 64, 81, 307.

*Second*, Plaintiffs cite a 9.39% decrease (or -7.75% abnormal return) in Goldman's stock

price on April 30, 2010 following public reports that Goldman had committed securities fraud in

its mortgage trading practices. *See* 1/30/2015 Finnerty Decl. ¶¶ 68–75.

*Third*, Plaintiffs cite a 2.21% decrease (or -4.52% abnormal return) in Goldman's stock

price on June 10, 2010 following public reports of Goldman's alleged conflicts surrounding

another CDO (the "Hudson CDO"). *See* 1/30/2015 Finnerty Decl. ¶¶ 76–81.

Plaintiffs' expert, Dr. John Finnerty, opined that all three price decreases were statistically

---

[7] Plaintiffs initially alleged four corrective disclosures. *See* Compl. ¶¶ 316–17, 333. At the evidentiary hearing, however, they presented only three such price declines, abandoning the fourth, which Dr. Finnerty had concluded was not statistically significant. *See* July 25, 2018 Tr. 43, 180–81, ECF No. 233; *see also* Pls. Remand Mem. 9 n.8, ECF No. 253.

[8] "Abnormal return" refers to the difference between a stock's actual return and its expected return "based on general stock market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry." 1/30/2015 Finnerty Decl. ¶ 32.

significant, and that each was caused by the public disclosure of news concerning Goldman's conflicts. *See* 1/30/2015 Finnerty Decl. ¶¶ 43–45, 52–63, 68–80. From his analysis, Dr. Finnerty attributed the pre-disclosure inflation in Goldman's stock price to the company's failure to (1) disclose and manage its conflicts of interest, (2) comply with its own stated business principles, and (3) disclose the resulting reputational risks. July 25, 2018 Tr. 196. He further testified that the alleged misstatements maintained this inflation by omitting "information which, if it had been disclosed, would have caused the inflation to come out of [Goldman's] stock sooner than it did." *Id.* at 199.

### b. Defendants' Rebuttal Evidence

#### *Dr. Gompers and Dr. Choi*

At the 2018 evidentiary hearing, Defendants called two experts, Dr. Paul Gompers and Dr. Stephen Choi, who opined that the alleged misstatements had no price impact, and instead ascribed the entirety of Plaintiffs' cited price drops to news spotlighting enforcement actions against Goldman. Dr. Gompers reviewed news reports from 36 earlier dates[9] that he testified had contained "largely the same information about the CDO mortgage business and those conflicts as were embedded in the Abacus complaint or the rumored Hudson investigation." July 25, 2018 Tr. 59–69, ECF No. 233. From his analysis, Dr. Gompers concluded that news of Goldman's conflicts did not affect its stock price on any of these 36 dates (*see* 4/6/2015 Gompers Decl. ¶¶ 48–60, ECF No. 193-4) and played no role in the three stock declines cited by Plaintiffs (*see id.* at ¶¶ 61–95), and therefore that the alleged misstatements had no impact on Goldman's stock price during the Class Period (*see* 7/2/2015 Gompers Rep. ¶¶ 80–124, ECF No. 193-6).

---

[9] Dr. Gompers initially identified 34 dates, and later incorporated two additional articles into his analysis. *See* Defs.' Supp. Mem. 8 n.5, ECF No. 192.

Dr. Choi opined that Plaintiffs' three cited price drops were attributable exclusively to news of enforcement activities against Goldman, irrespective of the underlying allegations. He reached this conclusion by way of an event study centered around the April 16, 2010 post-ABACUS disclosure price decline. *See* 7/2/2015 Choi Decl. ¶¶ 24–56, 66–81, ECF No. 193-8. He did not conduct event studies for the other two price declines. July 25, 2018 Tr. 116–17, 119–20.

In his study, Dr. Choi compiled a dataset of 117 enforcement actions from 2010–14, from which he identified a total of just four other actions that shared three unusual characteristics with the ABACUS enforcement action. 7/2/2015 Choi Decl. ¶¶ 31–38. These traits, which he dubbed "severity factors" (*see* July 25, 2018 Tr. 100–01) included: (1) the fact that the announcement of the ABACUS enforcement action, unlike most SEC actions, was not accompanied by a concurrent announcement that the action had been resolved (i.e., settled); (2) the SEC's charges against Goldman included fraud or scienter-based charges; and (3) the ABACUS enforcement action included charges against an individual (employee Fabrice Tourre), in addition to those brought against the company as a whole. 7/2/2015 Choi Decl. ¶ 30. Per Dr. Choi, these three traits were typical of the more severe enforcement actions in his dataset. *See* 7/2/2015 Choi Decl. ¶ 46.[10] Averaging the four qualifying data points, Dr. Choi calculated an expected abnormal return for enforcement events sharing these three severity factors, and then used a two-sample t-test to calculate the difference between this control value and the actual post-ABACUS disclosure abnormal return, which he concluded was not statistically significant. 7/2/2015 Choi Decl. ¶¶ 24–42; July 25, 2018 Tr. 176–77. Accordingly, he credited the entirety of the post-ABACUS disclosure price decline to news of the enforcement action itself, rather than to the underlying

---

[10] The first severity factor alone implicated "four of the six actions in the entire 117 enforcement action dataset with the largest negative abnormal returns." 7/2/2015 Choi Decl. ¶ 46.

revelations concerning Goldman's conflicts.  7/2/2015 Choi Decl. ¶¶ 24–42.

### *Dr. Starks*

Although they did not call Dr. Starks to testify at the evidentiary hearing, and only briefly

cited to her work in their 2018 supplemental briefing as a buttress for Dr. Choi's analysis (*see*

Defs.' Supp. Mem. 11, 20, ECF No. 192), Defendants have once again changed course; they now

shift considerable weight onto Dr. Laura Starks' expert submission.  In her report, which was

submitted and reviewed prior to the 2018 Certification, Dr. Starks opined that in her experience

investors do not find "general" and "aspirational" statements regarding a company's business

principals, client franchise quality, reputation, or management of conflicts of interest "to be

pertinent to making investment decisions."  Starks Rep. ¶¶ 19, 27–47, ECF No. 193-10.  Because,

in Dr. Starks' view, Goldman's alleged misstatements fell into this category of statements

inapposite to "a company's future financial performance and value"—and because they echoed

similar statements from over 30 other prominent corporations, including several Goldman

competitors—they did not "contain information that can be used in investment decision-making."

*Id.* at ¶¶ 19, 27–47, 80, Ex. 6.

Dr. Starks attempted to reinforce these opinions through analysis of 880 contemporary

analyst reports, initially compiled by a prior expert in this litigation.  *See* Starks Rep. ¶ 52.[11]  From

---

[11] Dr. Starks' analysis derived in part from the work of Charles Porten, CFA, Defendants' earlier
expert whose reports were presented to the Court prior to its 2015 Certification.  *See* Porten
Decl., ECF No. 146.  Mr. Porten also did not appear at the 2018 evidentiary hearing, and
Defendants have not relied on his analysis or conclusions in either their 2018 or 2021 briefing.
Nonetheless, the Court has reviewed his work, which closely tracked Dr. Starks' subsequent
methodology: Mr. Porten also compiled and reviewed the same 880 pre- and post-disclosure
securities analyst commentary.  *See id.* at ¶¶ 20–24; Starks Rep. ¶ 52 n.70 (noting that Dr. Starks
excluded four of Mr. Porten's original 884 reports).  He similarly concluded (1) that, because
these reports "did not discuss the alleged misstatements," the misstatements had no price impact
(Porten Decl. ¶¶ 12, 24–51); and (2) that based on his experience, analysts "typically do not
comment on the types of statements at issue in this matter, which are generic in nature . . . and

her review, she determined none of these reports—neither those published prior to the alleged corrective disclosures, nor those published after the ABACUS disclosure—referred to the alleged misstatements. *Id.* at ¶¶ 48–79. Thus, she reasoned, the alleged misstatements could not "have been utilized for investment decision-making during the Class Period." *Id.* at ¶¶ 19, 80.

### c. Plaintiffs' Surrebuttal Evidence

Plaintiffs' expert, Dr. Finnerty, offered several critiques of his counterparts' opinions.

#### *Dr. Gompers and Dr. Choi*

Addressing Dr. Gompers' analysis, Dr. Finnerty attributed the lack of abnormal price movement on the 36 cited dates to his observation that the prior reports either contained other information (such as credible denials by Goldman or commentary that the conduct described was proper) or *lacked* the kind of information (such as specific details or hard evidence) subsequently found "for the first time" in the alleged corrective disclosures. July 25, 2018 Tr. 157–67, 169–71. He then criticized Dr. Choi's attempts to distinguish the enforcement actions from the underlying conduct that was, in Dr. Finnerty's view, "inextricably tied" to those actions. *Id.* at 174; *see* Finnerty Rebuttal Rep. ¶¶ 105–16, ECF No. 193-14. He further dismissed Dr. Choi's four-action sample as "too small," too noisy, and too factually distinct from Goldman's situation to be reliable. Finnerty Rebuttal Rep. ¶¶ 93–104.

#### *Dr. Starks*

As to Dr. Starks' opinion that investors do not rely upon purportedly generic misstatements concerning conflicts and business principles when making investment decisions, Dr. Finnerty countered that this assertion takes for granted investors' belief that companies are in fact adhering to those principles in the first place. Finnerty Rebuttal Rep. ¶ 125. "[O]nce investors learn of a

are not unique to Goldman Sachs" (*id.* at ¶¶ 12, 52–61).

13

company's violation of its business principles or its failure to manage its conflicts of interest effectively," he explained, investors would certainly find *that* information relevant. *Id.* at ¶ 127. He added that Dr. Starks failed to account for this dynamic with respect to the other companies she cited as having made similar statements. *Id.* at ¶ 128.

Dr. Finnerty also criticized the "unreasonably narrow scope" of Dr. Starks' methodology. Finnerty Rebuttal Rep. ¶¶ 129–32. Not only did Dr. Starks limit her review to securities analysts' reports, ignoring articles from *The Wall Street Journal* and the *Associated Press* along with other prominent market commentary, but she was also too restrictive in her search criteria—limiting her hunt to direct quotations and explicit attributions while neglecting remarks that paraphrased the alleged misstatements or made reference to their subject matter. *Id.* As a result, Dr. Finnerty observed, Dr. Starks' analysis failed to acknowledge the significant esteem and weight many of these analyst reports ascribed to Goldman's conflicts infrastructure and reputation.[12] These included, *inter alia*, a CIBC analyst report that "Goldman is very careful about the conflicts or perceived conflicts that emerge, and actually has a full time partner monitoring conflicts" (*see* Exhibit 19, ECF No. 201-5, at 77), a Merrill Lynch analyst report that "we believe that Goldman has actually tended its customer-oriented business carefully, which explains . . . the absence of major conflict problems" (*see* Exhibit 21, ECF No. 201-7, at 3), and a Wachovia report that

---

[12] Defendants did not call Dr. Starks as a witness, and she therefore was not subject to cross-examination at the 2018 evidentiary hearing. Plaintiffs have included in their subsequent briefing soundbites from her deposition, in which they claim she gave testimony that "seriously undermined" her work, including admissions that analysts whose reports she reviewed often discussed the underlying "subject matter" of the alleged misstatements, and that these issues were "important" to investors, who would have "reacted if Goldman had told the truth" about those issues. *See* Pls' Reply Mem. 2–3, ECF No. 256 (apparently quoting Dr. Starks' deposition). Because the Court again deems the existing record, which does not contain the relevant deposition transcripts, sufficient to resolve the instant motion, it declines to consider these statements.

Goldman's "sterling reputation should allow the company to drive above-average profit growth, resulting in premium valuation over time" (*see* Pls.' Summary 4, ECF No. 215-2).[13]

From his own review of market commentary, Dr. Finnerty concluded Goldman's stock price inflation and subsequent price declines were "in fact related to the alleged misrepresentations concerning the conflicts of interest management, the business principles, and Goldman's reputation." July 25, 2021 Tr. 179. Conflict of interest management, he opined, was especially at the forefront of investors' minds. *Id.* at 168. Here, Dr. Finnerty relied upon, and presented to the Court, pre- and post-disclosure market commentary. This included, *inter alia*, some of the same market analysis discussed above, as well as other commentary from Merrill Lynch that "conflict management process is clearly taken extremely seriously" at Goldman, and that the company "manages conflicts, rather than simply avoiding them, in order to maximize the value of its franchise." Finnerty Presentation 15, ECF No. 215-1. It also included post-disclosure commentary foreboding "serious . . . reputational effects" for Goldman, questioning the company's ethos of "trust, integrity and putting clients' interests first," citing its "'14 Business Principles,' which preach an almost militant philosophy of putting the client before the firm," and observing "[n]ow, it's that very philosophy that has been questioned by the government." *Id.* at 25–28.

## III.    Analysis

### a.   The *Basic* Presumption

"The parties agree that plaintiffs established the preliminary elements to invoke the *Basic* presumption of reliance." *ATRS I*, 879 F.3d at 484. Their sole dispute at this stage of the litigation

---

[13] Dr. Starks did acknowledge analyst discussion of "reputational damage" to Goldman in the wake of the enforcement revelations, which she attributed to the "potential DOJ investigation and the negative sentiment against Wall Street," without reference to the underlying conduct that sparked the enforcement actions. *See* Starks Rep. ¶¶ 64, 73.

is whether Defendants have met their burden to rebut the presumption through showing, by a preponderance of the evidence, that the alleged misstatements had no price impact.

In its now-vacated 2018 Certification, the Court concluded Dr. Finnerty's model had "at the very least, establishe[d] a link between the news of Goldman's conflicts and the subsequent stock price declines," and that Defendants had failed to present evidence sufficient to sever that link. 2018 WL 3854757, at *4–6. The Supreme Court has since clarified that courts may not end their inquiry there. They must also evaluate whether the subsequent inference required for class certification under the inflation-maintenance theory—that back-end price drop corresponds with front-end inflation maintained through alleged misstatements—is fatally undermined by the generic nature of those misstatements, a "mismatch" in genericness between misstatement and corrective disclosure, or other common-sense factors. *Goldman*, 141 S. Ct. at 1958–63.

Accordingly, the Court revisits the evidence in light of this fresh guidance.

**b. Plaintiffs' Persuasive Evidence of Price Impact**

Plaintiffs have persuasively established a link between the public revelations concerning Goldman's conflicts of interest and the subsequent stock price declines. Through Dr. Finnerty, they have identified three statistically significant price drops immediately following public, damaging reports as to Goldman's questionable management of its conflicts, including credible allegations that it deliberately bet against its own clients. Unlike the pre-ABACUS disclosure reporting cited by Dr. Gompers, these disclosures were colored with inflammatory and granular detail, and substantiated with evidence from inside Goldman itself. Plaintiffs' expert, Dr. Finnerty, conducted a thorough analysis linking the stock price declines to news detailing "for the first time" (*see* July 25, 2018 Tr. 170–71) Goldman's purportedly problematic conflict management—that is, to the *conduct* underlying the reported enforcement actions, not merely the actions themselves.

16

*See ATRS II*, 955 F.3d at 272 (observing that allegations of Goldman betting against its own clients would reasonably prompt investors to "seriously reconsider trusting Goldman with their money," and that the resulting drag on Goldman's bottom line would "have nothing to do with the threat of enforcement actions, and everything to do with how Goldman managed its conflicts of interest"). Crucially, Dr. Finnerty's conclusions did not end there: he also convincingly linked these declines back to pre-disclosure inflation through his analysis of market commentary, and his critique that Dr. Starks' contrary conclusions, based on her own narrower review, assumed the very investor ignorance that the misstatements themselves propagated.

The Court credits Dr. Finnerty's conclusions, and finds that Plaintiffs have presented compelling evidence that the alleged misstatements in fact impacted Goldman's stock price.

### c. Defendants' Failure to Rebut the *Basic* Presumption

#### i. Dr. Gompers and Dr. Choi

Neither Dr. Gompers' nor Dr. Choi's analysis persuasively undermine these findings. In its 2018 Certification, the Court declined to credit Dr. Gompers' opinion that the lack of abnormal movement in Goldman's stock price on any of the 36 pre-decline dates showed a lack of price impact attributable to the alleged misstatements. *See 2018 Certification*, 2018 WL 3854757, at *4. Since the updated direction from the Supreme Court and Second Circuit has no bearing on these factual findings, the Court here reiterates, and restates, its grounds only in brief: (1) importantly, although some of the prior reports had gestured at Goldman's conflicts surrounding the ABACUS deal, the first alleged corrective disclosure was the first public account to detail and document those conflicts with hard evidence, including incriminatory emails and memoranda authored by Goldman employees; (2) the underlying source of the disclosure—the SEC—lent extra credibility and gravitas unequaled in the prior reports; and (3) the disclosure was

unencumbered by any of the denials or mitigating commentary that had rendered prior reports less jarring.[14]  The Court thus again declines to credit Dr. Gompers' conclusions.

The Court also again declines to place any significant weight on Dr. Choi's event study for reasons articulated in full in the 2018 Certification and unaffected by the updated direction from above.  The Court found in 2018, and reiterates today, that Dr. Choi's methodology was novel, unreliable, and thoroughly outpaced by the conclusions he derived therefrom.  *See 2018 Certification*, 2018 WL 3854757, at *5–6.  Specifically, (1) Dr. Choi's choice of "severity factors," which he was the first to use and which are not generally accepted in his field, targeted enforcement events involving dissimilar companies and subject matters (i.e., allegations not involving conflicts of interest), while juicing his control average with many of the largest negative returns in his sample pool; (2) his model failed to account for the misconduct underlying the selected enforcement events; (3) his conclusions were founded upon an unreliable simple average among a small control sample with a wide variance in values; and (4) he failed to demonstrate his use of a two-sample t-test was appropriate or reliable in this context.[15]  Further, by his own admission, Dr. Choi's methodology could not extend beyond the first of Plaintiffs' three corrective disclosures.  *See* July 25, 2018 Tr. 116–17, 119–20.  Therefore, while the Court accepts that the enforcement

---

[14] The Court before discounted, and again discounts today, Dr. Gompers' conclusion that "the internal e-mails [disclosed in the ABACUS complaint] didn't have a price impact" because, he reasoned, the Senate's subsequent disclosure of additional internal e-mails on April 26, 2010 had no statistically significant price impact.  *See* July 25, 2018 Tr. 92–93.  As the Court remarked in its 2018 Certification, at that point, news of the ABACUS complaint would presumably have already dissipated any portion of the overall price inflation vulnerable to email evidence of the ABACUS matter.  *See* 2018 WL 3854757, at *5 n.1.

[15] The Court acknowledges Defendants' assertion that Dr. Choi was prepared, if allowed upon remand, to supplement his findings with five additional data points.  *See* Defs.' Supp. Submission 11 n.5, ECF No. 254.  But even assuming this change would have assuaged the Court's sample size concerns, Defendants do not claim that any of the study's other foundational flaws would have been addressed; indeed, they concede that Dr. Choi was prepared to deploy the "same severity factors" that the Court has already deemed novel and unreliable.  *See id.*

actions themselves—divorced from the underlying conduct alleged therein—may have been a "contributing factor" to Goldman's price drops, it again declines to credit Dr. Choi's conclusion that the *entirety* of the decline is so attributable. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017) (affirming the district court's finding that the *Basic* presumption had not been rebutted where "*some* of the price reaction" was attributable to the "regulatory action itself") (emphasis in *Waggoner*) (internal quotation marks and citations omitted).

### ii.    *"Generic" Nature*

The Court turns next to the heart of the parties' post-appeal dispute: the extent of the alleged misstatements' generic nature, and any accompanying effect on the inference of price impact required for class certification.    Defendants now argue the alleged misstatements were "exceptionally generic," offering no "'specific, factual' or 'concrete' information" for reasonable investors to rely upon, and therefore that the statements "did not, and could not" influence Goldman's stock price. Defs.' Supp. Submission 2, 4, ECF No. 254 (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168, 170 (2d Cir. 2021) (affirming, in relevant part, a motion to dismiss claims founded upon a company's "generally optimistic opinions")).

As a preliminary matter, to the extent Defendants' contention that such statements "could not" exert any price impact revives the proposed "genericness"-as-a-matter-of-*law* test they had previously abandoned, the Court again rejects their argument.[16]

Turning to "genericness" as a matter of *fact*, the Supreme Court has instructed courts to

---

[16] This Court most recently rejected an earlier iteration of this argument in its now-vacated 2015 Certification. *See* 2015 WL 5613150 at *7 n.5. The Second Circuit rejected, in essence, the same argument in a portion of its now-vacated 2020 ruling that the Supreme Court did not discuss. *See ATRS II*, 955 F.3d at 267. Defendants then abandoned the argument at the Supreme Court. *See Goldman*, 141 S. Ct. at 1964 (Sotomayor, J., concurring in part) (agreeing with the Second Circuit that Defendants' abandoned genericness-as-a-matter-of-*law* test was "materiality by another name").

consider, in their review of all evidence probative of price impact, that "a more-general statement will affect a security's price less than a more-specific statement on the same question." *Goldman*, 141 S. Ct. at 1960 (internal quotation marks and citations omitted). Citing Dr. Starks' analysis, Defendants argue the alleged misstatements "did not provide information pertinent to the Firm's valuation or financial performance" and, because they therefore "contained no information that could be utilized in investment decision-making," they did not—as a matter of fact—have any price impact in this instance. Defs.' Supp. Submission 2 (internal quotation marks omitted).

The Court disagrees. The alleged misstatements were not so generic as to diminish their power to maintain pre-existing price inflation—and given the strong evidence of price impact discussed above, the Court finds that the statements *did* in fact maintain price inflation in this instance.

Importantly, despite Defendants' bid to paint them all with the same brush, some of the statements at issue are more generic than others. Although some may present as platitudes when read in isolation, others are significantly more substantive. In particular, the statements concerning Goldman's conflicts—for example, that "we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client" and that "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest"—are quite a bit more specific in form and focus than, say, assurances that "[i]ntegrity and honesty are at the heart of our business." *See* Compl. ¶¶ 134, 154. Further, even the more generic statements, when read in conjunction with one another (and particularly in conjunction with statements *specifically* concerning conflicts), may reinforce misconceptions about Goldman's business practices, and thereby serve to sustain an already-inflated stock price.

20

The Court credits Dr. Finnerty's opinion that this is, in fact, what happened here. *See* Finnerty Rebuttal Rep. ¶ 125 ("Goldman's repetition of these principles year after year led to the expectation that the company's behavior would conform to those statements.").

And while the Court credits Dr. Starks' testimony that some of the alleged misstatements here were unlikely, in a vacuum, to consciously influence investor behavior, it also credits Dr. Finnerty's common-sense critique of the limited usefulness of that testimony. Naturally, statements pertaining to a company's business practices that *reinforce what investors already think* (and indeed expect) are unlikely to prompt investors to change their behavior in the moment. But this axiom relies upon the very misconception the alleged misstatements served to reinforce. Because the proper measure of inflation maintenance by a company that chooses to speak "is not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*," *Vivendi*, 838 F.3d at 258, the Court credits Dr. Finnerty's analysis that truthful, contrary substitutes for the alleged misstatements *would* have impacted investors' subsequent decision-making. And as Dr. Finnerty concluded, "[t]his is precisely what happened here when investors learned in April and June 2010 the details and severity of Goldman's misconduct, and Goldman's stock was devalued accordingly." Finnerty Rebuttal Rep. ¶ 127.

On this point, the evidence and common sense speak as one. As a factual matter, the Court agrees with the Second Circuit that "[i]t is difficult to imagine that Goldman's shareholders would have been indifferent had Goldman disclosed its alleged failure to prevent employees from illegally advising clients to buy into CDOs that were built to fail by a hedge fund secretly shorting the investors' positions." *ATRS II*, 955 F.3d at 271. Tellingly, Defendants have presented no evidence purporting to demonstrate, under the test set forth in *Vivendi*, that if Goldman had replaced the alleged misstatements with the alleged truth about its conflicts, its stock price would

have held fast.  *See* 838 F.3d at 258; *see also ATRS II*, 955 F.3d at 271 ("[Under *Vivendi*]

Goldman's burden is to show that the market would not have reacted had Goldman told the truth

about its alleged failure to manage its conflicts.").  At best, Defendants' evidence serves only to

surface other complementary sources of price impact, such as the sticker shock of pending

unresolved enforcement actions, and the foreboding of additional enforcement measures.

But Defendants' burden is not merely to prove that the alleged misstatements were one of

several sources of price impact, nor even that other sources loomed larger.  Defendants must show,

by a preponderance, that the alleged misstatements had *no* price impact whatsoever.  *Goldman*,

141 S. Ct. at 1963.  Even applying the Supreme Court's updated guidance as to genericness,

Defendants have not carried this burden.

### iii.  "Generic" in Practice

Defendants also argue the alleged misstatements are effectively a rite of passage among

companies of its ilk—that the practice of issuing statements of this kind is itself so generic as to

nullify any price impact.  *See* Defs.' Supp. Submission 5–6.  Brandishing a quote from Plaintiffs'

class representative that the alleged misstatements simply reaffirmed what "everybody expects"

of institutions like Goldman, Defendants insist that such commonplace statements cannot have

evoked reliance from investors.  *See* Defs.' Supp. Submission 6.  The crux of their argument: if

everyone is saying these things, and everyone expects us to say these things too, how can it make

any difference when we do so?[17]

---

[17] Both parties rely upon materiality and other merits decisions in support of their arguments
concerning genericness.  *See, e.g.*, *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP
Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  As the Supreme Court made clear, courts
need not, and indeed must not, rule on materiality or other merits issues at the class certification
stage, even as they also must not disregard evidence probative of price impact merely because
the same evidence is also relevant to materiality.  *See Goldman*, 141 S. Ct. at 1961 n.2.  The
Court thus considers this authority only to the extent it informs the Court's narrow mandate to

22

Here, Defendants again fall flat.  As a threshold matter, the fact that similar companies have made similar statements does not *per se* render a statement incapable of maintaining pre-existing price inflation.  But more fundamentally, Defendants' "strength-in-numbers" argument misconstrues the inflation-maintenance theory itself.  Inflation-maintenance claims do not hinge on whether such statements were consciously relied upon, in the moment, by investors evaluating Goldman.  *See Vivendi*, 838 F.3d at 257, 259 ("[S]ecurities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation.").  Nor must price inflation be introduced through fraud.  *See id.* at 256 ("Artificial inflation is not necessarily fraud-induced, for a falsehood can exist in the market (and thereby cause artificial inflation) for reasons unrelated to fraudulent conduct.") (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 418 (7th Cir. 2015) (defining inflation as the "difference between the stock price and what the price would have been if the defendants had spoken truthfully," and remarking that fraud-induced inflation therefore "can increase even if the stock price doesn't change and that [inflation] must be zero before the first false statement").

Rather, such claims hinge on whether the statements *maintained* an already-inflated stock price.  *Vivendi*, 838 F.3d at 256.  Therefore, if Defendants are correct that investors already assumed, prior to the alleged misstatements, that Goldman had sufficient conflicts procedures in place (and thus overvalued Goldman's stock), it does not matter how they initially stumbled upon that misconception.  *See id.*  It matters only whether Goldman's alleged misstatements *reinforced* that misconception.  *See id.* at 256–59 ("We decline to erect a *per se* rule that, once a market is already misinformed about a particular truth, corporations are free to knowingly and intentionally

---

determine whether Defendants have demonstrated a lack of price impact by a preponderance of the evidence.

reinforce material misconceptions by repeating falsehoods with impunity.") (quoting *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1317 (11th Cir. 2011)).

On this point, the evidence and common sense again tilt comfortably in Plaintiffs' favor. Plaintiffs have presented evidence persuasively attributing the April and June 2010 price declines to circumstances that directly implicated the substance of the alleged misstatements. Here, the Court again credits Dr. Finnerty's analysis of the news coverage and commentary surrounding the alleged corrective disclosures, which convincingly links Goldman's post-disclosure plight back to the alleged misstatements. Dr. Starks' narrower review of analyst commentary, although not without any probative value as to the *extent* of the price impact, fails to negate the inference that the alleged misstatements had *some* price impact—particularly as closer inspection reveals that several reports she reviewed placed significant emphasis on Goldman's conflicts infrastructure.[18]

This point is buttressed by the common sense the Supreme Court has urged courts to exercise in these inquiries. This Court is hard-pressed to understand why statements such as those at issue here would have achieved such ubiquity in the first place were they incapable of influencing (including by maintaining) a company's stock price. Moreover, in a marketplace where, according to Defendants, dozens of Goldman competitors and other blue-chip corporations routinely make statements "indistinguishable" from some of the alleged misstatements, it seems

---

[18] Defendants argue the third-party commentary pertaining to the alleged misstatements cited by Dr. Finnerty is "legally irrelevant" because Goldman cannot be liable for third-party statements unless it "place[d] its "imprimatur" on them. Defs.' Supp. Reply Submission 3–4, ECF No. 255 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993)). But the instant inquiry of course does not concern any direct liability arising from third-party conduct, and the Court considers such statements only insofar as they constitute evidence probative of price impact attributable to Goldman's own statements, per the Supreme Court's directive. *See Goldman*, 141 S. Ct. at 1960. On that score, Defendants do not dispute the statements' significance, and in fact themselves argue that such statements are "a useful measure of the information that investors would deem most significant." Defs.' Supp. Submission 5–6.

unlikely that Goldman's conspicuous failure to conform—or indeed, under *Vivendi*, its conspicuous statements to the contrary—would be irrelevant to investors.

        *iv.  "Mismatch"*

    Finally, Defendants contend that the alleged misstatements and subsequent corrective disclosures present a "glaring . . . informational mismatch" sufficient to defeat any inference of price impact. Defs.' Supp. Submission 8.

    As an initial matter, the Court declines to adopt either party's slanted construction of the Supreme Court's guidance as to any "mismatch" in "genericness" between misstatement and corrective disclosure. For their part, Plaintiffs ask this Court to interpret the updated guidance as nothing more than a cosmetic rephrasing of pre-existing law—that the Supreme Court's use of the word "match" is simply a synonym for the same search for a causal "link" between misstatement and corrective disclosure this Court conducted in its previous certification orders. *See* Pls. Remand Mem. 8–10, ECF No. 253. Thus, Plaintiffs argue, because the Court has already found that such a "link" exists, it need not devote any additional thought to the matter. *See id.* Defendants, meanwhile, interpret the Supreme Court as having held that "if Plaintiffs' claimed corrective disclosures did not 'match' the alleged misstatements, they may not rely on the inflation-maintenance theory." Defs.' Supp. Submission 1.

    The Court finds little merit in either view. The Supreme Court made itself perfectly clear: under the inflation-maintenance theory, the inference of price impact "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure" because, naturally, "[u]nder those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation." *Goldman*, 141 S. Ct. at 1961. This dynamic, the Supreme Court explained, may occur "when the earlier misrepresentation is generic (e.g., 'we

have faith in our business model') and the later corrective disclosure is specific (e.g., 'our fourth quarter earnings did not meet expectations')" because, in such circumstances, "there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*

Plaintiffs plainly err in suggesting this Court need not delve beyond its prior "link" analysis, which did not speak to the relative genericness of the two poles of Plaintiffs' price impact theory—a "new idea[]" of a vintage more recent than the Court's last ruling in this action. *See ATRS III*, 11 F.4th at 143.

Defendants hit only marginally nearer to the mark. They greatly overstate the Court's obligation to do away with any inflation-maintenance claims that rely on corrective disclosures whose degree of genericness does not precisely "match" the alleged misstatements' degree of genericness. Nothing in the Supreme Court's language purports to set forth such a restrictive rule. Phrases such as "*starts* to break down," "*less* likely," and "*less* reason," *Goldman*, 141 S. Ct. at 1961 (emphasis added), suggest a *sliding* scale intended to orient this Court's review of a particular evidentiary issue, rather than a forceful *tipping* of the scale in Defendants' favor. The Court operates under the assumption that the Supreme Court meant what it said, and said what it meant, which is that the inference of price impact becomes weaker—and at some point must fail—as misstatement and corrective disclosure diverge in genericness.

Applying this sliding-scale test, the Court finds the alleged misstatements are not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record. As the Court noted earlier, while some of the isolated alleged misstatements equate roughly, in terms of genericness, to the Supreme Court's prototype ("our fourth quarter earnings did not meet expectations"), others do not. *See Goldman*, 141 S. Ct. at 1961. In particular, the alleged misstatements concerning Goldman's

specific approach to conflicts management are substantially less generic than the Supreme Court's

exemplar, both when read in isolation and certainly when read in conjunction with the other alleged

misstatements. Meanwhile, the corrective disclosures, although somewhat more detailed and

narrow in scope than the corresponding alleged misstatements, implicate these same conflicts and

Goldman's infrastructure for managing them. Surely, they do not present *equivalent* levels of

genericness. But Defendants offer no authority for the proposition—nor did the Supreme Court

hold—that the *Basic* presumption can no longer withstand *any* differing levels of abstraction

between misstatement and disclosure.[19] *Cf. Pearlstein*, 2021 WL 253453, at *18 (holding, at the

class certification stage, that "there is no requirement that the corrective disclosure take a particular

form or be of a particular quality, such that it be a mirror image" of the alleged fraud) (internal

quotation marks and citations omitted); *see also Vivendi*, 838 F.3d at 261 ("Proof of loss causation

requires demonstrating that the *subject* of the fraudulent statement or omission was the cause of

the actual loss suffered.") (emphasis in original) (internal quotation marks and citations omitted).[20]

---

[19] In addition to their arguments concerning a mismatch in generic *nature*, Defendants also discuss a mismatch in *scope*. They contend that because the alleged misstatements articulated "aspirational expectations" for all Goldman employees, and "did not promise, much less guarantee, that all 30,000 employees would always follow those principles," the statements "do not match" the corrective revelations of government enforcement actions concerning specific wrongdoing. Defs.' Supp. Submission 2–3, 9 (citing *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 n.6 (S.D.N.Y. Sept. 8, 2017) (remarking, in the motion to dismiss context, that "[t]he fact that a code of conduct prohibits certain conduct by employees is not a factual representation that those policies will always be followed by all employees or that they are 100% effective")). But here Defendants again apply the same warped reading of the Supreme Court's "mismatch" guidance, which does not purport to require such a precise "match," much less any sort of broken "promise" or "guarantee." *See Goldman*, 141 S. Ct. at 1961. Nor does it signal to courts weighing evidence of price impact that narrower corrective disclosures cannot poke targeted, meaningful holes in overarching impressions reinforced through broader prior statements—especially where, as here, there is compelling evidence of price impact.

[20] Although these cases were decided prior to the recent rulings in this action, the Court does not infer from the Supreme Court's updated guidance any intent to broadly upend this body of case

27

Thus, in light of the otherwise convincing evidence of price impact, the Court finds that the comfortable, though certainly not boundless, gap in genericness between the alleged misstatements and subsequent corrective disclosures fails to satisfy Defendants' burden to demonstrate a complete lack of price impact attributable to the alleged misstatements.

## CONCLUSION

Applying the fresh guidance from the Supreme Court and the Second Circuit, the Court's thorough review of all evidence probative of price impact reveals that the alleged misstatements had *some* impact on the price of Goldman's stock during the Class Period. Thus, because Defendants have failed to establish a lack of price impact by a preponderance of the evidence, Plaintiffs' motion for class certification is granted.

The Clerk of the Court is directed to terminate the motion at ECF No. 135.

Dated: New York, New York
      December 8, 2021

SO ORDERED

_Paul A. Crotty_
_____
HONORABLE PAUL A. CROTTY
United States District Judge

---

law. To the contrary, the Supreme Court explicitly disclaimed any comment as to the inflation-maintenance theory. *See Goldman*, 141 S. Ct. at 1959 n.1.