# No. 22-484

## United States Court of Appeals
### for the Second Circuit

ARKANSAS TEACHER RETIREMENT SYSTEM, WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD, PLUMBERS AND PIPEFITTERS PENSION GROUP,
*Plaintiffs-Appellees,*

*(Caption continued on inside cover)*

Appeal from the United States District Court
for the Southern District of New York
(No. 1:10-cv-03461)

## BRIEF FOR PLAINTIFFS-APPELLEES

Spencer A. Burkholz
Joseph D. Daley
ROBBINS GELLER RUDMAN & DOWD LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Thomas C. Goldstein
Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
(202) 362-0636

Thomas A. Dubbs
James W. Johnson
Michael H. Rogers
Irina Vasilchenko
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY 10005
(212) 907-0700

*Attorneys for Plaintiffs-Appellees*

PENSION FUNDS, ILENE RICHMAN, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED, PABLO ELIZONDO, THOMAS DRAFT,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs*,

HOWARD SORKIN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED, TIKVA BOCHNER, ON BEHALF OF HERSELF AND ALL OTHERS
SIMILARLY SITUATED, DR. EHSAN AFSHANI, LOUIS GOLD, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Consolidated-Plaintiffs*,

v.

GOLDMAN SACHS GROUP, INC., LLOYD C. BLANKFEIN,
DAVID A. VINIAR, GARY D. COHN,

*Defendants-Appellants*,

SARAH E. SMITH,

*Consolidated-Defendant*.

## CORPORATE DISCLOSURE STATEMENT

Lead Plaintiffs Arkansas Teacher Retirement System, West Virginia Investment Management Board, and Plumbers and Pipefitters Pension Group are not corporations. They do not issue stock and are not controlled by any publicly held corporation. Plumbers and Pipefitters Pension Group is now called United Association National Pension Fund.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES.................................................................iv

STATEMENT OF THE CASE ...............................................................1

I.    Factual Background ......................................................................2

    A.    Goldman's Business Model And False Statements ...............2

    B.    Goldman's Multi-Billion-Dollar Conflicted CDOs .................4

    C.    Initial Press Suspicions And Goldman's False Denials .........7

    D.    Disclosure Of The Truth .........................................................8

II.   Procedural Background................................................................11

    A.    Most Recent Appeal ...............................................................11

    B.    Supreme Court Decision .......................................................11

    C.    Remand Proceedings.............................................................13

SUMMARY OF ARGUMENT .............................................................20

STANDARD OF REVIEW...................................................................23

ARGUMENT ......................................................................................23

I.    The District Court Properly Found That Goldman Failed To
      Sustain Its Burden Of Disproving Price Impact...........................23

    A.    The District Court Made No Legal Errors In Applying
            The Supreme Court's Guidance To This Case. .....................24

        1.    The District Court Did Not Disregard The Supreme
                  Court's Instructions In Considering The Nature Of
                  The Statements And Common Sense. ............................24

        2.    The District Court Correctly Understood The
                  Supreme Court's Guidance On "Mismatch." .................26

    B.    The District Court Did Not Clearly Err In Finding That
            Goldman Failed To Disprove Price Impact............................31

1.   Goldman Does Not Seriously Challenge The District Court's Rejection Of Its Direct Evidence Of Price Impact. ............................................................................ 32

2.   The District Court Did Not Clearly Err In Finding That Goldman's Indirect Evidence Was Insufficient To Carry Its Burden Of Proof ........................................ 35

    i.   Nature Of The Statements ................................. 37
    ii.  Purported Mismatch .......................................... 46

3.   The District Court Did Not Clearly Err In Weighing The Competing Evidence On Price Impact. .................. 54

C.   Goldman's Request To Narrow The Scope Of The Class And The Evidence Is Forfeit And Meritless. ........................ 57

II.   The District Court Properly Applied This Circuit's Inflation-Maintenance Precedents. ............................................................... 59

A.   There Is No Basis For Goldman's "Near-Perfect Match" Limitation For Inflation-Maintenance Cases. ...................... 59

B.   Goldman's Complaints About The District Court's "Substitute Truthful Statement" Have No Merit. ................ 65

C.   Applying Established Doctrine Does Not Create An Affirmative-Disclosure Regime Or Contradict *Halliburton II*. .......................................................... 70

CONCLUSION ....................................................................... 73

# TABLE OF AUTHORITIES

## Cases

*Alaska Elec. Pens. Fund v. Flowserve Corp.*,
 572 F.3d 221 (5th Cir. 2009) ................................................................ 61

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 11 F.4th 138 (2d Cir. 2021) ........................................................ passim

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 955 F.3d 254 (2d Cir. 2020) ........................................................ passim

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) ................................................................ 33, 36

*Cifra v. Gen. Elec. Co.*,
 252 F.3d 205 (2d Cir. 2001) ................................................................ 42

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014) ................................................................ 40

*Dodona I, LLC v. Goldman Sachs & Co.*,
 132 F. Supp. 3d 505 (S.D.N.Y. 2015) ................................................ 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011) ................................................................ 56

*Glickenhaus & Co. v. Household Int'l, Inc.*,
 787 F.3d 408 (7th Cir. 2015) ................................................................ 64

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
 141 S. Ct. 1951 (2021) ........................................................ passim

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014) ........................................................ 32, 33, 70, 72

*Huddleston v. Herman & MacLean*,
 640 F.2d 534 (5th Cir. Unit A Mar. 1981) ........................................ 68

*In re BofI Holding, Inc. Sec. Litig.*,
 977 F.3d 781 (9th Cir. 2020) ................................................................ 61

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ...................................... 33

*In re Mattel, Inc. Sec. Litig.*,
 2021 WL 4704578 (C.D. Cal. Oct. 6, 2021) ........................................ 61

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .......................................................... passim

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ............................................................. 61

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) .................................................................... 39

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  2022 WL 2114628 (S.D.N.Y. June 13, 2022) ................................. 40, 41

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................. 44

*Local 703, I.B. of T. Grocery & Food Empl. Welfare Fund v.
  Regions Fin. Corp.*,
  762 F.3d 1248 (11th Cir. 2014) ............................................................. 72

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................. 71

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................ 51, 52

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) .................................................................. 51

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .................................................................. 68

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) .............................................................. 52, 67

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .................................................................... 68

*Sykes v. Mel S. Harris & Assoc.*,
  780 F.3d 70 (2d Cir. 2015) .................................................................... 59

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ........................................................ 55, 62, 63

## Other Authorities

Fed. R. Civ. P. 23(c)(1)(C)...........................................................59

## Rules

*Nat'l Austl. Bank Ltd. v. Goldman, Sachs & Co.*,
  2015 FINRA Arb. LEXIS 455 (May 7, 2015).........................................6

## STATEMENT OF THE CASE

For the third time in the twelve-year history of this case, Goldman appeals the district court's certification of a class of investors injured when the market became aware that despite its assurance that the Company had "extensive procedures and controls that are designed to identify and address conflicts of interest," JA3278, and a commitment to use them to protect its clients' best interests, JA3203, Goldman had inflicted billions of dollars in losses on unsuspecting clients through trades riddled with undisclosed conflicts.

Last year, this Court remanded the case to the district court with instructions to "consider all record evidence relevant to price impact and apply the legal standard as supplemented by the Supreme Court" in its recent decision in this case. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143-44 (2d Cir. 2021) (per curiam) (*Goldman III*). After two additional rounds of briefing, Judge Crotty did just that, reaffirming his prior certification order based on factual findings this Court previously affirmed and the Supreme Court did not disturb, credibility determinations that fall uniquely within the province of the

1

trial court, and a straightforward application of this Court's and the Supreme Court's relevant precedents. His decision should be affirmed.

## I.    Factual Background

### A.    Goldman's Business Model And False Statements

Defendant Goldman, an international financial firm, creates and markets investment vehicles, such as the synthetic collateralized debt obligations (CDOs) at issue in this case. Goldman both sells those products to its clients and invests in them itself. This practice can create conflicts of interest—Goldman may well be betting against the performance of a security it is creating and selling to its own clients, as would happen if Goldman took the "short-side" of a CDO while selling the "long-side" to its clients. As long as it fully discloses its positions to its clients and properly manages its conflicts, Goldman's business model can be exceedingly profitable. And because the market traditionally viewed Goldman as excelling at such management, its stock traded at a premium. SA14-15. As Merrill Lynch explained, Goldman's "[c]onflict [m]anagement skill maximizes franchise value" because "Goldman manages conflicts, rather than simply avoiding them, in order to maximize the value of its franchise." JA782.

Goldman recognized that its business practices created substantial risks. It acknowledged in its Form 10-K filings that "we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client." JA3278. Goldman further warned that "a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses." *Ibid.* Violations of conflict-of-interest rules would not only create potential liability with respect to the specific investments involved. It would also diminish Goldman's reputation and credibility with its clients across the breadth of its operations, a reputation that Goldman affirmed was "one of our most important assets." *Ibid.*

Although nothing in the law required it to do so, Goldman regularly reassured investors that these risks were well-controlled and, hence, its premium should be preserved. Most importantly, it specifically represented that it had "extensive procedures and controls that are designed to identify and address conflicts of interest." JA3278. It underscored that message by assuring investors that it would not disregard those constraints in order to enrich itself because "[o]ur clients'

3

interests always come first," emphasizing "[w]e are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us," as "[i]ntegrity and honesty are at the heart of our business." JA3203.

### B. Goldman's Multi-Billion-Dollar Conflicted CDOs

But even as it was making those representations, Goldman was "intentionally packaging and selling securities that were designed to fail, while at the same time reaping billions for itself or its favored clients by taking massive short positions in the same transactions." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 260 (2d Cir. 2020) (*Goldman II*) (cleaned up). Starting in 2006, the firm engaged in a series of egregious violations of its clients' trust, creating CDOs that were designed to benefit only one of Goldman's favored clients or to reduce Goldman's "long" exposure to the subprime mortgage market by allowing it to short securities at its clients' expense, all while concealing and misrepresenting those facts to its clients who purchased those securities.

**Abacus CDO.** One such CDO was called "Abacus 2007 AC-1." *Goldman II*, 955 F.3d at 259. "Goldman marketed Abacus as an ordinary asset-backed security, through which investors could buy shares in

4

bundles of mortgages that the investors, and presumably Goldman, hoped would succeed." *Ibid*. But in reality, and unbeknownst to Abacus purchasers, Goldman allowed a favored client, hedge fund Paulson & Co., "an active role in selecting the mortgages that constituted the CDO," a power Paulson used to select "risky mortgages that it 'believed would perform poorly or fail'" given that it held 100% of the short position in the CDO. *Ibid*. (citation omitted). When, as expected, the underlying securities failed catastrophically, Goldman's customers lost, and Paulson gained, more than $1 billion. *Ibid*.

**Hudson CDO**. Around the same time, Goldman created the Hudson CDO as a vehicle for a "structured exit" from some of its most troubled mortgage-based securities investments. JA178-79. Goldman used the CDO to short $1.2 billion of mortgage-related assets from its own inventory, as well as another $800 million in other subprime residential mortgage-based securities. JA103. Goldman then sold the long side of the security to its clients without revealing its purpose and structure was to offload Goldman's proprietary risk. *Ibid*. Indeed, Goldman's marketing booklet represented, for example, that "Goldman Sachs has aligned incentives with the Hudson program by investing in a

portion of equity," while concealing that its $6 million long position was a mere fig leaf, representing less than one-third of one percent of the size of its short position. JA100-10.

Goldman ultimately pocketed nearly $1.35 billion in profits from its short position in Hudson at the direct expense of its client investors. JA110. In 2015, a FINRA arbitration panel found that Goldman made "material omissions and misstatements in the marketing materials" for Hudson, which "*masked a significant conflict of interest.*" *Nat'l Austl. Bank Ltd. v. Goldman, Sachs & Co*., 2015 FINRA Arb. LEXIS 455, at *3-4 (May 7, 2015) (emphasis added).[1]

---

[1] In *Dodona I, LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 514-16 (S.D.N.Y. 2015), the district court found that these hidden conflicts did not amount to actionable fraud against the purchasers, but did not decide whether Goldman's conduct was consistent with its representations to shareholders about its conflict systems and business principles. Indeed, the court acknowledged that Goldman's actions to "offload" its subprime exposure onto its clients could damage its reputation. *See id*. at 514. A congressional investigation was less charitable. It found that in marketing Hudson, Goldman "created a conflict of interest with its clients, concealed the conflict from them, and profited at their expense." JA820. The report further detailed similar conduct with respect to the Timberwolf and Anderson CDOs. *See* JA822-24; *see also* JA101-35.

### C. Initial Press Suspicions And Goldman's False Denials

In the end, Goldman ultimately survived, even thrived, while the housing market crashed and its competitors lost billions. Goldman's shorting of residential mortgage-backed securities was a core driver of that success—the Structured Products Group in its Mortgage Department earned Goldman $3.7 billion in net earnings in 2007, "primarily as a result of its subprime investment activities," representing more than 30 percent of the entire firm's net earnings that year. JA806; Goldman 2007 10-K at 64.[2]

Eventually, some in the press began to question Goldman's practice of selling the long side of mortgage-backed securities to its clients when the firm was shorting the same securities with its own money. Goldman responded that it had undertaken no undisclosed or otherwise improper conflicts with its clients. For example, one of the challenged misstatements in this case was made in a press release in which Goldman falsely represented, in response to a *New York Times* article, that its

---

[2] *Available at* https://www.goldmansachs.com/investor-relations/financials/archived/10k/docs/2007-form-10-k-file.pdf.

short position was "fully disclosed and well known to investors." JA87; *see* JA86-88, JA93.

In the absence of any concrete evidence that these denials were false, Goldman's stock price remained buoyed.

### D. Disclosure Of The Truth

Beginning in April 2010, however, reports of government lawsuits and investigations revealed that Goldman's representations about its conflict systems and business principles were materially false and misleading, and contained material omissions.

First, on April 16, 2010, the SEC filed a civil lawsuit charging Goldman with securities fraud in relation to the Abacus CDO. *See* JA3581. The 22-page complaint provided detailed allegations that had not previously been reported and supporting evidence, such as internal emails, that were previously undisclosed. *See* JA3581-3602. Goldman would later settle the suit for $550 million and admit to misconduct— namely, that its representations regarding Abacus and Paulson's role were "incomplete" and "a mistake." JA666; *see Goldman II*, 955 F.3d at 259. In addition, in its Consent Decree with the SEC, Goldman specifically linked the April 16, 2010 corrective disclosure to its

8

misstatements regarding its conflicts and business principles, acknowledging that as part of its corporate reforms stemming from the lawsuit, it was conducting a "firmwide review of its *business standards*," and an "evaluation of [its] *conflict management*." JA671 (emphasis added). Meanwhile, a Goldman vice president, Fabrice Tourre, went to trial and was found liable on six of the SEC's seven counts of securities fraud, *including aiding and abetting Goldman's fraud* in connection with Abacus. *See* Verdict, *SEC v. Tourre*, No. 10-cv-3229, ECF No. 439 (S.D.N.Y. Aug. 1, 2013).

The day the SEC's suit was revealed, Goldman's stock price fell by 12.79%. JA2213. Analysts and others explained that the revelation affected Goldman's worth not simply because the suit could result in substantial costs and penalties. As one market observer wrote, the "greatest penalty for Goldman is not the financial damages – Goldman is enormously wealthy – but the reputational damage." JA2215. That said, the extent of the damage was limited at first. Goldman strongly denied the charges and emphasized that they only related to a single CDO. *See* JA2213. A number of analysts accepted Goldman's suggestion that this

9

was an isolated incident whose fallout could be contained. *See* JA2214-17 (expert report collecting examples).

It was not. On April 29, 2010, *The Wall Street Journal* reported that the Department of Justice had opened a criminal investigation into whether Goldman had committed securities fraud in connection with its mortgage trading. JA3614-15. The story stated that the investigation was prompted by a referral from the SEC, but involved different evidence, pointing toward new problems with yet other transactions. *Ibid*. Indeed, a few days earlier, Goldman employees were questioned at a congressional hearing about other CDOs, including Hudson and Timberwolf. *See* JA3046; JA3670-75. Accordingly, the market had reason to believe that Goldman's illegal conflicts of interest were both broader and more serious than the SEC's civil suit initially suggested. The day after the disclosures, Goldman's stock fell another 9.39%. JA2228.

On June 10, 2010, reports of another SEC investigation, this time into Hudson, led to another stock price decline, this time by 4.52%. JA2233, JA2238.

## II.   Procedural Background

The long procedural history of this case is well known to the Court and recited in past opinions.  *See Goldman II*, 955 F.3d at 258-63; SA2-5. Plaintiffs recount here the most salient aspects.

### A.   Most Recent Appeal

Goldman's lead argument in the last appeal was that securities plaintiffs should not be permitted to bring inflation-maintenance claims in cases involving "general statements," because such statements "are incapable of maintaining inflation in a stock price for the same reasons that those statements are immaterial as a matter of law." *Goldman II*, 955 F.3d at 266-67 (quoting Goldman brief).  This Court rejected that per se rule.  *Id*. at 267.  The Court then reaffirmed circuit precedent holding that Goldman bore the burden of persuasion on price impact, *id*. at 270, and concluded that the district court did not clearly err in finding that Goldman had failed to sustain its burden of proof, *id*. at 274.

### B.   Supreme Court Decision

The Supreme Court granted certiorari.  Before that Court, Goldman abandoned its argument that "general statements" can never be the basis of an inflation-maintenance claim.  *See Goldman III*, 11 F.4th at 142.

11

Instead, it argued only that the "generic nature of a misrepresentation is *relevant* to price impact," and should not be disregarded simply because the general nature of the statement is also relevant to its materiality (an issue reserved for trial). *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021) (emphasis added). Plaintiffs agreed, but argued that this Court had not held otherwise.

The Supreme Court also agreed that "the generic nature of a misrepresentation is relevant to price impact," and that "courts may consider expert testimony and use their common sense in assessing whether a generic misrepresentation had a price impact." 141 S. Ct. at 1960. "The generic nature of a misrepresentation often will be important evidence of a lack of price impact" in inflation-maintenance cases, the Court explained, because the inference that a "back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id*. at 1961. When such a mismatch arises, "it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason" to infer price impact "from the back-end price drop." *Ibid*. In the end, however, the

12

Court made clear that a court must decide the price-impact question on the basis of *all* of the evidence, without giving talismanic significance to any one consideration. *Ibid*.

The Supreme Court also affirmed this Court's holding that defendants bear the burden of disproving price impact by a preponderance of the evidence. 141 S. Ct. at 1958.

## C. Remand Proceedings

On remand, this Court decided that the parties' arguments "raise fact-intensive issues better evaluated by the district court in the first instance." *Goldman III*, 11 F.4th at 143. Accordingly, the Court remanded with directions to "consider all the record evidence relevant to price impact and apply the legal standard as supplemented by the Supreme Court." *Id*. at 143-44. The ultimate question, this Court emphasized, is "not what might have happened had a company remained silent, but what would have happened if it had spoken *truthfully*." *Id*. at 141 (citation omitted).

Consistent with this direction, the district court revisited its class-certification decision, considering all the evidence (SA8-15), while paying particular attention to whether any inference of price impact was "fatally

13

undermined by the generic nature of those misstatements, a 'mismatch' in genericness between misstatement and corrective disclosure, or other common-sense factors." SA16.

***Plaintiffs' Evidence***.  The district court began by reviewing and accepting Plaintiffs' evidence that Goldman's statements maintained an artificial inflation in the company's stock. SA16-17.  The court explained that Plaintiffs' expert, Dr. Finnerty, had found three statistically significant stock-price drops attributable solely to the corrective disclosures regarding Goldman's "questionable management of its conflicts, including credible allegations that it deliberately bet against its own clients." SA16.  "Crucially, Dr. Finnerty's conclusions did not end there: he also convincingly linked these declines back to pre-disclosure inflation through his analysis of market commentary." SA17.  The court "credit[ed] Dr. Finnerty's conclusions, and [found] that Plaintiffs have presented compelling evidence that the alleged misstatements in fact impacted Goldman's stock price." *Ibid*.

***Goldman's Affirmative Evidence***.  The court then reconsidered and rejected Goldman's principal direct evidence purporting to prove that markets were indifferent to the falsity of its misstatements.

14

The district court once again "declined to credit Dr. Gompers' opinion that the lack of abnormal movement in Goldman's stock price on any of the 36 pre-decline dates" associated with newspaper articles regarding Goldman's trading practices "showed a lack of price impact attributable to the alleged misstatements." SA17. The court also "again decline[d] to credit Dr. Choi's conclusion that the *entirety* of the decline" was attributable to investor concerns about the costs of enforcement actions rather than Goldman's conflict-management practices. SA19. Among other things, the court recounted that Dr. Choi's methodology was "unreliable" and, in any event, "could not extend beyond the first of Plaintiffs' three corrective disclosures." SA18.

The court further noted that its rejection of both experts' conclusions had been affirmed on the last appeal and that nothing in the Supreme Court's decision drew either holding into question. SA17-18.

Its principal affirmative evidence rejected, Goldman was left to assert that the allegedly generic nature of the statements, standing alone, disproved price impact because markets would not rely on such general statements and because there was a supposedly fatal "mismatch"

15

between the generic misstatements and the more-specific corrective disclosures. The district court rejected those claims as well.

***Nature of the Statements***. To support its claim that the misstatements were too generic to have price impact, Goldman relied on an expert it did not call to testify at the prior evidentiary hearing and whose work it barely mentioned in the prior rounds of litigation. *See* SA12, SA14 n.12. Dr. Laura Starks "opined that in her experience investors do not find 'general' and 'aspirational' statements regarding a company's business princip[les] . . . or management of conflicts of interest 'to be pertinent to making investment decisions.'" SA12. She based this claim on her general education and experience, JA2601-02 (¶25), and on her research purportedly showing that such statements were common, SA12. Dr. Starks also claimed that analysts did not cite Goldman's misstatements, and reasoned that this showed markets were indifferent to whether those statements were true. SA12-13.

Plaintiffs' expert Dr. Finnerty testified, however, that in *his* experience, Goldman's conflict statements *were* the kind of statements investors would care about. SA15. He also showed that Dr. Starks skewed her results by "limiting her hunt to direct quotations and explicit

16

attributions while neglecting remarks that paraphrased the alleged misstatements or made reference to their subject matter." SA14. That myopic review ignored the legally relevant question, which is not whether the analysts quoted Goldman's false statements, but whether investors would have "reacted had Goldman told the truth about its alleged failure to manage its conflicts." *Goldman II*, 955 F.3d at 271.

Focused on *that* question, Dr. Finnerty's review of analyst and other reports, before and after the corrective disclosures, confirmed this Court's view (955 F.3d at 271-72) that investors certainly would have reacted had Goldman told the truth about its conflict systems. SA10, SA14-15. Dr. Finnerty explained that during the class period analysts had repeatedly emphasized the importance of Goldman's purportedly rigorous conflict-management systems. SA14. And after the corrective disclosures, market commentary expressly identified the revealed failure of Goldman's purported conflict-management systems as a major cause for the market reaction to the corrective disclosures. SA14-15.

The district court evaluated this conflicting evidence and "credit[ed] Dr. Finnerty's analysis that truthful, contrary substitutes for the alleged misstatements *would* have impacted investors' subsequent decision-

17

making," while also "credit[ing] Dr. Finnerty's common-sense critique" of Dr. Starks' report and methodology. SA21. The court acknowledged that "some of the statements at issue are more generic than others." SA20. But "when read in conjunction with one another (and particularly in conjunction with statements *specifically* concerning conflicts)," the statements could "reinforce misconceptions about Goldman's business practices, and thereby serve to sustain an already-inflated stock price." *Ibid.*

"On this point," the court continued, "the evidence and common sense speak as one." SA21. "As a factual matter," the court "agree[d] with" this Court "that 'it is difficult to imagine that Goldman's shareholders would have been indifferent had Goldman disclosed its alleged failure to prevent employees from illegally advising clients to buy into CDOs that were built to fail by a hedge fund secretly shorting the investors' positions.'" *Ibid.* (quoting *Goldman II*, 955 F.3d at 271) (brackets omitted). "Tellingly, Defendants have presented no evidence purporting to demonstrate, under the test set forth in *[In re] Vivendi[, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016)], that if Goldman

18

had replaced the alleged misstatements with the alleged truth about its conflicts, its stock price would have held fast." SA21-22.

The district court also rejected Goldman's claim that its statements could have no price impact because other businesses routinely make similar statements. SA22-23.

**_Mismatch_**. Turning to Goldman's mismatch arguments, the district court rejected Plaintiffs' argument that it was enough to show "a causal 'link' between misstatement and corrective disclosure," as the district court had done "in its previous certification orders." SA25; *see also* SA26. At the same time, the court rebuffed Goldman's assertion that a fatal mismatch arises when the "degree of genericness does not precisely 'match' the alleged misstatements' degree of genericness." SA26. Instead, the Supreme Court directed courts to apply a "*sliding* scale" under which "the inference of price impact becomes weaker—and at some point must fail—as misstatement and corrective disclosure diverge in genericness." *Ibid.*

Applying that approach, the district court acknowledged that some of the misstatements "equate roughly, in terms of genericness, to the Supreme Court's" example of a fairly generic statement, while "others do

not." SA26. In particular, the court observed that the "alleged misstatements concerning Goldman's specific approach to conflicts management are substantially less generic than the Supreme Court's exemplar." SA26-27. The district court nonetheless acknowledged that the corrective disclosures were "more detailed and narrow in scope," resulting in some degree of mismatch. SA27. But the mismatch was not so large as to be fatal. Even if more-specific, the disclosures were clearly on point, "implicat[ing] these same conflicts and Goldman's infrastructure for managing them." *Ibid*. And the court rejected Goldman's suggestion that "*any* differing levels of abstraction between misstatement and disclosure" disproved price impact. *Ibid*.

Taking this limited mismatch into account with all the evidence, as the Supreme Court directed, the district court ultimately concluded that the "comfortable, though certainly not boundless, gap in genericness" was insufficient to disprove price impact "in light of the otherwise convincing evidence of price impact." SA28.

## SUMMARY OF ARGUMENT

I.   On remand, the district court examined all the evidence, faithfully applied the Supreme Court's recent guidance, and reasonably

concluded that Goldman had not sustained its burden of disproving price impact.

Goldman identifies no legal error in the district court's analysis. The court did not underestimate the genericness of Goldman's statements. Nor did it hold that there is no cognizable mismatch so long as the corrective disclosure addresses the same subject matter as the misstatement. Instead, the court correctly recognized that the Supreme Court adopted a "sliding scale" approach under which the greater the mismatch, the less likely it is that the market reaction to a corrective disclosure supports a finding of price impact.

The district court also committed no clear error in finding that Goldman's common-sense, genericness, and mismatch arguments were insufficient to overcome the other evidence of price impact in this case. As this Court held in the last appeal, common sense strongly suggests that Goldman's representations about its conflict systems and business principles would have affected its stock price. Goldman's attempt to prove the contrary through Dr. Starks' report on genericness was unconvincing given the serious methodological, logical, and other flaws in her study. The court further recognized that although there was some

degree of mismatch in specificity, that did not prevent the corrective disclosures from actually correcting Goldman's misleading statements about its conflict systems and business principles. Goldman's argument to the contrary is mostly a reprise of the claim it made in the last appeal— *i.e.*, that intentionally selling billions of dollars in CDOs to its clients, without disclosing Goldman was betting on the investments to fail, was consistent with Goldman's representations because Goldman never promised its conflict systems would work in every case. This Court rightly rejected that assertion in the last appeal, and there is no reason for a different result now.

II.  Goldman separately urges this Court to limit inflation-maintenance theory to cases in which there is a "near-perfect" match between the misstatement and the corrective disclosure. But that argument flies in the face of the Supreme Court's recent guidance and has no basis in this Court's precedents.

Goldman also argues that the district court should have asked the question posed by *Vivendi*—how would the market have reacted if the defendant "had spoken *truthfully*"?—at a higher level of generality. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). That argument

has no merit, but this Court need not resolve it because a more-general statement would have failed to move markets only if it were as misleading as what Goldman actually said.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of class certification for abuse of discretion, reviewing *de novo* the conclusions of law underlying that decision and for clear error the factual findings underlying its ruling, such as the court's price impact determination." *Goldman III*, 11 F.4th at 142 (cleaned up).  A "finding is clearly erroneous only if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ibid*. (citation omitted).

## ARGUMENT

## I.   The District Court Properly Found That Goldman Failed To Sustain Its Burden Of Disproving Price Impact.

On remand, the district court did exactly what it was instructed to do.  Goldman does not contest that the court considered all the parties' arguments and evidence, including the allegedly generic nature of the misstatements, the purported mismatch between those statements and the corrective disclosures, and what common sense suggested.  Goldman

simply thinks the district court made a factual mistake in finding that Goldman failed to disprove price impact. Goldman tries to dress up its factual disagreement in the garb of legal error, but those attempts fail. The district court correctly understood and applied the law to reach a conclusion that is nowhere close to clearly erroneous.

## A. The District Court Made No Legal Errors In Applying The Supreme Court's Guidance To This Case.

Contrary to Goldman's claims, the district court fully understood and faithfully applied the Supreme Court's recent guidance on generic statements, common sense, and mismatch.

### 1. The District Court Did Not Disregard The Supreme Court's Instructions In Considering The Nature Of The Statements And Common Sense.

The district court fully accepted the Supreme Court's teaching that the "generic nature of a misrepresentation often is important evidence of price impact that courts should consider at class certification." SA4 (quoting *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021)); *see also* SA7-8. It therefore carefully considered whether the inference of price impact established by Plaintiffs' evidence was "fatally undermined by the generic nature of th[e] misstatements." SA16. In doing so, the court acknowledged that those statements were generic

24

in varying degrees, with Goldman's business principles being "more generic" than its claims about its conflict-management systems. SA20. Taking that genericness into account with all the competing evidence of price impact, the court concluded that the "alleged misstatements were not so generic as to diminish their power to maintain pre-existing price inflation . . . *given the strong evidence of price impact*" provided by the other evidence in the case. *Ibid.* (emphasis added); *compare* Br. 29 (omitting italicized language).

Accordingly, Goldman's claim that the court gave "no weight to the generic nature of the challenged statements," Br. 19, is false. The court simply concluded that the generic nature of the statements did not *outweigh* the other relevant price-impact evidence, a conclusion entirely consistent with the Supreme Court's and this Court's direction to "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021) (per curiam) (*Goldman III*) (quoting *Goldman*, 141 S. Ct. at 1963).

25

Nor did the district court "resist[] both the Supreme Court's and this Court's characterizations" of the misstatements by "understat[ing]" their genericness. Br. 29. Goldman implies that the Supreme Court held that the statements in this case were "exceedingly generic." *Ibid.* But the Court simply stated that the statements were "generic," without assessing the *degree* of that genericness. *See* 141 S. Ct. at 1957, 1959, 1961. That is hardly surprising. Whether Goldman's statements were a little generic or exceedingly so had no bearing on the legal question before the Court, which was whether genericness in any form was relevant to the price-impact analysis. The Supreme Court left it to this Court and the district court to decide on remand how generic the statements were and what that meant for the ultimate question of price impact. *See id.* at 1961, 1963; *see also Goldman III*, 11 F.4th at 143.

> 2. *The District Court Correctly Understood The Supreme Court's Guidance On "Mismatch."*

Goldman also argues that the district court committed legal error by "misconstru[ing] the Supreme Court's mismatch framework" in two ways. Br. 34.

*First*, Goldman accuses the district court of applying a "subject-matter test" under which, "short of an 'exceedingly' large or 'boundless

26

gap in genericness,' it was sufficient that (some of) the challenged statements and (some of) the 'corrective disclosures' 'implicated the same conflicts and Goldman's infrastructure for managing them.'"  Br. 35 (quoting SA26-28) (cleaned up).  Even a casual examination of the district court's opinion shows this is not so.

To start, the district court *specifically rejected* the claim—which Goldman now says the court accepted—that is it enough for there to be a "link" between the misstatement and corrective disclosure.  SA25-26. The court acknowledged that it had required little else in its last class certification decision, but found that the Supreme Court's intervening decision introduced the "new idea" that required it to consider the "relative genericness" of the misstatements and corrective disclosures in the mismatch analysis.  SA26.  Accordingly, instead of establishing some arbitrary threshold below which a mismatch is inconsequential, as Goldman claims (Br. 35), the district court applied the Supreme Court's "sliding-scale test" under which "the inference of price impact becomes weaker—and at some point must fail—as misstatement and corrective disclosure diverge in genericness."  SA26.

Goldman's contrary assertions rely on quoting bits and pieces of the district court's opinion out of context. The court's reference to disclosures that "'implicate' the same general subject matter" as the misstatements, Br. 35 (quoting SA24), was not part of some general rule, but a portion of the court's explanation as to why the genericness of the statements in this case did not preclude a finding of price impact given the other evidence. *See* SA23-24. Likewise, the court did not hold that the genericness of Goldman's statements was irrelevant unless "exceedingly more generic than the corrective disclosures." SA26; *contra* Br. 35. It said that in "[a]pplying this sliding-scale test, the Court finds the alleged misstatements are not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record." SA26. Finally, the court did not hold that only a "boundless gap in genericness" is problematic so long as the misstatement and disclosure address the same subject. Br. 35 (quoting SA28) (brackets omitted). Rather, the court was again describing the degree of mismatch it found in this particular case and holding that it was insufficient to sustain Goldman's burden "in light of the otherwise convincing evidence of price impact." SA28.

*Second*, Goldman appears to argue that the Supreme Court held that there is a fatal mismatch between a misstatement and a corrective disclosure unless the two "involve the same . . . level of specificity." Br. 35. But the district court correctly understood that the Supreme Court held no such thing. SA26. To the contrary, the Court made clear that even when a mismatch in specificity is significant (as in the hypothetical example it gave), that discrepancy merely makes it "*less likely* that the specific disclosure actually corrected the generic misrepresentation, which means that there is *less reason* to infer . . . price impact." 141 S. Ct. at 1961 (emphasis added).

As Goldman sometimes seems to recognize (*e.g.*, Br. 37), what matters in the end is whether the "specific disclosure actually *corrected* the generic misrepresentation." 141 S. Ct. at 1961 (emphasis added). Sometimes, a mismatch in specificity may prevent a disclosure from correcting a defendant's misstatement. But not always. A car company may say its vehicles have "'passed all safety tests,'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016), only to have that statement proven false by a 40-page government safety report on one particular model. Goldman cannot seriously claim that the market's reaction to that

report would fail to prove price impact because the report was significantly more detailed than the false statement. Yet, the logic of its argument is that the case for price impact would be *improved* if the corrective disclosure were *less* detailed, as if the example the Supreme Court gave in this case would be less problematic if the corrective disclosure were as vague as the misstatement (*e.g.*, "Things are a little iffy just now.").

The dissonance in Goldman's position is illustrated by its simultaneous complaints that the disclosures in this case have too much and too little detail. Goldman says the first and third disclosure are problematic because they "were far more specific" than Goldman's statements. Br. 40. But a page later, Goldman says the mismatch is "fatal" because the disclosures were *not detailed enough*, "convey[ing] less information on much narrower subjects than the Supreme Court's example of a report that 'fourth quarter earnings did not meet expectations.'" Br. 41 (citation omitted); *see also id*. 39 (complaining that "the second [disclosure] was entirely vague"). The Supreme Court did not suggest that price impact can only be found in rare Goldilocks cases in

which the specificity of the misstatement and corrective disclosure align just so.[3]

## B. The District Court Did Not Clearly Err In Finding That Goldman Failed To Disprove Price Impact.

Unable to show that the district court applied the wrong legal standard, Goldman must demonstrate that the court committed clear error in finding, based on its review of all the evidence and its assessment of the credibility of the expert witnesses, that Goldman failed to prove its misstatements had no price impact. *See Goldman III*, 11 F.4th at 142.

That is a tall order. Goldman itself publicly acknowledged that "failure to appropriately identify and deal with conflicts of interests could adversely affect our business." JA3278. The market responded harshly when Goldman's failure to manage its conflicts was revealed, a reaction that Goldman admits was in response to the corrective disclosures (not to some other unrelated news). And as this Court has observed, common

---

[3] Goldman also makes no effort to reconcile its claim that the corrective disclosures were too vague to correct its misstatements with its simultaneous argument that earlier articles of similar detail—based on less-credible sources and published in the face of Goldman's denials—had already revealed the relevant truth to the market. *See, e.g.*, Br. 38-39, 47-48.

sense dictates that if Goldman had told the truth about its conflict systems, "clients and potential clients [would] seriously reconsider trusting Goldman with their money," thereby damaging "Goldman's bottom line" and the value of its stock. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 272 (2d Cir. 2020) (*Goldman II*).

Moreover, given this Court's decision in the last appeal, Goldman has been forced to abandon any real attempt to sustain its burden through the usual event study or other direct empirical evidence of price impact. Instead, it argues that its indirect evidence—its complaints about the generic nature of its misstatements, the purported mismatch between those statements and the corrective disclosures, and its own version of "common sense"—so convincingly shows that one would not *expect* such statements to have a price impact that the district court was compelled to find an absence of price impact on the strength of that evidence alone. That effort fails.

### 1. *Goldman Does Not Seriously Challenge The District Court's Rejection Of Its Direct Evidence Of Price Impact.*

In *Halliburton II*, the Supreme Court explained that there are two kinds of price-impact evidence. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281-82 (2014). There is *indirect* evidence

suggesting that one would *expect* a statement to have, or not have, a price impact. *Id*. at 281. The *Basic* prerequisites are indirect evidence of price impact because one would expect that a statement made in that context would affect stock prices. *Ibid*. (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). The price-impact rebuttal opportunity is provided to allow defendants to present "*direct*, more salient evidence showing that the alleged misrepresentation did not *actually* affect the stock's market price." *Id*. at 282 (emphasis added). Ordinarily, that direct evidence of what actually happened takes the form of an event study or similar empirical evaluation of how investors in fact reacted to a statement or its correction. *See id*. at 280; *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *20 (S.D.N.Y. Oct. 18, 2019).

In this case, Defendants presented two empirical studies attempting to provide direct evidence on price impact: (1) Dr. Gompers' study of media reports predating the corrective disclosures, which purported to demonstrate that the market was indifferent to earlier revelations that Goldman was engaging in transactions rife with undisclosed conflicts; and (2) Dr. Choi's event study, which attempted to show that the market reaction to the first corrective disclosure was

caused by something other than the market's realization of the truth about Goldman's conflict practices.

In its second order, the district court "declined to credit Dr. Gompers' opinion" and found "that Dr. Choi's methodology was novel, unreliable, and thoroughly outpaced by the conclusions he derived therefrom." SA17-18. This Court affirmed both conclusions. *See Goldman II*, 955 F.3d at 271 ("Goldman has no persuasive response to the [district] court's" rejection of Gompers' study); *id.* at 272 (Goldman never "meaningfully engage[d] with the district court's detailed rejection of Dr. Choi's report"). Nothing in the Supreme Court's subsequent decision called those holdings into doubt. And in its most recent remand decision, the district court again "decline[d] to credit Dr. Gompers' conclusions" and reaffirmed its rejection of Dr. Choi's study as "unreliable." SA17-18; *contra* Br. 43 (mischaracterizing district court as giving "little weight" to this evidence, rather than rejecting it wholesale as unreliable and uninformative).

Goldman makes no more effort in this appeal to address the district court's rejection of this evidence than it did in the last. Instead, Goldman simply asserts that its experts "provided economic analyses showing that

. . . the market's reaction to the 'corrective disclosures' was attributable solely to the reported government enforcement activity," Br. 47, as if simply saying so made it true.

> ## 2. The District Court Did Not Clearly Err In Finding That Goldman's Indirect Evidence Was Insufficient To Carry Its Burden Of Proof.

As it has in the past, Goldman responds to the weakness in its own proof by trying to shift the burden of persuasion to Plaintiffs. Having failed to present a credible event study of its own, Goldman brazenly faults *Plaintiffs* for failing to "hire[] an expert to perform an event study." Br. 49.[4] Goldman further argues that because its attempt at disproving price impact through direct evidence was a complete failure, and because Plaintiffs supposedly "offered minimal evidence of their own," the court should have ignored that the "evidentiary record" was "thin" and instead simply decided who had the better of the argument regarding the "common-sense evidence about the statements themselves and their mismatch with the 'corrective disclosures.'" Br. 43; *see also* Br. 28 (calling

---

[4] In fact, Dr. Finnerty performed an event study in his report. *See, e.g.*, JA2203-09; SA9-10.

"the nature of the generic challenged statements" the "most significant[]" evidence of price impact in the case).

Goldman has it exactly backwards. Even setting aside Goldman's unsupported criticism of Plaintiffs' evidence, *see infra* at 54-56, the argument ignores that Plaintiffs already provided sufficient indirect proof of price impact to justify shifting the burden of proof to Goldman. "Once the shareholders successfully invoke *Basic*, which happened here, the question is not which side has better evidence, but whether the defendant has rebutted the presumption." *Goldman II*, 955 F.3d at 272 n.19. The Supreme Court directly rejected the suggestion that a defendant could shift the burden back to the plaintiff simply by pointing to the generic nature of its misstatements. 141 S. Ct. at 1963.

In fact, Goldman's inability to marshal any credible direct, empirical evidence in support of its position is, in itself, powerful proof that Goldman's expectations about the price impact of its misstatements are unfounded. If, as Goldman insists, it is obvious that such statements can have no impact, it should have been easy enough to produce a traditional event study identifying an alternative cause of the undisputed market reaction to the corrective disclosures. That is why Goldman hired

36

Dr. Choi.  The unmitigated failure of Dr. Choi's study (and Dr. Gompers' similar efforts) is itself substantial evidence that Goldman's speculations are unfounded.

Accordingly, the question on remand was whether, having failed to provide any meaningful direct evidence of lack of price impact, Goldman could yet sustain its burden of proof on the strength of its *indirect* evidence purporting to show that one would not *expect* Goldman's statements to have a price impact.  The district court permissibly concluded that Goldman's indirect evidence could not bear that weight.

### i.  Nature Of The Statements

Goldman starts with the nature of the misstatements, claiming that they were incapable of affecting its stock price because they were "exceedingly generic" and "aspirational."  Br. 29; *see also id*. 32.  For this proposition Goldman appeals to "common sense" and a report from its expert, Dr. Laura Starks.

<u>Common Sense</u>.  As the district court observed, the challenged statements read in context and together conveyed information important to the market's evaluation of Goldman's value.  SA20, 27.  Goldman actively courts conflicts in order to maximize revenue and the firm's

37

value.  That business model offered high rewards, but also considerable risks.  It is only common sense that the market would care about whether Goldman had in place conflict-management practices that would reliably prevent the kinds of massive, undisclosed conflicts that ended up severely damaging Goldman's reputation in this case.  *See Goldman II*, 955 F.3d at 271-27, 275 n.25.  That surely is why Goldman went out of its way to reassure investors, even though it had no legal obligation to do so, that it had "extensive procedures and controls that are designed to identify and address conflicts of interest."  JA3278.  Goldman's further representations about its business principles "reinforce[d] misconceptions about Goldman's business practices," SA20, by falsely assuring investors that Goldman would not intentionally bypass or subvert its conflict systems in order to subordinate its clients' interests to its own.

Goldman nonetheless insists that these statements were too generic to affect its share price.  Br. 32.  But the district court was clearly correct that Goldman's statements about its conflict systems "are substantially less generic than the Supreme Court's exemplar."  SA27; *compare* 141 S. Ct. at 1961 ("we have faith in our business model").

38

Indeed, although Goldman never quotes the relevant language, the Company's statements address with specificity the kind of conflicts at issue in this case, noting the rise in "situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interests of another client." JA3278.    Moreover, the business-principle statements, while more generic, are not challenged standing alone but as reinforcing the conflict statements.[5]

Nor were Goldman's representations about its conflict system "aspirational," for reasons the court in *Karimi v. Deutsche Bank*

---

[5] For that reason, there is no merit in Goldman's reliance (Br. 30 & n.3) on cases finding allegedly similar business-principle statements immaterial when challenged in other contexts and in isolation, without regard to a particular defendant's business model and more-concrete representations about specific business practices and systems. *See, e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016) ("[S]tatements about a company's reputation for integrity or ethical conduct" must be viewed "in context" and may "give rise to a securities violation" when, "for example, a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry."). Goldman is also wrong to claim (Br. 32) that Plaintiffs did not urge the district court to consider the statements together in context. *See, e.g.*, R. 253 at 9.

*Aktiengesellschaft*, 2022 WL 2114628 (S.D.N.Y. June 13, 2022), recently gave in rejecting a similar argument. There, the defendant bank represented that it had "developed effective procedures for assessing clients in order to facilitate comprehensive compliance" with anti-money laundering rules. *Id*. at *6 (alteration omitted); *see also id*. at *7 (bank "claimed to implement 'special safeguards'" and "'intensive checks'"). The bank argued that these statements were "just aspirational" because they did not promise the bank would always succeed in avoiding violations. *Id*. at *6. Following this Court's decision in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014), the district court rejected that argument, observing that the statements were not "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" 2022 WL 2114628, at *7 (quoting *UBS*, 752 F.3d at 187). Instead, they "describe *specific processes* that the Complaint alleges were routinely ignored or, in practice, did not even exist when it came to ultra-rich" clients. *Id*. at *9 (emphasis added).

So, too, here. Goldman described the "extensive procedures and controls" it claimed to "have," not the ones it aimed to create and observe in the future. JA3278. The whole point was to assure investors that

40

Goldman not only aspired to avoid conflict problems, but that it had done something concrete and effective to actually avoid them. To be sure, investors would have known that Goldman was not claiming that its systems were infallible. But given these representations, investors also would not have expected Goldman to intentionally ignore or bypass those systems in order to benefit a favored client or its own financial interests. *See Karimi*, 2022 WL 2114628, at *9.

Dr. Starks. Goldman nonetheless argues that a report by Dr. Starks, a witness it barely mentioned in the last appeal, establishes that Goldman's "statements were too generic to be relied upon by investors." Br. 44.[6] Her report offered three kinds of evidence, each of which the district properly found unpersuasive.

*First*, Dr. Starks "opined that in her experience investors do not find 'general' and 'aspirational' statements regarding a company's business princip[les] . . . or management of conflicts of interest 'to be pertinent to making investment decisions.'" SA12. The district court, however, credited Dr. Finnerty's contrary testimony that in *his* experience,

---

[6] "Defendants did not call Dr. Starks as a witness, and she therefore was not subject to cross-examination[.]" SA14 n.12.

41

Goldman's conflict statements *were* the kind of statements investors would care about.  SA15.  Such credibility assessments fall uniquely within the province of the district court.  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 213 (2d Cir. 2001).

*Second*, Dr. Starks claimed that similar statements are commonly made and reasoned that this meant that the statements could not affect stock prices.  Br. 44.  The district court rightly rejected this "strength-in-numbers" argument as logically and legally unsound.  SA23.  Car companies claim all the time that their vehicles have "passed all safety tests."  *Vivendi*, 838 F.3d at 259.  But that doesn't mean that "no investor would take such statements seriously."  Br. 30 (citation and brackets omitted).  Here, Dr. Starks cited nothing to support her assumption that the alleged ubiquity of statements addressing conflict-management practices meant that investors are uninterested in the subject or universally disbelieve whatever firms say about it.  *See* JA2610.  If anything, common sense suggests the opposite is true.  *See* SA24 ("This Court is hard-pressed to understand why statements such as those at issue here would have achieved such ubiquity in the first place were they incapable of influencing (including by maintaining) a company's stock

42

price."); Amicus Br. of Soc'y for Corp. Governance 4 (acknowledging that many statements are commonly made because "companies are frequently **expected** to" address certain subjects) (emphasis in original); *Goldman II*, 955 F.3d at 271-72, 275 n.25 (common sense that investors would care about conflict-management practices).

*Third*, Dr. Starks asserted Goldman's statements had no price impact because stock analysts purportedly did not mention them at the time they were made or in the aftermath of the corrective disclosures. SA12-13. But the district court "credit[ed] Dr. Finnerty's common-sense critique" of Dr. Starks' methodology and conclusion. SA21. Dr. Finnerty explained that "[n]ot only did Dr. Starks limit her review to securities analysts' reports, ignoring articles from *The Wall Street Journal* and the *Associated Press* along with other prominent market commentary," but she was also "too restrictive in her search criteria—limiting her hunt to direct quotations and explicit attributions while neglecting remarks that paraphrased the alleged misstatements or made reference to their subject matter." SA14; *see* SA21. Indeed, Dr. Finnerty cited extensive analyst and other market commentary during the Class Period discussing the subject of Goldman's misstatements, including the

43

importance of Goldman's purportedly effective conflict management systems and sterling reputation, which Dr. Starks ignored. *See infra* at 47-48.

The court also agreed with Dr. Finnerty that repeated representations "reinforc[ing] what investors already think" can "'le[a]d to the expectation that the company's behavior will conform to those statements'" without prompting specific comment from analysts or the media. SA21 (quoting JA2815) (emphasis omitted). Goldman's misleading representations told the public what everyone expected to be true and, hence, were not newsworthy. JA2815.

That analysts may not have mentioned the misstatements in reporting on the corrective disclosures is uninformative as well. Price impact asks whether the market reacted to the revelation of the "truth behind the alleged fraud"—here, the lack of meaningful conflict-control systems—not whether market analysts specifically identified the lies that hid the truth. *Vivendi*, 838 F.3d at 261; *accord Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (in asking whether misstatement caused a loss, question is whether "the misstatement or

44

omission concealed something from the market that, when disclosed, negatively affected the value of the security").

At the same time, under *Vivendi*, the question is not whether analysts reported Goldman's confirmatory false statements, but what "would have happened if [Goldman] had spoken *truthfully*." SA21 (quoting *Vivendi*, 838 F.3d at 258); *see also Goldman II*, 955 F.3d at 271. Dr. Starks' survey—which asked only whether analysts noted what Goldman said and ignored what Goldman should have said—could provide no answer to that question. As a result, the court rightly found that Goldman "presented no evidence purporting to demonstrate, under the test set forth in *Vivendi*, that if Goldman had replaced the alleged misstatements with the alleged truth about its conflicts, its stock price would have held fast." SA21-22.[7]

---

[7] Goldman also ignores entirely its challenged statement in a press release falsely claiming that its CDOs were "fully disclosed and well known to [CDO] investors." JA87 (Compl. ¶124); *see also* JA86-88, JA93-94. That statement was hardly generic and matches the corrective disclosures precisely.

*ii.    Purported Mismatch*

Goldman further argues that the district court should have found no price impact given the purportedly "stark differences in the content and specificity of the challenged statements and 'corrective disclosures.'" Br. 38. But the district court fully acknowledged a certain degree of mismatch, SA28, before concluding that the "alleged misstatements are not so exceedingly more generic than the corrective disclosures that they vanquish the otherwise strong inference of price impact embedded in the evidentiary record," SA26. That decision was not clearly erroneous.

As discussed earlier, the Supreme Court has not required a perfect match in specificity, so long as the difference does not preclude the disclosures from correcting the alleged misstatements. *See supra* at 29-31.[8] And here there was ample evidence showing that the corrective disclosures revealed the truth concealed by Goldman's misstatements. Dr. Finnerty explained that analysts had repeatedly emphasized the

---

[8] Goldman faults the district court for failing to walk through the corrective disclosures and misstatements in greater detail. Br. 36-37. But the Supreme Court did not dictate the manner in which district courts must write their opinions. And it is plain that the district court—writing its third class-certification opinion for parties intimately familiar with the details of the case—fully considered the relationship between all the misstatements and the corrective disclosures. *See* SA1, SA25-28.

importance of Goldman's purportedly rigorous conflict-management systems. *See* JA4709-12. For example, *The Wall Street Journal* explained that "conflicts [are] intrinsic" to Goldman's business model and that its "stock carries a premium to its peers in bull markets" because "of the perception that it is an elite advisor and an elite trader that can do both simultaneously while managing the conflicts to the satisfaction of its clients." JA3772-73. Merrill Lynch likewise reported that Goldman's "[c]onflict [m]anagement skill maximizes franchise value" because "Goldman manages conflicts, rather than simply avoiding them, in order to maximize the value of its franchise." JA782.[9]

But after the corrective disclosures, *The Wall Street Journal* reported, Goldman's

> *premium has dissolved* because the market is worried, not about lawsuits or politics, but about Goldman's core business.

---

[9] *See also, e.g.*, JA1228 (2009 Bank of America Merrill Lynch report: "*Goldman has always managed its conflicts effectively*. … Goldman has often been viewed as having more than the average amount of *potential conflict* because of its principal activities (private equity and prop trading), though the scale and growth of its client trading and investment-banking franchise make it clear that *these conflicts have overall been well managed*."); JA794 (2008 Bank of America Merrill Lynch report: "[W]e believe that Goldman has actually tended its customer-oriented businesses carefully, which explains . . . *the absence of major conflict problems*.") (emphasis added).

> The Abacus affair has highlighted the *conflicts* intrinsic to the investment banking business. But historically Goldman has managed those conflicts well. . . . Conversely, *evidence of poorly managed conflicts* is especially dangerous to Goldman. Some damage has already been done.

JA3772-73 (emphasis added). In other words, investors devalued Goldman's stock because they believed that the corrective disclosures revealed that Goldman lacked either the procedures or the integrity to avoid the kinds of undisclosed conflicts illustrated by the corrective disclosures, risking damage to its reputation and to its ability to attract and retain clients. *See, e.g.*, JA2040-44 (Finnerty's report collecting supporting market commentary).[10]

Indeed, even Goldman insiders admitted this obvious truth. Defendant Viniar, for example, acknowledged at his deposition that after "the SEC suit on the Abacus case" the "world deemed us to have not managed [the] conflict well," which is "not good for your reputation." JA686-87; *see also* JA678-83 (Goldman internal, contemporaneous admission that what "drove [its stock] price during the day" on April 16,

---

[10] As these citations demonstrate, Goldman's claim (Br. 17) that Dr. Finnerty "identified only three articles even tangentially related to the challenged statements" is nonsense.

2010 was news of Goldman's "conflicts of interest in connection with CDO marketing"); JA671 (Goldman Consent Decree with SEC agreeing to "firmwide review of its *business standards*" and an "evaluation of [its] *conflict management*") (emphasis added).[11]

As a result, regardless of any mismatch in levels of specificity, the corrective disclosures suffered from no mismatch in content—they corrected Goldman's false claims to have extensive procedures in place to deal with conflicts and a commitment to business principles that would prevent it from evading those client protections.

Goldman makes little effort to deny that the district court could permissibly view this evidence as showing that the market was reacting to revelation of Goldman's failure to manage its conflicts. Instead, it says

---

[11] Dr. Finnerty also identified market commentary noting what was evident on the face of the corrective disclosures—Goldman's behavior was inconsistent with its business principles, which were specifically referenced in the articles. *See, e.g.*, JA2040-41 (Finnerty report, describing AP story citing Goldman's "*14 Business Principles*" and noting that they have "been questioned by the government," which "may cost it clients") (emphasis added); JA1201 (Finnerty demonstrative, quoting *Wall Street Journal* article stating, "It's hard to imagine the damage that these developments have done already to Goldman Sachs's reputation. *The company has always maintained a public position that the business of investment banking depends on trust, integrity and putting clients' interests first*.") (emphasis added).

the disclosures were not corrective—and therefore did not match its misstatements—because Goldman never promised it would *always* avoid exploiting its clients in these ways. "[F]ar from representing that Goldman had no conflicts," Goldman argues, the conflict statements "cautioned that the firm's conflicts were complex and difficult to manage and that enforcement actions could result if controls failed." Br. 40 (cleaned up).

If this argument seems familiar, it's because Goldman made the same claim in the last appeal and this Court rejected it. *See* 955 F.3d at 273. Goldman "argue[d] that the news of its alleged conflicts could not have caused its share price to decline on the corrective-disclosure dates because its alleged misstatements were 'consistent' with the later-revealed fact that it had significant conflicts of interest." *Id*. at 273. "Specifically, Goldman contend[ed] that statements such as 'potential or perceived conflicts could give rise to litigation or enforcement actions,' 'expressly warned' the market that it might have conflicts." *Id*. at 273-74. Consequently, Goldman argued, its statements were "'consistent' with the revelation that it allegedly failed to prevent its employees from colluding with hedge funds to trick investors into buying risky

50

securities." *Id*. at 274. This Court found this claim "doubtful," and held that the "district court did not abuse its discretion by rejecting that theory." *Ibid*. Nothing in the Supreme Court's subsequent decision addressed this case-specific factual issue, much less called this Court's holding into doubt.

This Court's recent decision is consistent with its earlier precedent in *Meyer v. Jinkosolar Holdings Co*., 761 F.3d 245 (2d Cir. 2014). There, the Court acknowledged that a defendant's representation that it had in place systems to control pollution "did not guarantee 100% compliance 100% of the time." *Id*. at 251. But, the Court held, "investors would be misled" if the defendant failed to disclose "then-ongoing and serious pollution violations." *Ibid*. "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Ibid*.; *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 125 (2d Cir. 2013) ("[S]aying that exceptions occur does not reveal what the [plaintiff] alleges, namely a wholesale abandonment of underwriting standards.") (cleaned up); *SEC*

51

*v. Gabelli*, 653 F.3d 49, 54, 57 (2d Cir. 2011) (similar), *rev'd on other grounds*, 568 U.S. 442 (2013).

Here, undisclosed conflicts were a "peculiar risk" to Goldman's business model and its statements were designed to reassure investors that those risks were mitigated by extensive conflict-management systems. Goldman did not need to promise that those systems would be 100% effective in order to mislead investors in the same way as the defendants did in *Meyer*. After all, Plaintiffs' claims are not based on some one-off mistake by a low-level employee.[12] As the market commentary reflects, the disclosures showed uncontrolled conflicts of such significance as to risk serious damage to the firm's reputation and its bottom line.

Goldman's remaining mismatch arguments have no merit either. It objects that the Abacus and Hudson conflicts "had previously been reported in *The New York Times*" and argues that the district court therefore should have compared only the new "granular detail" in the

---

[12] *See* JA57 (Complaint identifying high-level Goldman officials involved); JA58-60, JA62-67, JA92-134 (same, explaining officials' roles); JA3581-3602 (SEC complaint against Goldman and Goldman Vice President Fabrice Tourre).

corrective disclosures to the challenged misstatements, resulting in a greater mismatch in specificity. Br. 39-40. But this Court previously affirmed the district court's rejection of the premise that the market accepted these articles as credible revelations of Goldman's falsehoods, despite Goldman's denials and the lack of hard evidence. *Goldman III*, 955 F.3d at 271. If it took these granular details to convince the market that the prior reporting was correct, that does nothing to undermine the conclusion that the market's reaction to this late-breaking realization shows that the false statements hiding the truth had maintained an artificial inflation in Goldman's stock.

Goldman says the second disclosure involved only a "vague rumor" of another government investigation, without saying what deals were under scrutiny. Br. 39. But although the article itself did not say what deals were under investigation, it made clear that the inquiry extended beyond Abacus. *See* JA3615. Moreover, the report came only a week after congressional hearings probing Goldman's other CDOs, including Hudson. *See supra* at 10. Accordingly, the disclosure revealed that the Abacus episode was not the isolated incident that many analysts had initially believed it to be, which had tempered the market reaction to the

53

first disclosure.[13]  The market's response to the second disclosure was based on investors' improved understanding of the breadth of Goldman's departure from its purported conflict practices and business principles.

>    3.    *The District Court Did Not Clearly Err In Weighing The Competing Evidence On Price Impact.*

Given all this, the district court was clearly within its discretion to decide that, all things considered, Goldman failed to show by a preponderance of the evidence that its misstatements had no price impact.

As it has in the past, Goldman "focuses heavily on the supposed lack of evidence the shareholders introduced" to rebut its price-impact claims. *Goldman II*, 955 F.3d at 272.  But as this Court explained in rejecting the same argument two years ago, Dr. Finnerty conducted exactly the kind of empirical analysis this Court's decisions have long approved.  The "best way to determine the impact of a false statement is to observe what

---

[13] JA2216 (Finnerty report, quoting Bank of America Merrill Lynch as stating after the first disclosure, "This is clearly a serious charge, but so far it is a one-off"); JA1202 (same, quoting Citigroup Global Market analysis stating "the issue is whether this was an isolated incident or not"); *ibid*. (same, quoting another Bank of America Merrill Lynch report stating "it's not clear whether there are more such cases").

happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on share price is equal to the additive inverse of the truth's negative impact." *Id.* at 273 (quoting *Vivendi*, 838 F.3d at 255). That is "precisely what the district court did" in accepting Dr. Finnerty's analysis showing that the fall in share prices was caused by "'the news of Goldman's conflicts.'" *Ibid.* (citation omitted). Indeed, Dr. Finnerty went further, confirming the results of his statistical analysis through a review of market commentary showing that the decline in stock price was the direct result of the market's discovery about the truth of Goldman's conflict-management practices and business principles. SA17.

Defendants object that Dr. Finnerty failed to "disaggregate the price impact of the purported revelation that Goldman's challenged statements were 'false'" from the market's concerns about the direct costs of any enforcement actions. Br. 48-49. Even if it made any difference whether the market was reacting to concerns about enforcement costs rather than reputation effects, which Plaintiffs dispute,[14] the burden was

---

[14] *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (rejecting disaggregation objection similar to Goldman's here,

on Goldman to establish that "the *entire* price decline . . . was due to something other than its alleged misstatements," not on Plaintiffs to disaggregate the causes of the corrective-disclosure declines. *Goldman II*, 955 F.3d at 270 (emphasis added); *see also id*. at 270 n.18.[15] And as this Court has observed, it is implausible that the market cared only about enforcement costs and not about how Goldman's customers would react to the revelations about Goldman's conflict-management practices. *Id.* at 271-72.[16]

---

explaining "regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification").

[15] Defendants' citation to allegedly contrary precedents governing loss-causation is thus inapt. *Compare* Br. 49, *with Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (plaintiffs need not establish loss causation at class certification).

[16] Evidence confirmed what common sense predicted. *See, e.g.*, JA1202 (Finnerty demonstrative, quoting Moody's report: "This development is a credit negative for Goldman Sachs given the potential franchise implications *and* direct financial costs.") (emphasis added); JA1203 (same, reporting Citigroup Global Market analysis: "To the extent clients lose faith and either reduce or eliminate their transactions with Goldman, it could have significant detrimental effect across all of the firm's business."); JA2215 (commentator explaining that the "greatest penalty for Goldman is not the financial damages – Goldman is enormously wealthy – but the reputational damage"); *see also* JA1202-03, 2215, 2229-30 (Finnerty report).

That, ultimately, is the fatal flaw in Goldman's case. Even if Goldman could show that its statements were significantly more generic than they were, even if it could show that there was a stark mismatch in specificity, at the end of the day Goldman admits that the market reacted violently to the corrective disclosures and not to any other unrelated news. What was the market reacting to, if not the revelation that Goldman lacked extensive (or even nominal) conflict-control systems and that it was willing to sacrifice the interests of its clients to line its own pockets? The only answer Goldman has ever been able to come up with is that the market was worried about the direct cost of enforcement actions, while caring not at all about what the revealed lack of conflict controls and integrity would do to the Company's reputation and its bottom line. That hypothesis is wildly implausible, as confirmed by Goldman's complete inability to prove it through Dr. Choi's event study and the ample contemporaneous evidence that the market was *deeply* concerned about the disclosures' reputation effects.

## C. Goldman's Request To Narrow The Scope Of The Class And The Evidence Is Forfeit And Meritless.

Goldman argues that even if it failed to disprove price impact, the Court should nonetheless preclude the class from challenging Goldman's

business principles as false statements and order the district court to narrow the class period to exclude the second and third corrective disclosures. Br. 51-52. The Court need not consider these requests because Goldman never made them below. Indeed, although nothing prevented it from making these arguments at the outset of the class-certification proceedings, Goldman raised them for the first time only in this appeal, seven years later. The arguments are forfeit. *See Vivendi*, 838 F.3d at 243.

The requests have no merit either. As discussed, the district court correctly understood the business-principle statements as intertwined with the conflict-management claims, "reinforc[ing] misconceptions about Goldman's business practices, and thereby serv[ing] to sustain an already-inflated stock price." SA20. And Goldman's complaints about the second and third disclosures are particularly inapt given that Dr. Choi performed no event study regarding the stock declines following those disclosures. *See Goldman II*, 955 F.3d at 272. Given that Goldman bore the burden of proving that its misstatements had no price impact at all, the district court's "finding that the Abacus disclosure had a price impact suffices at this stage." *Ibid*.

58

There is no need to bend over backwards to forgive Goldman's failure to preserve these arguments. The district court remains empowered to reconsider and tailor class certification as the case progresses. Fed. R. Civ. P. 23(c)(1)(C); *Sykes v. Mel S. Harris & Assoc.*, 780 F.3d 70, 95 (2d Cir. 2015). And Goldman's motion for summary judgment raising essentially the same objections is already fully briefed and awaiting the district court's decision.

## II. The District Court Properly Applied This Circuit's Inflation-Maintenance Precedents.

Goldman separately argues (Br. 53) that the district court "unjustifiably extended this Court's inflation-maintenance theory," although exactly how is not entirely clear—Goldman seems to be raising two related objections, neither of which has merit.

### A. There Is No Basis For Goldman's "Near-Perfect Match" Limitation For Inflation-Maintenance Cases.

Goldman's principal argument seems to be that even when there is a sufficient match to prove price impact in an ordinary case, this Court should impose a *higher* standard in inflation-maintenance cases, requiring a "near-perfect" match between misstatements and corrective disclosures. Br. 55. Even more, Goldman would seemingly treat the

absence of a near-perfect match not as one consideration among many in the price-impact inquiry, but rather as an absolute bar to bringing an inflation-maintenance claim *at all*. *Ibid*. If that is what Goldman is arguing, it contradicts what the Supreme Court just wrote in this case and has no foundation in the decisions of this Court or the statute.

In its recent decision, the Supreme Court emphatically did *not* require a "near-perfect" match for inflation-maintenance claims. To the contrary, as noted earlier, the Court explained that even a very substantial mismatch merely makes it *"less* likely that the specific disclosure actually corrected the generic misrepresentation" and therefore may provide *"less* reason to infer" price impact "from the back-end price drop." 141 S. Ct. at 1961 (emphasis added). Moreover, the Court treated mismatch as simply one piece of "evidence" to consider, not a prerequisite for inflation-maintenance claims. *See ibid*. It is hard to see why the Court would have been so measured if it had contemplated that a near-perfect match would be required for inflation-maintenance claims to be cognizable in the first place.

Goldman counters that one can infer a "misstatement's inflation-maintaining effects" from "a corrective disclosure's inflation-dissipating

effects" *only* if "one statement is the inverse of the other." Br. 55; *see also id*. 59 (requiring "tight match"). But it offers no explanation for that assertion, which conflicts with the Supreme Court's mismatch guidance and is plainly incorrect. In the "analogous loss-causation context," Br. 49, it is well-established that a statement can be corrective even if it is not the "mirror image" of the misstatement. *See* SA27; *see also, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) ("[T]o be corrective, a disclosure 'need not precisely mirror the earlier misrepresentation'"), *cert. denied*, 142 S. Ct. 71 (2021) (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) ("This Court does not read *Goldman* to contradict that a corrective disclosure need not be a 'mirror image' disclosure[.]") (citation omitted). Instead, the corrective disclosure must simply "reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements." *Alaska Elec. Pens. Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (per curiam); *accord Vivendi*, 838 F.3d at 261 (a corrective disclosure "reveals the truth behind the alleged fraud"). That truth can be revealed in innumerable ways, some direct and others subtle. *See*

61

*Vivendi*, 838 F.3d at 262 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus.").

Goldman nonetheless claims, as it has before, that its proposed limitation on inflation-maintenance theory is implicit in this Court's precedents. Br. 55. But the argument fails for the same reasons as last time. "In effect, what Goldman has done is surveyed [this Court's] inflation-maintenance cases[,] claimed that each case fits one of its special circumstances, and thereby concluded that these are the *only* permissible applications of the theory." *Goldman II*, 955 F.3d at 266. "The problem for Goldman is that none of these cases held that the inflation-maintenance theory applies so narrowly." *Ibid*.

In *Waggoner*, for instance, this Court said nothing about the comparative levels of specificity between the misstatements and the corrective disclosures. And, in fact, the misstatements and corrective disclosures were quite similar to those in this case. As here, the defendant made representations regarding its business principles (*e.g.*, the company "was 'built on transparency'") and the systems it had in

place to protect clients from a particular risk inherent in its business
(*e.g.*, it had a "sophisticated surveillance framework that protects clients
from predatory trading activity").  875 F.3d at 87.  And as here, both
kinds of statements were shown to be untrue by a government lawsuit
alleging that the "protections" the defendant purported to "afford[] its
customers from high-frequency traders were false and misleading."  *Id*.
at 88.  If that is sufficient to constitute a "near-perfect" match, the same
is true in this case.

Likewise, *Vivendi* said nothing about the comparative levels of
generality.  In fact, it did not even quote the majority of the 57 alleged
misstatements.  *See* 838 F.3d at 238, 250, 262-63.  And those it did quote
were often substantially more general than the corrective disclosures.
*Compare, e.g.*, *id*. at 252 (alleged misstatements: Vivendi had "cash
available for investing" and emphasized "the strength of [its] cash flow")
(brackets in original), *with id*. at 263 (corrective disclosures: "news that
Vivendi planned to sell €10 billion in assets over the following two years,
€5 billion of which it hoped to sell within just nine months"; news reports
that "French authorities had raided Vivendi's Paris headquarters to
investigate possible securities fraud").

"Goldman's formulation of the inflation-maintenance theory is at odds with *Vivendi*" in another respect as well. *Goldman II*, 955 F.3d at 268. "That opinion, relying on the Seventh and Eleventh Circuits whose doctrine it adopted, noted that theories of 'inflation maintenance' and 'inflation introduction' are not separate legal categories." *Ibid*. (citation omitted). Yet, once again, "Goldman's proposed rule, by applying only to inflation-maintaining statements, would make inflation maintenance and inflation introduction 'separate legal categories.'" *Ibid*.[17]

Finally, Goldman's proposal opens opportunities for gamesmanship. For example, it would allow companies to avoid liability for inflation-maintaining false statements by issuing their own corrective disclosures phrased in ways designed to facilitate a mismatch objection while still having the practical effect of releasing artificial inflation from its stock price (and, therefore, precluding any claim that a later, better-matching corrective disclosure from another source demonstrated that the misstatement had a price impact).

---

[17] Parties rely on corrective disclosures to show how false statements affect stock prices in both inflation-introduction and inflation-maintenance cases. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).

**B.    Goldman's Complaints About The District Court's "Substitute Truthful Statement" Have No Merit.**

Goldman also faults the district court for stating that it "agrees with the Second Circuit that '[i]t is difficult to imagine that Goldman's shareholders would have been indifferent had Goldman disclosed its alleged failure to prevent employees from illegally advising clients to buy into CDOs that were built to fail by a hedge fund secretly shorting the investors' positions.'"  SA21 (citation omitted); *see* Br. 58 (citing SA21). Goldman argues that the court should have asked how the market would have reacted to a "reasonable truthful substitute" that was as general as its misstatements.  Br. 58.  Something like, "We have imperfect controls for avoiding conflicts of interest" or "We have extensive conflicts controls, but do not always follow them perfectly."  *Ibid*.  That objection fails for several reasons.

To start, the district court was simply repeating—indeed, directly quoting—the question this Court posed under *Vivendi* in the last appeal. *See* Br. 58 (citing SA21 (quoting *Goldman II*, 955 F.3d at 271)).  Goldman did not challenge this Court's interpretation of *Vivendi* when it sought rehearing en banc or certiorari.  And in remanding the case back to the district court, this Court rejected any suggestion that the Supreme

65

Court's decision altered the "'contours' of the inflation-maintenance theory" under *Vivendi*. *Goldman III*, 11 F.4th at 141 n.3 (quoting 141 S. Ct. at 1959 n.1).

Goldman thinks this Court got it wrong, but it cites no basis for requiring that the truthful substitute must closely match the level of generality of the defendant's misstatements. *Vivendi* simply requires a court to consider how the market would have reacted if the defendant revealed that relevant truth rather than concealed it. It makes no difference whether the defendant would have revealed that truth through a general or a specific statement; the common-sense question *Vivendi* asks is whether the market would have been indifferent to that truth, however expressed.

Goldman insists the level of generality *does* make a difference because the market would not have reacted to a much more general statement like, "We have imperfect controls for avoiding conflicts of interest." Br. 58. But if that is true, it is only because Goldman's proposed alternatives are just as misleading as what it actually said. Saying that Goldman's conflict controls were "imperfect" or that not every business and employee "always follow[s] them," *ibid.*, when the company

66

knew that high-level Goldman officials were at that very time engaged in massive illegal conflicts is exactly the kind of "half-truth" *Vivendi* and other cases have condemned. *See Vivendi*, 838 F.3d at 240. For example, in *SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011), a mutual fund represented that traders who engaged in certain market-timing arbitrage "have been identified and restricted or banned from making further trades," but noted that "these procedures . . . did not completely eliminate all timers." 653 F.3d at 55 (citation omitted). The truth, however, was that defendants had allowed one favored client to engage in market-timing on a massive scale. *Id*. at 54. This Court held that claiming the fund had imperfect procedures for banning market timers was a "half-truth" because it gave the impression that the defendants "had attempted in good faith to reduce or eliminate . . . market timing across the board," when in reality the defendants had allowed one major client to "engage in a very large amount of . . . market timing." *Id*. at 57. The parallels to this case, and to the Abacus CDO in particular, are obvious.

"In a similar vein, cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d

64, 85 (2d Cir. 2021); *see also ibid*. ("[T]here is a 'critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur'—particularly where that distinction holds 'enormous significance' for investors.") (citation omitted). "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. Unit A Mar. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (noting it would be entirely misleading for someone to "warn[] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away") (citation omitted). In this case, a more-general statement would have failed to move markets only if it misled investors by concealing that the risk of significant conflict-management failures had *already materialized*.

In the end, Goldman admits that its substitutes are "essentially what Goldman said in the first place." Br. 58. The argument thus devolves again to Goldman's claim that what it said was true and

68

consistent with what the corrective disclosures revealed. But as discussed above, this Court rightly rejected that argument in the prior appeal. *See supra* at 50-51.

Finally, even if the district court erred in asking the *Vivendi* question in the terms this Court used in the prior appeal, Goldman cannot show that alleged error had any conceivable effect on the outcome. The level-of-specificity question had no bearing on the district court's rejection of Dr. Starks' report as asking the wrong question (how markets reacted to what Goldman said, rather than how they would have reacted to a truthful substitute). SA21. And while one sentence of the opinion quoted this Court's more-specific version of a substitute truthful statement, *see ibid.*, the same paragraph also quoted this Court's more general formulation asking whether the market would have "reacted had Goldman told the truth about its alleged failure to manage its conflicts," SA22 (quoting *Goldman II*, 955 F.3d at 271). Nothing in the opinion suggests that the district court thought the two formulations yielded different answers. Indeed, the district court found that given the ubiquity of such statements in the industry (not to mention Goldman's own history of making such statements) the market likely would have

69

reacted even if Goldman had said *nothing at all* about its conflict systems. SA24-25; *see also Vivendi*, 838 F.3d at 258 (noting "it is hardly obvious that had [the defendant] remained silent, the market would indeed have maintained" its misapprehensions).[18]

## C. Applying Established Doctrine Does Not Create An Affirmative-Disclosure Regime Or Contradict *Halliburton II*.

Goldman ends its brief as it has ended many others, arguing that unless this Court adopts the arbitrary limitation it is peddling today, defendants will be forced into "'rite[s] of confession'" and subject to securities class actions whenever caught engaging in "any misconduct." Br. 61 (citation omitted); *compare Goldman II*, 955 F.3d at 269 (rejecting Goldman's "parade of horribles" as ground for restricting inflation-maintenance claims). That argument fails again.

---

[18] Accordingly, this case does not present the question whether "the proper approach is to compare the price following an alleged inflation-maintaining statement with the hypothetical price that would have followed a company's silence." Br. 54 n.5 (emphasis omitted) (preserving issue for further Supreme Court review).

70

No one forced Goldman to say anything about its conflict systems or business principles.  Even if SEC rules required Goldman to identify business risks, including the risk of unmanaged conflicts (Br. 62), it was Goldman's independent decision to assuage investor concerns about that risk by representing it had extensive systems in place to manage potential conflicts.  Had Goldman elected to remain silent, nothing in *Vivendi*, *Goldman II*, or the district court's decision would have required it to confess to anything.  The law simply requires that if Goldman chooses to make representations about its conflict systems, those representations must be truthful and non-misleading.  *See Vivendi*, 838 F.3d at 258 ("[A]t the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim."); *id.* at 240 (rejecting argument that this principle imposes a duty of disclosure).

Accordingly, "companies can control what they have to disclose" by "controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).  To be sure, if a company elects to address a question of importance to investors, like its conflict controls, and chooses to mislead the market, it may have a hard time disproving

71

price impact.  But that is as it should be—although the Supreme Court has afforded defendants a right to *attempt* to disprove price impact, "*Halliburton II* by no means holds that . . . the presumption will always be defeated." *Local 703, I.B. of T. Grocery & Food Empl. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1259 (11th Cir. 2014).  At the same time, Congress has enacted multiple protections for defendants facing potentially meritless securities claims.  *See Goldman II*, 955 F.3d at 269-70.

## CONCLUSION

The judgments below should be affirmed.

Dated: July 13, 2022

Respectfully submitted,

/s/ Kevin K. Russell
Kevin K. Russell
Thomas C. Goldstein
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
(202) 362-0636

Thomas A. Dubbs
James W. Johnson
Michael H. Rogers
Irina Vasilchenko
LABATON SUCHAROW LLP
140 Broadway, 34th Floor
New York, NY 10005
(212) 907-0700

Spencer A. Burkholz
Joseph D. Daley
ROBBINS GELLER RUDMAN &
   DOWD LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,991 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point New Century Schoolbook font.

/s/ Kevin K. Russell
Kevin K. Russell

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2022, I caused the foregoing document to be electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered users of that system and that service will be accomplished by that system.

/s/ Kevin K. Russell
Kevin K. Russell