# 22-484-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

ARKANSAS TEACHERS RETIREMENT SYSTEM, WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD, PLUMBERS AND PIPEFITTERS PENSION GROUP,

*Plaintiffs-Appellees,*

*(Caption continued on inside cover)*

PURSUANT TO MARCH 9, 2022 ORDER GRANTING PERMISSION TO APPEAL
FROM AN ORDER GRANTING CERTIFICATION OF CLASS BY
THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
MASTER FILE NO. 1:10 CIV. 03461 (PAC)
THE HONORABLE PAUL A. CROTTY

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

Kannon K. Shanmugam
Aimee W. Brown
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 223-7300

Audra J. Soloway
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Robert J. Giuffra, Jr.
Richard H. Klapper
David M.J. Rein
Benjamin R. Walker
Julia A. Malkina
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Defendants-Appellants The Goldman Sachs Group, Inc.,*
*Lloyd C. Blankfein, David A. Viniar, and Gary D. Cohn*

August 3, 2022

Pension Funds, Ilene Richman, Individually and on behalf of all others similarly situated, Pablo Elizondo, Thomas Draft, Individually and on behalf of all others similarly situated,

*Plaintiffs,*

Howard Sorkin, Individually and on behalf of all others similarly situated, Tikva Bochner, On behalf of herself and all others similarly situated, Dr. Ehsan Afshani, Louis Gold, Individually and on behalf of all others similarly situated,

*Consolidated-Plaintiffs,*

—against—

Goldman Sachs Group, Inc., Lloyd C. Blankfein, David A. Viniar, Gary D. Cohn,

*Defendants-Appellants,*

Sarah E. Smith,

*Consolidated-Defendant.*

# TABLE OF CONTENTS

*Page*

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................4

I.     **THE DISTRICT COURT APPLIED THE WRONG LEGAL TEST TO THE MOST IMPORTANT PRICE-IMPACT EVIDENCE IN THIS CASE** ..............................................4

        A.    The Challenged Statements Themselves Are Important Evidence That Supports Decertification ..............................5

                1.    The challenged statements were exceedingly generic ................5

                2.    There is a glaring mismatch between the challenged statements and "corrective disclosures" ...................................10

        B.    The District Court's Legal Errors Were Outcome-Determinative ......15

                1.    Common-sense evidence about the nature of the challenged statements is sufficient to sustain Goldman's burden.....................................................................15

                2.    Dr. Starks's opinions about market perception reinforced the common-sense assessment of the challenged statements................................................................17

                3.    Plaintiffs offered scant competing evidence relevant to price impact.............................................................20

        C.    At A Minimum, Any Class Should Be Limited ..................................24

II.    **THE DISTRICT COURT ERRONEOUSLY EXTENDED THIS COURT'S INFLATION-MAINTENANCE THEORY** ...........................26

        A.    The Inflation-Maintenance Theory Requires A Close Match Between The Challenged Statements And Corrective Disclosures ..................................................................26

B.     The District Court's Decision Would Prompt An Affirmative-Disclosure Regime ................................................................30

**CONCLUSION**......................................................................................32

# TABLE OF AUTHORITIES

*Page(s)*

## Cases:

*Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................17

*Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*,
    11 F.4th 138 (2d Cir. 2021) (*Goldman III*)................................14, 16

*Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*,
    955 F.3d 254 (2d Cir. 2020) (*Goldman II*)........................13

*Arkansas Teachers Ret. Sys.* v. *Goldman Sachs Grp.*,
    879 F.3d 474 (2d Cir. 2018) (*Goldman I*)........................10

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ...............................29

*City of New York* v. *Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011) ...............................................15

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ...........................................9, 22

*Construction Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020) ...........................28, 29

*Dodona I, LLC* v. *Goldman Sachs & Co.*,
    132 F. Supp. 3d 505 (S.D.N.Y. 2015) .............................14

*ECA, Local 134* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .............................9, 18, 19, 22

*Employees' Ret. Sys.* v. *Whole Foods Market, Inc.*,
    905 F.3d 892 (5th Cir. 2018) .............................................22

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    563 U.S. 804 (2011)...........................................................11

*Goldman Sachs Grp.* v. *Arkansas Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021)..................................................*passim*

*Hevesi* v. *Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) ................................................................26

*Indiana Pub. Ret. Sys.* v. *SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ..................................................................8

*Karimi* v. *Deutsche Bank AG*,
2022 WL 2114628 (S.D.N.Y. June 13, 2022) ...................................8, 9

*Lopez-Esparza* v. *Holder*,
770 F.3d 606 (7th Cir. 2014) .............................................................24

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)..............................................................................32

*In re Mattel, Inc. Sec. Litig.*,
2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)........................................27

*Meyer* v. *Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) .................................................................9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ...............................................................28

*Pearlstein* v. *BlackBerry Ltd.*,
2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................27

*Plumbers & Steamfitters Local 773* v. *Danske Bank*,
11 F.4th 90 (2d Cir. 2021) ....................................................................9

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..................................................29

*SEC* v. *Gabelli*,
653 F.3d 49 (2d Cir. 2011) .................................................................29

*Set Cap. LLC* v. *Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) .................................................................29

*Singh* v. *Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019) ...............................................................7, 9

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ................................................................12, 27, 28

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ........................................................................21, 27

**Statutes, Rules, and Regulations:**

17 C.F.R. § 229.101 ................................................................................................31

**Other Authorities:**

NYSE Listed Company Manual § 303A.10 ...........................................................31

# INTRODUCTION

It bears repeating what Plaintiffs allege was securities fraud here: that Goldman Sachs defrauded shareholders when it reiterated its decades-old "business principles" that (i) "[o]ur clients' interests always come first," (ii) "[w]e are dedicated to complying fully with the letter and spirit of the laws," and (iii) "[i]ntegrity and honesty are at the heart of our business." JA3203. To try to add some meat to this bone, Plaintiffs challenge Goldman's separate warning to investors, first added to the "Risk Factors" section of its Form 10-K several years before the class period, that conflicts of interests are "increasing" and "difficult" to manage. JA3278. In noting that Goldman has "extensive procedures and controls that are designed to identify and address conflicts," the warning did not promise perfection, but emphasized that "conflicts could give rise to litigation or enforcement actions." *Id.*

At every turn, Plaintiffs obscure that those are the statements propping up this action. For Plaintiffs, it makes no difference that the statements were generic, *see* Opp. 24-25, or that a significant mismatch exists between the challenged statements and the three claimed "corrective disclosures," *see id.* at 27-30. Nor does it matter that virtually every company makes analogous corporate-value statements and risk disclosures, *see id.* at 42-43; that this Court has repeatedly held that investors do not rely on such generic statements, *see id.* at 39 n.5; or that market analysts never

discussed Goldman's challenged statements, *see id.* at 43-44. Even worse, when Plaintiffs do occasionally discuss the challenged statements, they mischaracterize them. *See, e.g.*, *id.* at 1, 3, 38, 39, 40-41, 49.

In Plaintiffs' view, to show price impact and certify a class, they need to allege only that Goldman engaged in misconduct in (at most) four CDOs—out of countless transactions Goldman undertook every day—and that Goldman's stock price declined on three dates following reports of actual or rumored government enforcement activity. As hard as Plaintiffs try to dress up the work of their sole expert, Dr. Finnerty did nothing more than calculate a statistically significant stock-price decline on those dates. He offered no explanation for when or how any "inflation" entered Goldman's stock price, much less how it was "maintained." Instead, he simply presumed the stock price declined because investors learned that the challenged statements were "false," rather than because of news of enforcement activity.

The Supreme Court's decision in this case requires a different approach—one focused on the challenged statements themselves and the undeniable "mismatch" between those statements and Plaintiffs' asserted "corrective disclosures." *See Goldman Sachs Grp.* v. *Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021). Applying the Supreme Court's instructions, this Court should reverse the district court's class certification for two reasons.

*First*, the district court improperly assessed the challenged statements. The court minimized their genericness and misconstrued the Supreme Court's mismatch framework—finding that (some of) the challenged statements were sufficiently related to (some of) the "corrective disclosures" merely because they "implicated" the same general subject.

Plaintiffs accept that the genericness of the challenged statements and their mismatch with the "corrective disclosures" cut against price impact, but assert that those common-sense considerations were overwhelmed by other evidence of price impact. But Plaintiffs' minimal other evidence suffered from the same overarching legal error: it ignored the actual statements Plaintiffs claim are fraudulent. Dr. Finnerty's market analysis identified only discussions of the statements' general subject matter, and his statistical analysis did not disaggregate the effect of any enforcement activity from the effect of any revelation that the statements were "false." Because Plaintiffs presented scant evidence that Defendants' generic statements had any price impact, and because there was a stark mismatch between those statements and the claimed "corrective disclosures," the district court never should have certified the class.

*Second*, in tolerating such a mismatch, the district court expanded this Court's inflation-maintenance theory in a new and unjustified way. Plaintiffs contend that the common thread in this Court's prior decisions—parity between the

misstatements alleged and any "truthful substitute" imagined—was happenstance, but it was a crucial premise. And the district court's expansion of the inflation-maintenance theory would, contrary to multiple decisions of this Court, usher in a regime of mandatory disclosure of unadjudicated wrongdoing for any company that has previously spoken on broad aspirational topics—which is to say, for every company.

## ARGUMENT

### I. THE DISTRICT COURT APPLIED THE WRONG LEGAL TEST TO THE MOST IMPORTANT PRICE-IMPACT EVIDENCE IN THIS CASE.

Throughout their brief, Plaintiffs try (at 21, 23-24, 31) to recast Defendants' arguments as a dispute over a "factual finding," reviewable for clear error. Far from it. This case involves two categories of evidence. The first comprises the challenged statements themselves—both their generic nature and their mismatch with the purported "corrective disclosures." The district court's analysis of those statements was legally flawed, and even Plaintiffs now admit (at 24-25, 28-29) that this category of evidence weighs against price impact. The second category includes expert testimony about the statements and their economic effects. But Plaintiffs' sole expert, Dr. Finnerty, was plagued at every turn by a fundamental legal error: he neglected to focus on the statements themselves. Once that legal error is corrected, Plaintiffs have scant evidence remaining. That leaves no evidentiary balancing to

do or burdens to invoke. Because Defendants have "important evidence" on their side, *Goldman*, 141 S. Ct. at 1961, and Plaintiffs have nothing but stock drops on theirs, no class can be certified.

### A. The Challenged Statements Themselves Are Important Evidence That Supports Decertification.

In reviewing the district court's second certification order, the Supreme Court identified two aspects of the challenged statements that are critical to price impact: (i) "[t]he generic nature of a misrepresentation," whether discerned by "expert testimony" or "common sense"; and (ii) whether "there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1960-1961. Plaintiffs try to minimize the district court's legal errors in applying each prong, but those errors went to "the heart of the parties' post-appeal dispute." SA19.

### 1. The challenged statements were exceedingly generic.

Plaintiffs begin with a concession: they agree (at 24-25) that the challenged statements "were generic in varying degrees," but assert (at 25) that their "genericness" was outweighed by "other relevant price-impact evidence." That is incorrect. *See* Part I.B, *infra*. And in trying to minimize just *how* generic the statements were (at 37-41), Plaintiffs make the same two legal mistakes that the district court did.

a.     *First*, Plaintiffs impermissibly lump together (at 37-39) unrelated statements, in an effort to make each appear more specific.  Without any basis, Plaintiffs assert that the business principles built on the conflicts warning and "falsely assur[ed] investors that Goldman would not intentionally bypass or subvert its conflict systems in order to subordinate its clients' interests to its own." Opp. 38; *see* SA20 (construing the business principles "in conjunction with statements *specifically* concerning conflicts").  But the business principles and conflicts warning were different types of statements (aspirational company values vs. risk disclosure), made in different documents (annual report vs. Form 10-K), beginning at different times (1979 vs. 2003).  No reasonable investor would pluck a decades-old, company-wide business principle from Goldman's annual report and construe it as a specific promise about a single line in a warning in the middle of a 300-page Form 10-K.  The district court never attempted to justify that logical leap, nor do Plaintiffs.

Whether on their own or in their immediate context, the business principles are exceedingly generic.  Even Plaintiffs acknowledge (at 39) that they are "more generic" and cannot withstand scrutiny "standing alone."  The district court said the same.  SA20 (business principles "present as platitudes when read in isolation").  Those concessions should remove the business principles from any class.  *See* pp. 24-25, *infra*.

In addition, Plaintiffs effectively rewrite the conflicts warning. As reflected in its single bolded sentence, this "Risk Factor" clearly was a warning, not a promise of perfect compliance: "***Conflicts of interest are increasing and a failure to appropriately identify and deal with conflicts of interest could adversely affect our businesses***." JA3278 (emphasis in original). Plaintiffs say (at 39-40) that this warning "address[es] with specificity the kind of conflicts at issue in this case," and that "Goldman described the 'extensive procedures and controls' it claimed to 'have.'" But the actual text—which appears at JA3278—does not. Although recognizing that Goldman faced conflicts across its many businesses, the warning did not describe any particular procedures guarding against such conflicts. The only "procedures and controls" mentioned, without any further detail, do not apply here: "those designed to prevent the improper sharing of information among our businesses." JA3278. That leaves only the bare (and qualified) statement that Goldman had "extensive procedures and controls that are designed to identify and address conflicts." *Id.* This Court has described a similar statement "about having 'policies and procedures' and allocating 'significant resources'" to a compliance issue as a "*simple and generic assertion*[]." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 60, 64 (2d Cir. 2019) (emphasis added).

b. *Second*, Plaintiffs (like the district court, *see* SA8, 22 n.17) improperly minimize or ignore this Court's more than a dozen decisions holding in the closely

related materiality context that reasonable investors do not rely on comparable generic statements. *See* Opening Br. 30 n.3, 33 n.4. As a matter of common sense, those decisions indicate that such generic statements typically will not affect a company's stock price.

Because Plaintiffs cannot dispute that common-sense conclusion, they quibble with its application. For the business principles, Plaintiffs cite (at 39 n.5) this Court's decision in *Indiana Public Retirement System* v. *SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016), which said that statements about a company's integrity might "amount to more than 'puffery'" if they "are clearly designed to distinguish the company from other specified companies in the same industry." But the statements here do not purport to distinguish Goldman from its peers—all of which made virtually identical statements. *See* JA2608-2613. Indeed, the business principles are at least as generic as the statements that *SAIC* held were *not* actionable: statements emphasizing a company's "'culture of high ethical standards, integrity, operational excellence, and customer satisfaction' and its 'reputation for upholding the highest standards of personal integrity and business conduct.'" 818 F.3d at 97.

For the conflicts warning, Plaintiffs mostly ignore this Court's repeated decisions holding that investors place no weight on similar statements about compliance policies. *See* Opening Br. 30 & n.3. They instead analogize (at 39-41, 51-52) to a recent district court decision, *Karimi* v. *Deutsche Bank AG*, 2022 WL

2114628 (S.D.N.Y. June 13, 2022), and to this Court's decision in *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014). Both decisions involved far more specific compliance statements than those here. In *Karimi*, the company described "the processes by which [it] claims to vet its clients" and represented that it "takes specific actions before on-boarding clients," which it allegedly routinely disregarded. 2022 WL 2114628, at *6. And in *Meyer*, "the company described its compliance mechanisms in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and its clean compliance record." *Singh*, 918 F.3d at 63. This Court's decisions in *Danske Bank*, *Singh*, *UBS*, and *JP Morgan* provide much closer analogies to the conflicts warning here. *See Plumbers & Steamfitters Local 773* v. *Danske Bank*, 11 F.4th 90, 103 (2d Cir. 2021) (Danske "'strives to conduct [its] business in accordance with internationally recognised principles in the area of anti-corruption'") (brackets and ellipses omitted); *Singh*, 918 F.3d at 60 (Cigna "'established policies and procedures to comply with applicable requirements'"); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014) (UBS "prioritized '*adequate* diversification of risk' and 'avoidance of *undue* concentrations'"); *ECA, Local 134* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009) ("JPMC had 'risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process'") (brackets omitted).

## 2. There is a glaring mismatch between the challenged statements and "corrective disclosures."

The district court next misconstrued the Supreme Court's mismatch framework, applying a subject-matter test and failing to compare the contents of the challenged statements and "corrective disclosures." *See* Opening Br. 34-38.

a. Plaintiffs try to bolster the district court's perfunctory analysis. They emphasize (at 27) that the court rejected a "link" test at the outset of its analysis. But the court's subject-matter test—and its core conclusion that both the challenged statements and "corrective disclosures" "implicate the[] same conflicts and Goldman's infrastructure for managing them," SA27—is indistinguishable from the improper "link" test it earlier purported to reject. *See* SA26-27. This Court rightly rebuffed a similar argument in *Goldman I*, reasoning that, although the district court "acknowledged [the correct] standard" of proof, it was "unclear . . . whether the court required more of defendants." *Arkansas Teachers Ret. Sys.* v. *Goldman Sachs Grp.*, 879 F.3d 474, 485 (2d Cir. 2018).

Plaintiffs also accuse Defendants (at 28) of "quoting bits and pieces of the district court's opinion out of context." But they identify no analysis that Defendants omitted. The district court acknowledged that the challenged statements and "corrective disclosures" "do not present *equivalent* levels of genericness," and that the "corrective disclosures" were "somewhat more detailed and narrow in scope." SA27; *see id.* at SA27 n.19 (observing some "mismatch in generic *nature*" and

"mismatch in *scope*"). The court then waved away those differences, concluding that both sets of statements "implicate the[] same conflicts and Goldman's infrastructure for managing them." SA27. The commonality in subject matter does all the work in the court's analysis; the court gave no other reason why the mismatch did not weigh heavily against price impact.

Finally, Plaintiffs assert (at 46 n.8) that even if the district court failed to put its mismatch analysis into writing, it must have "fully considered" all of the statements at issue. But an appellate court must take a lower court "at its word," and may not guess what it "meant to say." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 814-815 (2011). A matching exercise requires analyzing what the alleged misstatements said, what new information the "corrective disclosures" revealed, which alleged misstatements matched this newly revealed information, and how closely they matched. Plaintiffs nowhere identify where the district court—in its written analysis—did any of that.

b. Plaintiffs next contend (at 29-30) that a mismatch in specificity does not ordinarily prevent a "specific disclosure" from "actually correct[ing] a generic misrepresentation." *Goldman*, 141 S. Ct. at 1961. But that is precisely what the Supreme Court's example illustrates: a "generic" statement that "we have faith in our business model" is not corrected by a "specific" disclosure that "our fourth quarter earnings did not meet expectations." *Id.* Despite Plaintiffs' selective

quotation (at 29), *Vivendi*'s hypothetical illustrates the other side of the mismatch coin. There, a specific statement that "Model V has passed all safety tests" was corrected by an equally specific disclosure that "Model V has failed crash test after crash test." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258-259 (2d Cir. 2016).

c.     Even if some borderline cases exist, this case is not one. The challenged statements conveyed that Goldman (i) has aspirational firmwide principles about integrity and client service, and (ii) employs extensive, but fallible, firmwide conflicts procedures. None of the purported "corrective disclosures" actually corrected any of those statements. At most, the first disclosure revealed additional details about a previously reported conflict in the Abacus CDO. *See* Opening Br. 39-40, 52-53. The second disclosure did not even mention conflicts, as Plaintiffs acknowledge (at 53), but only a rumored DOJ investigation into unspecified "mortgage trading." JA3615. It thus shares *no* content with the conflicts warning. And the third disclosure revealed only an SEC investigation into a previously disclosed conflict in the Hudson CDO. JA2944, 3618. Read generously, the "corrective disclosures" discuss alleged misconduct in two CDOs—which, contrary to Plaintiffs' assertion (at 7), were among the residential mortgage-related products that together contributed only "approximately 1%" of the company's 2007 revenues. JA3675.

Plaintiffs respond (at 49) by acknowledging a "mismatch in levels of specificity," but asserting that the "disclosures suffered from no mismatch in content," because they "corrected Goldman's false claims to have extensive procedures in place to deal with conflicts and a commitment to business principles that would prevent it from evading those client protections." But none of the three "corrective disclosures" revealed that Goldman did *not* have extensive conflicts procedures, or even that those procedures were not followed here. Instead, Plaintiffs' theory is that, whatever Goldman's conflicts *procedures*, the "corrective disclosures" revealed that Goldman reached a substantively incorrect *result* by insufficiently disclosing conflicts in four CDOs. *See* Opp. 4. That is not a match in content. If anything, Plaintiffs' sleight of hand illustrates the fundamental problem with the district court's truncated analysis: if a court does not specify what the "corrective disclosures" revealed and how they lined up with the challenged statements, then it is all too easy to generalize and declare a match.

Plaintiffs make two final attempts to avoid the stark mismatch here. *First*, they suggest (at 50-51) that this Court has already decided the question. To the contrary, this Court expressed skepticism only about whether the conflicts warning was "consistent" with revelations of misconduct. *Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*, 955 F.3d 254, 273-274 (2d Cir. 2020) (*Goldman II*). It did not assess whether the challenged statements and "corrective disclosures" match, as

the Supreme Court later required. And this Court presumably did not believe that *Goldman II* had resolved the question, or it would not have remanded in *Goldman III*. *Arkansas Teacher Ret. Sys.* v. *Goldman Sachs Grp.*, 11 F.4th 138, 143-144 (2d Cir. 2021).

*Second*, Plaintiffs complain (at 30-31) that Defendants advocate a "Goldilocks" approach under which a "corrective disclosure" must be detailed but not too detailed. Plaintiffs conflate two distinct issues. One is whether the "corrective disclosures" add any new information capable of "correcting" previous misstatements. The other is whether that new information is narrower than a broad asserted misstatement. *See* Opening Br. 35-37. Plaintiffs' second "corrective disclosure" suffered from the first flaw: because it reported a rumored investigation into unspecified "mortgage trading," it added no new information to "correct" the challenged statements. The first and third disclosures suffered from the second flaw: they involved previously disclosed conflicts in the Abacus and Hudson CDOs, in stark contrast with the firmwide challenged statements. *See id.* at 39-40. There is no "dissonance" in making both points. Opp. 30.[1]

---

[1]     In a footnote, Plaintiffs invoke (at 45 n.7) an additional challenged statement that banks sponsoring CDOs generally disclosed their short positions. JA87. Plaintiffs have mentioned that statement only in the occasional footnote over this 12-year litigation—presumably because it is factually accurate. *See, e.g.*, *Dodona I, LLC* v. *Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 516-517 (S.D.N.Y. 2015). Because the district court did not rely on the point and Plaintiffs make no real effort

-14-

**B.    The District Court's Legal Errors Were Outcome-Determinative.**

Plaintiffs claim (at 46-57) that, even if the nature of the challenged statements cuts in Goldman's favor, the district court reached a fact-intensive conclusion that a host of other evidence on price impact outweighed some degree of genericness and mismatch.  But anything that Plaintiffs offered on the other side of the balance was itself tinged by legal error.  As a result, Plaintiffs had little *relevant* evidence of price impact.

**1.    Common-sense evidence about the nature of the challenged statements is sufficient to sustain Goldman's burden.**

Plaintiffs begin by downplaying the weight of the common-sense evidence about the challenged statements themselves—even though the Supreme Court called that evidence "important." *Goldman*, 141 S. Ct. at 1961.  Plaintiffs contend (at 32-36) that Goldman's evidence of the generic nature of the statements, including Dr. Starks's expert testimony, is "indirect" evidence of price impact that cannot carry its burden, in contrast with "direct" evidence like an "event study or similar empirical evaluation."  Plaintiffs also contend (at 36) that treating generic, mismatched statements as powerful evidence against price impact would

---

to develop it, this Court should deem it forfeited.  *See City of New York* v. *Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("We ordinarily deem an argument to be forfeited where it has not been sufficiently argued in the briefs.") (quotation marks omitted).

impermissibly "shift the burden [on price impact] back to the plaintiff." Both contentions are wrong.

Plaintiffs made a similar directness argument in opposing certiorari in the Supreme Court, *see* Pls.' Cert. Opp. 19, and the Supreme Court rejected any artificial distinction between "direct" and "indirect" evidence. Instead, it instructed courts to "assess all the evidence of price impact—direct and indirect." *Goldman*, 141 S. Ct. at 1963. Following that instruction, this Court observed that the district court had not previously "discuss[ed] the generic nature of Goldman's alleged misrepresentations," or "Dr. Starks's expert report" and remanded for the district court to "consider *all* record evidence relevant to price impact." *Goldman III*, 11 F.4th at 143 (emphasis added). Neither this Court nor the Supreme Court has suggested that some portion of the evidence must be "direct."

Plaintiffs' burden-shifting argument is equally meritless. Plaintiffs lean on this Court's prior statement that the price-impact determination is "not [about] which side has better evidence." Opp. 36. But the Supreme Court said the opposite. Where, as here, "the plaintiffs and defendants submit competing expert evidence on price impact[,] [t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963.

The defendant bears the burden of persuasion, but that burden "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Id.*

### 2. Dr. Starks's opinions about market perception reinforced the common-sense assessment of the challenged statements.

Dr. Starks opined on the generic nature of the alleged misstatements and the types of information relevant to investment decisions. The district court did not fully credit her opinions only because it got the law wrong.[2]

Plaintiffs repeat (at 43-44) the district court's criticism of Dr. Starks for reviewing whether analysts quoted or made "explicit attributions" to the challenged statements, while disregarding analyst reports that referred to the "subject" of Goldman's reputation and conflict management. But whether "investors are []interested in the subject" of Goldman's reputation and conflict management, Opp. 42, is not enough to establish price impact. Price impact focuses on whether investors actually cared about *Goldman's generic statements* that it aspires to act with integrity and has extensive but fallible conflicts controls, such that *those statements* "affect[ed] [the] market price." *Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). By giving less weight to Dr. Starks for failing to consider whether analysts were generally interested in Goldman's reputation and

---

[2]    Although Plaintiffs complain (at 41 n.6) that they did not cross-examine Dr. Starks at a hearing, they deposed her. JA881.

conflict management, the district court "conflate[d] the importance of a bank's reputation for integrity" with "a bank's statements regarding its reputation." *JP Morgan*, 553 F.3d at 206.

Plaintiffs also criticize (at 43) Dr. Starks for "limit[ing] her review to securities analysts' reports," and not also considering opinion pieces in newspapers. But analyst reports, unlike newspaper op-eds, "provide[] a useful measure of the information that investors . . . deem most significant," JA2614-2615, as Dr. Finnerty also recognized, JA318. In any event, newspaper op-eds no more suggested concern about Goldman's statements about its integrity and conflicts controls than analyst reports did. The only op-ed that mentioned the challenged statements described Goldman's business principles as "a sales pitch that few Wall Street firms always live up to." JA3770.

The district court also discounted Dr. Starks's evidence that the challenged statements are pervasive among public companies and thus provide no "information content for investors in determining the future financial performance or value of a company." JA2613. The court was wrong twice over.

*First*, the point of Dr. Starks's analysis was not that "investors are uninterested in the subject [of conflicts] or universally disbelieve whatever firms say about it." Opp. 42. Rather, as this Court has explained, the "fact that almost every investment bank makes these statements" means that such statements, at least when they are

both ubiquitous and generic, provide no basis for "assessing a potential investment." *JP Morgan*, 553 F.3d at 206.

*Second*, the ubiquity of the statements is fatal to Plaintiffs' theory of price impact. Plaintiffs contend (at 47) that Goldman's "stock carrie[d] a premium to its peers," supposedly as a result of Goldman's "[c]onflict [m]anagement skill." But the fact that all similar firms made similar generic statements necessarily means that the market could not have placed any premium on Goldman's stock *because of Goldman's generic statements*.

In a final effort to resuscitate the district court's legally erroneous critique of Dr. Starks, Plaintiffs assert (at 41-42) that the court credited Dr. Finnerty's contrary assertion that, "in *his* experience, Goldman's conflict statements *were* the kind of statements investors would care about." But Dr. Finnerty testified only that "[c]onflict of interest management . . . was especially at the forefront of investors' minds." SA15. Again, whether conflict management was of interest to the market does not determine whether Goldman's generic conflicts warning had price impact. Defendants thus do not quibble with the district court's "credibility" determinations, Opp. 42; the court committed legal error when it focused on evidence about the importance of a topic, rather than the importance of a company's generic statements on that topic.

### 3. Plaintiffs offered scant competing evidence relevant to price impact.

Plaintiffs' brief confirms that their affirmative price-impact showing boiled down to (i) stock-price declines at the end of the class period; and (ii) their expert's speculation that a few news articles supported a link between the challenged statements and "corrective disclosures."

a. As Plaintiffs describe (at 14), Dr. Finnerty's statistical analysis showed only that Goldman's stock price declined on the three "corrective disclosure" dates. But Dr. Finnerty did not purport to connect those declines to the supposed revelation that the challenged statements were false. *See* Opening Br. 47-51. That wholly undermines the relevance of his analysis.

Plaintiffs first respond (at 55-56) that it was not their burden to "disaggregate the causes of the corrective-disclosure declines." That misses the point. Dr. Finnerty acknowledged that government enforcement activity is "almost always met with a strong negative reaction." JA641, 643. Without undertaking any effort to isolate the stock-price decline attributable to that enforcement activity, Dr. Finnerty had no basis to conclude that *any* part of the stock-price decline could be attributed to a revelation that the challenged statements were "false." As even Plaintiffs' amici observe, some effort to "isolat[e] a single event's effects from confounding factors and disaggregat[e] independent causes behind movements in share price" is "standard fare in securities litigation nationwide." Financial Economists Br. 9.

Plaintiffs next contend, citing *Waggoner* v. *Barclays PLC*, 875 F.3d 79 (2d Cir. 2017), that they were not required to disentangle the impact of enforcement activity because Goldman is liable for market responses to that activity. Opp. 55 n.14. In *Barclays*, however, the New York Attorney General sued to enforce a state fraudulent-marketing statute, asserting fraud in the *same misstatements* that shareholders separately challenged. 875 F.3d at 87-88. This Court thus determined that "the [New York Attorney General's] regulatory action and any ensuing fines were a part of the alleged harm" and need not be disaggregated in the shareholder suit. *Id.* at 106. Here, by contrast, the enforcement activity reported in the "corrective disclosures" did not involve the challenged statements. The government has *never* taken action involving Goldman's business principles or conflicts warning. And Plaintiffs themselves distinguish the CDO disclosures that were the subject of government inquiry. Opp. 6 n.1.

b.      Plaintiffs also rely on Dr. Finnerty's survey of more than 1,500 articles and analyst reports relating to Goldman, *see* JA2102-2182, which produced only a few instances of media commentary that "emphasized the importance of Goldman's" effectiveness at conflict management. Opp. 46-48. As an initial matter, references to conflict management in a handful of 1,500 reports hardly supports the legally irrelevant proposition that "[c]onflict of interest management . . . was especially at the forefront of investors' minds." SA15.

Regardless, none of the articles that Plaintiffs quote—or any other commentary that Dr. Finnerty identified—attributed any stock-price "premium" to Goldman's own statements about its conflict management. That is again because the "importance" of a subject is "not synonymous" with the importance of a company's statements about that subject. *UBS*, 752 F.3d at 185; *JP Morgan*, 553 F.3d at 206. A "reasonable investor will not judge [a company's] value based on its own generalized and self-serving statements" but instead "will 'rely on facts.'" *Employees' Ret. Sys.* v. *Whole Foods Market, Inc.*, 905 F.3d 892, 902 (5th Cir. 2018). Here, as Plaintiffs' own examples reveal, investors formed views about Goldman's "[c]onflict [m]anagement skill," Opp. 47, based on observing Goldman's actual conduct:

- "Goldman has actually tended its customer-oriented businesses carefully." JA794.

- "Goldman has always managed its conflicts effectively." JA1228.

- "[H]istorically Goldman has managed those conflicts well." JA3772-3773.

Those reports looked to facts on the ground about Goldman's conflicts practices and historical reputation in the market. They thus underscore that a reasonable investor "will not simply take [Goldman's] word for it." *Whole Foods*, 905 F.3d at 902.

c.     Finally, Plaintiffs mischaracterize the record in material respects.  For example, they state (at 48) that "Goldman insiders admitted" that the challenged statements had price impact.  In the snippet of deposition testimony Plaintiffs cite, David Viniar simply agreed that the SEC's suit over Abacus was "not good for [Goldman's] reputation."  JA686-687.  Likewise, the internal email Plaintiffs cite merely stated that "regulators filed civil fraud charges against Goldman Sachs regarding alleged conflicts."  JA683.  Lastly, Goldman's "Consent Decree with the SEC" concerning Abacus did not in any way "specifically link[] the April 16, 2010 corrective disclosure to [Goldman's] misstatements regarding its conflicts and business principles."  Opp. 8-9.  The Consent Decree stated that Goldman "acknowledges that it is presently conducting a comprehensive, firmwide review of its business standards."  JA671.  None of this has anything to do with whether Goldman's generic challenged statements had price impact.

d.     In contrast with Dr. Finnerty, Defendants' experts, Dr. Choi and Dr. Gompers, focused on the relevant price-impact question.  Dr. Choi reviewed the effects of prior government enforcement actions to determine whether Goldman's stock-price decline after the SEC filed its Abacus complaint was attributable to that enforcement activity.  JA2524-2535.  Meanwhile, Dr. Gompers reviewed reports of alleged conflicts, unaccompanied by enforcement activity, on 36 prior dates and found that none of those reports led to a statistically significant stock drop.  JA2389-

2396, 2404-2406. The district court declined to give Dr. Choi's evidence "significant weight," SA18—which is a direct quotation, not a "mischaracteriz[ation]," Opp. 34. And while the court discounted Dr. Gompers's conclusions, its rationale for doing so only underscores the mismatch described above: the court distinguished the first "corrective disclosure" from previous press reports because it contained "granular detail" about an alleged conflict in a single CDO. SA16. In any event, even accepting for purposes of this appeal the district court's mistaken conclusion that Dr. Gompers's and Dr. Choi's evidence merited little weight, *see* Opp. 33-34, those experts at least answered the relevant question. And some relevant evidence "would seem to preponderate over no evidence." *Lopez-Esparza* v. *Holder*, 770 F.3d 606, 609 (7th Cir. 2014).

\* \* \*

The critical evidence on remand was a common-sense evaluation of the generic challenged statements and their mismatch with the "corrective disclosures," coupled with Dr. Starks's confirmatory testimony about investor behavior. That evidence is more than sufficient to rebut price impact, with little to balance on the other side.

### C. At A Minimum, Any Class Should Be Limited.

Plaintiffs contend (at 57-58) that Goldman has forfeited the argument that the district court at least should have denied class certification as to the business

principles and the second and third "corrective disclosures." That is nonsense. Goldman repeatedly argued to the district court that no class could be certified as to any of the challenged statements and any of the "corrective disclosures," and made separate arguments about each. *See, e.g.*, Dist. Ct. Dkt. 254 at 5, 8, 10. The court ruled that class certification was warranted across the board, but it justified that conclusion with reasoning that applied only to the conflicts warning and the first "corrective disclosure." *See* Opening Br. 51-53. By challenging *all* of the statements, Goldman did not forfeit its right to argue that the district court's flawed analysis at most concerns a subset of those statements.

Nor should this Court hope that the district court will "tailor class certification as the case progresses." Opp. 59. Discovery is closed, and neither the district court nor Plaintiffs have ever explained how the business principles could have had any price impact, or how the second or third disclosures could have corrected the challenged statements. *See* Opening Br. 51-53 (discussing district court's decision); Opp. 39 (acknowledging that business principles cannot support Plaintiffs' claims "standing alone" and are relevant only as "reinforcing" the conflicts warning); Opp. 58 (relying only on the absence of an event study to justify the second and third disclosures). This Court should not permit Plaintiffs to attempt to pressure Defendants into a settlement based on statements that had no price impact and

irrelevant "corrective disclosures." *See Hevesi* v. *Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004).

## II. THE DISTRICT COURT ERRONEOUSLY EXTENDED THIS COURT'S INFLATION-MAINTENANCE THEORY.

### A. The Inflation-Maintenance Theory Requires A Close Match Between The Challenged Statements And Corrective Disclosures.

By tolerating a broad mismatch, the district court extended the inflation-maintenance theory well beyond this Court's precedents. In particular, the district court shifted its focus from the challenged statements at issue and repeatedly asked whether the "corrective disclosures" would naturally be market-moving. *See, e.g.*, SA21-22. Plaintiffs fail to justify that legal error.

1. Plaintiffs incorrectly suggest (at 60, 65-66) that this Court need not worry about the district court's focus on the wrong set of statements, because both the Supreme Court and this Court have blessed that approach. The Supreme Court could not possibly have done so: it declined to endorse the inflation-maintenance theory *at all* and described the theory more narrowly than *Vivendi*. *Goldman*, 141 S. Ct. at 1959 n.1, 1961. As for this Court's decision in *Goldman II*, Defendants have already explained that it did not decide this question and that, if it did, the Supreme Court's intervening decision requires reconsideration. *See* Opening Br. 60 n.6.

2.    On the merits, Plaintiffs offer few defenses of the district court's use of a "truthful substitute" far more specific than the challenged statements.  They first assert (at 61) that Defendants are advocating for a "plainly incorrect" mirror-image rule.  This Court has rejected such a loss-causation rule, concluding that "the basic loss-causation calculus" is the same whether the truth is revealed in "a corrective disclosure describing the precise fraud" or through "events constructively disclosing the fraud."  *Vivendi*, 838 F.3d at 262.  But that analysis is distinct from the price-impact question here:  whether the purported "corrective disclosures" are a close enough match in content and specificity to stand as an opposite-but-equal proxy for the challenged statements.  Plaintiffs identify (at 61) only two district court decisions discussing price impact, one of which expressly distinguished this case, *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021), and the other of which recited the "link" theory that the Supreme Court later abrogated, *Pearlstein* v. *BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (cited at SA27).

In trying to bring this case in line with the Court's previous inflation-maintenance decisions (at 62-63), Plaintiffs misconstrue *Vivendi* and *Barclays*, which both involved near-perfect matches.  Barclays specifically promised that it protected certain trading platforms from high-frequency traders—for example, because it "restrict[ed] high-frequency traders interacting with our clients"—but it in fact did not restrict, and even favored, high-frequency traders.  875 F.3d at 87, 88

(brackets omitted).  Likewise, the company in *Vivendi* promised that it had "cash available for investing" and "strong free cash flow," but several events revealed that it suffered from pervasive liquidity problems, its debt was being downgraded, and it was nearing bankruptcy.  838 F.3d at 252, 262-263.  Those close matches were no coincidence.  The foundational premise of the inflation-maintenance theory is that such a match allows a court to "assum[e] that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."  *Id.* at 255 (citation omitted).

3.     Shifting tactics, Plaintiffs contend (at 66-70) that any legal errors about the scope of the inflation-maintenance theory are beside the point.

Plaintiffs first assert (at 66-67) that no equivalent-but-truthful substitute is possible here, because any substitute as general as the challenged statements would necessarily be a "misleading" "half-truth."  That is a remarkable assertion:  in Plaintiffs' view, Goldman could not have said *anything* about conflicts or integrity without disclosing potential misconduct in four CDOs.  Such an argument stretches the decisions imposing liability for so-called "half-truths" "past their logical breaking point."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).  The case law is replete with instances where generalized statements or disclosures of risks have not been deemed misleading for omitting specific misconduct.  *See, e.g.*, *Construction Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,

433 F. Supp. 3d 515, 537-538 (S.D.N.Y. 2020); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 537 (S.D.N.Y. 2015); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 Fed. Appx. 93 (2d Cir. 2014).

In arguing to the contrary, Plaintiffs primarily rely (at 67-68) on *SEC* v. *Gabelli*, 653 F.3d 49 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013), and *Set Capital LLC* v. *Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021). Both decisions involved specific, misleading statements about a topic of investor concern. In *Gabelli*, the defendants "reassure[d] [fund] investors" about an imminent market-timing investigation by conveying that they "had attempted in good faith to reduce or eliminate [] market timing across the board," when they had not. 653 F.3d at 55, 57. In *Set Capital*, the company stated that it "had 'no reason to believe'" that its hedging activity would affect prices—despite "kn[owing] with virtual certainty" that it would harm investors. 996 F.3d at 85-86. Nothing like that exists here.

Plaintiffs next assert (at 69-70) that the district court *did* consider a truthful comparator as general as the challenged statements. They quote the district court's supposedly "more general formulation asking whether the market would have 'reacted had Goldman told the truth about its alleged failure to manage its conflicts.'" Opp. 69 (quoting SA22). But that formulation appeared in a "*see also*"

parenthetical, following two sentences clearly contemplating the specific revelation of potential CDO misconduct.  *See* SA21-22.[3]

## B.   The District Court's Decision Would Prompt An Affirmative-Disclosure Regime.

Plaintiffs dispute (at 70-72) that their theory would require companies to disclose unadjudicated misconduct to avoid costly securities-fraud class actions.  Yet they acknowledge (at 71-72) that if a company "elects to address a question of importance to investors," even at a high level of generality, it must disclose any misconduct that implicates the same subject matter, or "have a hard time disproving price impact."  Given the ubiquity of generic corporate statements on a variety of good-business topics, *see* Opening Br. 61-63; SA23, virtually every company has made *some* public statement that, on Plaintiffs' theory, could now be the basis for securities fraud.  Any company trying to avoid the specter of classwide liability thus would have little choice but to automatically disclose all uncharged misconduct—contrary to this Court's well-established precedent.

---

[3]     Plaintiffs also assert (at 69-70) that the district court "found" that the market "likely would have reacted even if Goldman had said *nothing at all*."  The court found no such thing.  Such a finding also would be contrary to the evidence, given Dr. Finnerty's testimony that he "d[idn't] know" whether Goldman's stock price would have fallen "[i]f Goldman had not made the [challenged] statements." JA1118.

No matter, Plaintiffs contend (at 71), because "[n]o one forced Goldman to say anything about its conflict systems or business principles" in the first place. The suggestion that companies should simply "elect[] to remain silent" is practically and legally infeasible. It would require a sea change in companies' public disclosures, which regularly "contain aspirational statements on issues ranging from corporate culture and governance, to issues of broader social interest and importance." Society for Corporate Governance Br. 11-13. It would also be impossible to square with the ever-growing volume and complexity of mandatory disclosures, including the required disclosure of a company's "Risk Factors," in which the challenged conflicts warning appears. JA3271, 3278; *see* 17 C.F.R. § 229.105; *see also* NYSE Listed Company Manual § 303A.10 (requiring all listed companies to address "conflicts of interest").

Further underscoring the dramatic regime-shift Plaintiffs advocate, their theory would require that a company disclose uncharged allegations of illegal behavior for which it is later *exonerated*. In the Hudson CDO, for example, it makes no difference to Plaintiffs that a court cleared Goldman of wrongdoing in connection with its disclosures, or that the government investigation reported in the third disclosure yielded no charges. *See* Opp. 6 n.1. In Plaintiffs' view, Goldman should have anticipated and disclosed Hudson purchasers' meritless claims all the same. Such a disclosure regime would impose a particularly onerous "affirmative duty to

disclose any and all material information," which Section 10(b) "do[es] not create."

*Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011).

## CONCLUSION

This Court should reverse the district court's certification order and decertify the class.

Respectfully,

*/s/ Robert J. Giuffra, Jr.*

Kannon K. Shanmugam
Aimee W. Brown
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 223-7300

Audra J. Soloway
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

Robert J. Giuffra, Jr.
Richard H. Klapper
David M.J. Rein
Benjamin R. Walker
Julia A. Malkina
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Attorneys for Defendants-Appellants The Goldman Sachs Group, Inc.;*
*Lloyd C. Blankfein; David A. Viniar; and Gary D. Cohn*

August 3, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(B) because the brief contains 6,997 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

Dated: August 3, 2022